# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **Solutions in Hometown Connections**,<br>6411 Ivy Lane, Suite 703, Greenbelt<br>Prince George's County, MD 20770<br><br>**Central American Resource Center**,<br>1460 Columbia Road NW, Suite C-1,<br>Washington, DC 20009<br><br>**Coalition for Humane Immigrant Rights**,<br>2533 West 3rd St., Suite 101,<br>Los Angeles, CA 90057<br><br>**Community Center for Immigrants, Inc.**,<br>1433 North Water St., Suite 400,<br>Milwaukee, WI 53202<br><br>**English Skills Learning Center**,<br>1270 W 2320 S, Suite F,<br>West Valley City, UT 84119<br><br>**Michigan Organizing Project**, d/b/a<br>**Michigan United**,<br>4405 Wesson St., Detroit, MI 48210<br><br>**Hebrew Immigrant Aid Society and Council Migration Service of Philadelphia**, d/b/a<br>**HIAS Pennsylvania**,<br>123 Broad St., Philadelphia, PA 19109<br><br>**Immigrant Law Center of Minnesota**,<br>450 Syndicate St. N #200, St. Paul, MN 55104<br><br>and<br><br>**Instituto del Progreso Latino**,<br>2520 S Western Ave., Chicago, IL 60608<br><br>            Plaintiffs,<br><br>**v.**<br><br>**Kristi Noem**, in her official capacity as Secretary of the Department of Homeland Security, 2707 Martin Luther King Jr Ave. SE, Washington, DC 20528 | **Civil Case No.** _____<br><br>Jury Trial Demanded |

**U.S. Department of Homeland Security**,
2707 Martin Luther King Jr Ave. SE,
Washington, DC 20528

**Kika Scott**, in her official capacity as Senior
Official Performing the Duties of the Director
of the U.S. Citizenship and Immigration
Services,
5900 Capital Gateway Dr., Camp Springs,
Prince George's County, MD 20746

**U.S. Citizenship and Immigration Services**,
5900 Capital Gateway Dr., Camp Springs,
Prince George's County, MD 20746

**Donald J. Trump**, in his official capacity as
President of the United States,
1600 Pennsylvania Ave. NW, Washington, DC
20500

                    Defendants.

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND VACATUR OF FINAL AGENCY ACTION

## INTRODUCTION

1.    Since the creation of the Department of Homeland Security and its component agencies, Congress has mandated that DHS "promot[e] instruction and training on citizenship responsibilities for aliens interested in becoming naturalized citizens of the United States, including the development of educational materials." 6 U.S.C. § 271(f)(2). To that end, in 2009 the Office of Citizenship in U.S. Citizenship and Immigration Services—one of DHS's component agencies—created the Citizenship and Integration Grant Program (CIGP) to "provide[] support to community-based, non-profit organizations and educational institutions actively working to remove barriers to naturalization."[1] Since 2009, the grant program has helped more than 350,000 lawful permanent residents prepare for citizenship.

2.    Plaintiffs are recipients of the CIGP grants. Using the grant funds, Plaintiffs provide critical services including "English language and civics instruction, legal assistance with naturalization applications, and … community space for immigrant [integration]."[2] Plaintiffs have hired and trained staff specifically for these programs, contracted with partner organizations to provide specific services mandated by the grant awards, and built reputations within their communities for providing effective, reliable assistance. In short, Plaintiffs have implemented the terms of the CIGP grants and, understandably, have come to rely on the funds guaranteed by DHS.

---

[1] *Grant Program Impact*, U.S. Citizenship and Immigration Services, https://perma.cc/9F4L-SVLG.

[2] *See id.* It appears that the Agency Defendants may have replaced "integration" and variations thereon with "assimilation" and its variations on Agency websites discussing the CIGP. This USCIS webpage does not indicate the date it was last updated, so it is unclear to Plaintiffs when this change in terminology was implemented.

3.    But in February, Defendant DHS Secretary Kristi Noem, purportedly implementing one of President Trump's executive orders, decided that all DHS grant funds that were awarded to nonprofits and "touch[ed] in any way on immigration" would be frozen indefinitely. Secretary Noem gave three reasons for this across-the-board freeze: concerns that the grants were funding illegal activities such as "encouraging . . . illegal immigration," concerns that some unspecified grants may contain racially discriminatory language, and concerns that the grants might not be an efficient use of government resources. None of these expressed concerns were supported by factual findings of any kind.

4.    Within a week, Plaintiffs had tens to hundreds of thousands of dollars in critical grant funds frozen. Their operations were thrown into disarray. Some were forced to cut programming. Some were forced to lay off staff. Some were forced to end relationships with partner organizations. And all are losing the trust of the communities they serve, which is an irreplaceable resource. Put simply, Plaintiffs have been, and continue to be, irreparably harmed by the loss of funds that they had been guaranteed and have relied on.

5.    Secretary Noem's threadbare justifications for these harms run from incomprehensible to irrelevant. First, it makes no sense to freeze grants for "encouraging illegal immigration" when the sole use of the grants is to help *lawful* permanent residents become naturalized citizens. Second, Secretary Noem did not explain what she meant by "racially discriminatory language," nor did she point to any examples of grants containing that language. And in all events, none of Plaintiffs' grants contain any language that could reasonably be construed as discriminatory. Third, Plaintiffs' grant funds are required by multiple statutes and regulations—so it does not matter if Defendants have decided on a whim that appropriated and guaranteed funds could be used more efficiently.

And finally, nonprofits like Plaintiffs are not part of some "shadow government"—they are organizations that provide the exact services Congress appropriated funds for, services that DHS encouraged and funded them to provide.

6.    Lacking any justification, Defendants' "freeze first, review later—or never" approach violates the Administrative Procedure Act because it is arbitrary and capricious, contrary to law and the Constitution, and in excess of their statutory authority. By refusing to spend appropriated funds for the purposes Congress specified, Defendants have violated the separation of powers and acted *ultra vires*. And by withholding Plaintiffs' grant funds without providing any opportunity to challenge the withholding, Defendants have violated Plaintiffs' due-process rights. Defendants' actions should be declared unconstitutional and unlawful; should be temporarily, preliminarily, and permanently enjoined; and should be stayed and ultimately vacated and set aside.

## JURISDICTION AND VENUE

7.    This Court has subject-matter jurisdiction over this action under 28 U.S.C. § 1331. This action arises under the U.S. Constitution and the APA, 5 U.S.C. §§ 551 *et seq.* An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a), and this Court may grant declaratory relief, injunctive relief, and other appropriate relief under 28 U.S.C. § 2201-02 and 5 U.S.C. §§ 705-06.

8.    Venue is proper under 28 U.S.C. § 1391(e)(1) because this action seeks relief against a federal agency and officials acting in their official capacity; at least one defendant resides in this district; at least one plaintiff resides in this district; and a substantial part of the events or omissions giving rise to the claims occurred in this district.

## THE PARTIES

9.    Plaintiff Solutions in Hometown Connections (SHC) is a nonprofit located in Greenbelt, Maryland that engages with refugees, asylees, and other newly arrived immigrants—especially women with small children—to build better communities. SHC provides services including multigenerational English classes and tutoring; early-childhood education; citizenship preparation, such as classes, tutoring, field trips, and connections to naturalization assistance; and assistance identifying and obtaining social and community services.

10.    Plaintiff Central American Resource Center (CARECEN DC) is a Washington, D.C.-based nonprofit founded in 1981 to help immigrants in the D.C. metropolitan region transition to an integrated life in their new home and equip them to play an essential role in the advancement of the community. Among other services, CARECEN DC offers low-cost citizenship classes, which include English-language learning and mock interviews; citizenship information sessions and workshops; citizenship tutoring and interview preparation; and assistance with naturalization applications.

11.    Plaintiff Coalition for Humane Immigrant Rights (CHIRLA) is a Los Angeles-based nonprofit that has been providing immigration advocacy and services throughout Southern California since 1986. Among other services, CHIRLA provides citizenship instruction, screenings for naturalization eligibility, and legal assistance with the citizenship process.

12.    Plaintiff Community Center for Immigrants Incorporated (CCI) is a Milwaukee, Wisconsin-based nonprofit providing immigration-related legal services and educational programming to predominantly low-income immigrant individuals and families. CCI guides students through the naturalization process while helping them develop the language, digital,

4

health, and financial literacies necessary to successfully integrate into the community. It provides free citizenship classes, English classes, voter registration and education, and affordable legal services.

13. Plaintiff English Skills Learning Center (ESLC) is a nonprofit located in West Valley City, Utah that helps integrate and strengthen communities by breaking language and cultural barriers. ESLC offers English-language classes to about 800 students a year, from more than 86 different countries, with 120 trained and mentored community volunteers.

14. Plaintiff Michigan Organizing Project, doing business as Michigan United, is a statewide organization of churches, labor, and community groups working to ensure that the Michigan economy works for everyone and to protect the democratic and civil rights of Michigan residents. As part of this mission, Michigan United provides low-cost immigration-related legal services throughout the state of Michigan. These services include free citizenship classes, English-as-a-Second Language classes, and assistance applying for citizenship.

15. Plaintiff Hebrew Immigrant Aid Society and Council Migration Service of Philadelphia (HIAS PA), doing business as "HIAS Pennsylvania," is a nonprofit organization headquartered in Philadelphia, Pennsylvania. HIAS PA serves low-income Lawful Permanent Residents (LPRs) and helps both immigrants and refugees access legal and social services. HIAS PA provides legal representation for LPRs seeking to naturalize and works with partner organizations to provide civics classes and English language education. For non-LPR immigrants and refugees, HIAS PA provides employment orientation, intensive case management support for vulnerable immigrants, and resettlement services including access to Social Security cards and community orientations.

16. Plaintiff Immigrant Law Center of Minnesota (ILCM) is a nonprofit organization headquartered in St. Paul, Minnesota. ILCM provides free immigration legal representation to low-income immigrants and refugees in Minnesota and to refugees in North Dakota. ILCM provides services such as applications for citizenship, DACA renewals, and support for non-US citizen survivors, refugees, and children. ILCM also works to educate the community about immigration matters and advocates for public policies that respect the universal human rights of immigrants.

17. Plaintiff Instituto del Progreso Latino (IDPL) is a nonprofit organization headquartered in Chicago, Illinois that helps immigrant families through education, training, and employment, and is the largest processor of citizenship applications in the state of Illinois. Specifically, IDPL's services include free citizenship, English, and adult education classes, as well as helping residents navigate the application process to become U.S. citizens.

18. Defendant Kristi Noem is the Secretary of Defendant DHS. Plaintiffs are suing Secretary Noem in her official capacity. Secretary Noem administers the CIGP through U.S. Citizenship and Immigration Services (USCIS), which is a component agency of DHS.

19. DHS is headquartered in Washington, D.C.

20. Defendant Kika Scott is, per the USCIS website as of the time this complaint was filed, the "Senior Official Performing the Duties of the Director" of Defendant USCIS. Plaintiffs are suing Interim Director Scott in her official capacity. As part of her official duties as Interim Director, Scott administers the CIGP.

21. USCIS is headquartered in Camp Springs, Maryland.

22.  Defendant Donald J. Trump is the President of the United States. He is responsible for the actions and decisions that are being challenged by Plaintiffs in this action and is being sued in his official capacity.

## LEGAL BACKGROUND

### The Administrative Procedure Act

23.  The APA requires courts to "hold unlawful and set aside" any agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"; "contrary to constitutional right, power, privilege, or immunity"; or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A)-(C).

24.  The APA requires an agency to "examine the relevant data and articulate a satisfactory explanation for its action including 'a rational connection between the facts found and the choice made.'" *Mayor of Balt. v. Azar*, 973 F.3d 258, 275 (4th Cir. 2020) (quoting *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). Agency action is arbitrary and capricious if the agency has "[r]elied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.* (quoting *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43). Agency action must be "upheld, if at all, on the same basis articulated in the order by the agency itself." *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 169 (1962).

25.  An agency that fails to follow the Constitution, statutes, or regulations acts contrary to law. In APA cases, "the reviewing court shall decide all relevant questions of law" and "interpret

constitutional and statutory provisions" at issue. 5 U.S.C. § 706. Courts do not defer to an agency's interpretation of its governing statute or other statutes it is implementing. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 393, 400-01 (2024).

26.  Agencies "are creatures of statute" and are therefore subject to the limits prescribed by Congress. *Nat'l Fed'n of Indep. Bus. v. Occupational Safety & Health Admin.*, 595 U.S. 109, 117 (2022) (per curiam). Agencies "'literally ha[ve] no power to act' except to the extent Congress [has] authorized." *Marin Audubon Soc'y v. Fed. Aviation Admin.*, 121 F.4th 902, 912 (D.C. Cir. 2024) (first alteration in original) (quoting *Fed. Election Comm'n v. Ted Cruz for Senate*, 596 U.S. 289, 301 (2022)). If an agency exceeds that power, the court must vacate and set aside its action under the APA. *See* 5 U.S.C. § 706(2)(C).

### The constitutional and statutory requirements that the Executive Branch spend funds appropriated by Congress

27.  The Constitution vests Congress, not the Executive branch, with "exclusive power" over federal spending. *U.S. Dep't of Navy v. Fed. Labor Rels. Auth.*, 665 F.3d 1339, 1346 (D.C. Cir. 2012) (quoting *Rochester Pure Waters Dist. v. EPA*, 960 F.2d 180, 185 (D.C. Cir. 1992)). The spending power is the first listed among Congress's enumerated powers in Article 1, Section 8. The founders understood Congress's power of the purse as "the most complete and effectual weapon" of a representative body, *id.* at 1347 (quoting The Federalist No. 58, at 359 (James Madison) (Clinton Rossiter ed., 1961)), and "a bulwark of the Constitution's separation of powers among the three branches of the National Government," *id.* at 1347. To ensure that Congress alone would control public spending, the Constitution explicitly denies that power to the other branches via the Appropriations Clause, which forbids the expenditure of federal funds except "in Consequence of Appropriations made by Law." U.S. Const. art. I, § 9, cl. 7.

8

28.   Consistent with this division of powers, the President must "faithfully execute[]" the laws as Congress enacts them. *Id.*, art. II, § 3. Like other statutes enacted by Congress, an appropriations act is "Law." *Id.*, art. I, § 9, cl. 7. The separation of powers forbids the President or his Executive officers from amending or ignoring such a law once duly enacted. *See Clinton v. City of New York*, 524 U.S. 417, 438 (1998).

29.   Nor do the President or his officers have inherent constitutional power to withhold funds that Congress has lawfully appropriated. Absent statutory authorization, the Executive has only the powers conferred on it by the Constitution minus those constitutional powers explicitly conferred on Congress. *See* U.S. Const. art. II, § 1, cl. 1; *see also Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring). The power to control federal spending policies is not among the President's powers. While the President and his officers may have "policy reasons . . . for wanting to spend less than the full amount appropriated by Congress for a particular project or program[,]" they "do[] not have unilateral authority to refuse to spend the funds." *In re Aiken Cnty.*, 725 F.3d 255, 261 n.1 (D.C. Cir. 2013) (Kavanaugh, J.). To spend less than Congress appropriated, the Executive branch must "propose the rescission of funds, and Congress then may decide whether to approve a rescission bill." *Id.*

30.  This limitation on the Executive branch's authority is confirmed by longstanding historical practice and the reasoned views of every branch of government. The Comptroller General, the top legislative-branch official charged with oversight of federal expenditures, has explained in opinions dating back to 1973 that "[t]he Constitution grants the President no unilateral authority to withhold funds from obligation." *In re Off. of Mgmt. and Budget—Withholding of Ukraine Security Assistance*, B-331564, 2020 WL 241373, at *4 (Comp. Gen. Jan. 16, 2020); *see*

*Rep. to the Sen. Subcomm. on Separation of Powers*, B-135564 (Comp. Gen. July 26, 1973). And the Supreme Court has long disapproved of assertions of executive power to withhold funds required to be disbursed by statute. *See Kendall v. United States*, 37 U.S. (12 Pet.) 524, 610 (1838).

31. The Department of Justice has likewise adhered to this settled understanding of the separation of powers. As future-Chief Justice Rehnquist wrote in an Office of Legal Counsel opinion, "the suggestion that the President has a constitutional power to decline to spend appropriated funds . . . is supported by neither reason nor precedent." *Presidential Authority to Impound Funds Appropriated for Assistance to Federally Impacted Schools*, 1 Op. O.L.C. Supp. 303, 309 (1969). That "the President disagree[s] with spending priorities established by Congress" cannot "justify his refusal to spend." *Id.* at 311.

32. In addition to the constitutional prohibition on the Executive's withholding of appropriated funds, Congress has enacted two federal statutes that make this prohibition explicit. First, in the Impoundment Control Act of 1974, Congress expressly prohibited the President from declining to obligate appropriated funds. Pub. L. No. 93-344, 88 Stat. 333 (codified as amended at 2 U.S.C. §§ 681 *et seq.*). Under the Impoundment Control Act, appropriated funds "shall be made available for obligation" unless the President transmits a special message to Congress and Congress rescinds the appropriation. 2 U.S.C. § 683(b); *see id.* § 684(a). This framework aligns with the constitutional mandate that changes to enacted legislation—including appropriations acts—require bicameralism and presentment. *See INS v. Chadha*, 462 U.S. 919, 956 (1983).

33. The Impoundment Control Act also permits the President to "defer[]" budget authority— that is, to withhold or delay the obligation or expenditure of appropriated funds—but only for limited purposes, for a limited time, and after transmitting a special message to Congress setting

forth the reasons for the proposed deferral. 2 U.S.C. § 684(a); *see id.* § 682(1). Deferral is permissible only "(1) to provide for contingencies; (2) to achieve savings made possible by or through changes in requirements or greater efficiency of operations; or (3) as specifically provided by law." *Id.* § 684(b). "No officer or employee of the United States may defer any budget authority for any other purpose." *Id.*

34. Second, the Anti-Deficiency Act Amendments of 1982 likewise forbid the Executive from declining to spend (and thus holding in reserve) appropriated funds for policy reasons, and from redirecting funds to purposes other than those prescribed by Congress. Pub. L. No. 97-258, 96 Stat. 929 (codified as amended throughout Title 31). The Anti-Deficiency Act provides that "[a]ppropriations shall be applied only to the objects for which the appropriations were made except as otherwise provided by law." 31 U.S.C. § 1301(a). "In apportioning or reapportioning an appropriation, a reserve may be established only—(A) to provide for contingencies; (B) to achieve savings made possible by or through changes in requirements or greater efficiency of operations; or (C) as specifically provided by law." *Id.* § 1512(c)(1).

35. Because Congress has repeatedly forbidden the President to withhold or redirect duly appropriated funds based on his own policy priorities, the President's "power is at its lowest ebb" when he attempts to do so. *Youngstown*, 343 U.S. at 637 (Jackson, J., concurring).

**The Department of Homeland Security and its component agencies**

36. Congress created DHS in 2002, as part of a wholesale restructuring of immigration, disaster response, and national security agencies in the wake of the attacks of September 11, 2001. Homeland Security Act of 2002, Pub. L. No. 107-296 (codified at 6 U.S.C. § 101 *et seq.*). Since 1933, the Immigration and Naturalization Service had overseen immigration and border security.

11

Congress abolished INS, redistributing its functions to DHS and its newly-created component agencies—including USCIS.

37.  By statute, DHS's "primary mission" is to "ensure that the functions of the agencies and subdivisions within the Department that are not related directly to securing the homeland are not diminished or neglected except by a specific explicit Act of Congress." 6 U.S.C. § 111(b)(1)(E).

38.  The Homeland Security Act further mandates that USCIS "promot[e] instruction and training on citizenship responsibilities for aliens interested in becoming naturalized citizens of the United States, including the development of educational materials." 6 U.S.C. § 271(f)(2). This is a function not related directly to securing the homeland.

39.  USCIS was tasked with adjudicating immigration-related applications and petitions, including asylum applications, naturalization petitions, and some immigrant visa petitions, and establishing "national immigration services policies and priorities." 6 U.S.C. §§ 271(a)(3)(D), (b).

40.  The Homeland Security Act also created the Office of Citizenship within USCIS. *Id.* § 271(f)(1). The Office of Citizenship, like USCIS, is headquartered in Camp Springs, Maryland. The USCIS website describes its mission as "to provide federal leadership, tools, and resources to proactively foster civic [integration]. To facilitate this process, the Office of Citizenship engages and supports partners to welcome immigrants; promote English language learning and education on the rights and responsibilities of citizenship; and encourage U.S. citizenship."[3]

---

[3] *Office of Citizenship*, U.S. Citizenship and Immigration Services, https://perma.cc/6U94-L5R6; *see also supra* note 2.

**DHS and its agencies carry out their statutory functions through grant programs**

41. In 2009, the Office of Citizenship created the Citizenship and Integration Grant Program (CIGP) to "provide[] support to community-based, non-profit organizations and educational institutions actively working to remove barriers to naturalization."[4] Grant recipients, which include "community and faith-based groups, public libraries, and adult education and literacy organizations," provide "English language and civics instruction, legal assistance with naturalization applications, and … community space for immigrant [integration]."[5]

42. On information and belief, CIGP grants are the primary means by which USCIS performs its statutory mandate to "promot[e] instruction and training on citizenship responsibilities for aliens interested in becoming naturalized citizens of the United States, including the development of educational materials." 6 U.S.C. § 271(f)(2).

43. Since 2009, USCIS has awarded more than $155 million through 644 competitive CIGP grants to organizations in 41 states and the District of Columbia. This program has helped more than 350,000 LPRs prepare for citizenship.

44. The CIGP is funded largely through Congressional appropriations. In Fiscal Year 2023, Congress appropriated $25 million "for the Citizenship and Integration Grant Program, … to remain available until September 30, 2024." Consolidated Appropriations Act of 2023, Pub. L. No. 117-328, 136 Stat. 4745. In Fiscal Year 2024, Congress appropriated $10 million "for the Citizenship and Integration Grant Program, … to remain available until September 30, 2025." Further Consolidated Appropriations Act of 2024, Pub. L. No. 118-47, 138 Stat. 612.

---

[4] *Grant Program Impact,* U.S. Citizenship and Immigration Services, https://perma.cc/WZM4-EGLF.
[5] *See id.*; *see also supra* note 2.

45. In May 2017, Congress authorized USCIS to supplement its CIGP appropriations with "gifts, including donations of property, for the purpose of providing an immigrant integration grants program and related activities to promote citizenship and immigrant integration." 8 U.S.C. § 1382. Congress stipulated that gifts received for CIGP "shall remain available until expended, and shall be available in addition to any funds appropriated or otherwise made available for an immigration integration grants program or other activities to promote citizenship and immigrant integration." *Id.*

46. No provision of the Consolidated Appropriations Act of 2023, the Further Consolidated Appropriations Act of 2024, or any other statute authorizes the President or the Agency Defendants to freeze appropriated CIGP funding.

47. The most common CIGP grants are Citizenship Instruction and Naturalization Application Services (CINAS) grants, which help public or nonprofit organizations offer citizenship instruction and assistance filing applications for naturalization. CINAS recipients receive funds over the course of a two-year performance period and report their performance metrics to USCIS, including the number of LPRs enrolled in citizenship-instruction classes and these students' educational gains, as well as the number of LPRs the recipients screen for naturalization eligibility and help apply for naturalization. Specifically, CINAS grantees are evaluated on the following performance metrics:

   a. Number of newly enrolled (non-duplicated) LPRs to enroll in citizenship instruction classes;

   b. Percentage of enrolled students who post-test using a nationally normed standardized test;

14

    c. Percentage of post-tested students demonstrating measurable educational gains (as measured by one percentage point between pre and post-test);

    d. Number of LPRs for whom the organization will provide naturalization eligibility screenings for Form N-400 (Application for Naturalization);

    e. Number of LPRs for whom the organization will prepare and file Form N-400 and Form G-28 (Notice of Entry of Appearance as Attorney or Accredited Representative).

48. CINAS grantees may use awarded funds only for approved purposes. Specifically, CINAS grant funds may be used for purposes including:

    a. Providing services to qualified LPRs only, regardless of race, color, religion, sex, or national origin;

    b. Resources to support citizenship instruction, such as staff salaries, textbooks/materials, CASAS Citizenship Assessment, and software;

    c. Resources to support naturalization application services including staff salaries, case management systems, and costs associated with DOJ recognition of organizations and accreditation (or renewal) of staff;

    d. Transportation costs for students and volunteers only if grantees have a system to track how transportation funds are used;

    e. Professional development and training for staff and/or volunteers related to the provision of citizenship instruction and/or naturalization application services; and

    f. Facility rental costs, not to exceed more than 20% of the total approved budget.

15

49.   The CIGP also awards Community and Regional Integration Network (CARING) Grants, which help public or nonprofit organizations provide extended civic integration services, citizenship instruction, and naturalization-application services to the most vulnerable immigrants, including refugees, asylees, Cuban and Haitian nationals, and victims of human trafficking. Like CINAS recipients, CARING recipients receive funding over the course of a two-year performance period. And like CINAS recipients, CARING recipients provide citizenship classes and naturalization application services. CARING program participants may qualify for services with a lower level of English-language proficiency, in recognition of the fact that many refugees and asylees have not had access to the same educational opportunities as other noncitizens due to their experiences of displacement. CARING grantees also develop individualized integration plans for each immigrant who participates in the program. CARING grantees are evaluated on the same performance metrics as CINAS grantees, with an additional metric—the number of integration plans developed.

50.   CARING grantees may also use awarded funds only for approved purposes. CARING grant funds may be used for the same purposes as CINAS grants, with the additional allowed purpose of covering childcare costs to allow eligible participants to attend grant-funded classes.

51.   CINAS and CARING grant funds may not be used for lobbying, USCIS application fees, costs for organized fundraising, purchase of real property, pre-award costs, food or refreshments, incentive items or gift cards, volunteer stipends, foreign travel, or to sue the federal government.

52.   All CIGP grant recipients must report to USCIS quarterly on all relevant performance metrics throughout the performance period of the grant.

53. In 2013, the Office of Management and Budget adopted guidance on Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards (Uniform Guidance). 2 C.F.R. § 200 *et seq.*; 79 Fed. Reg. 78589 (Dec. 26, 2013). Federal award-making agencies, including DHS and USCIS, implemented the Uniform Guidance through an Interim Rule, which became effective on December 26, 2014. 76 Fed. Reg. 75867; *see also* 2 C.F.R. § 3002.10. OMB revised the Uniform Guidance in 2024, and those revisions went into effect on October 1, 2024. 89 Fed. Reg. 30046.

54. The Uniform Guidance binds the Agency Defendants and is incorporated by reference into all DHS grants and awards. The Uniform Guidance requires an award-making agency to "manage and administer the Federal award in a manner so as to ensure that Federal funding is expended and associated programs are implemented in full accordance with the U.S. Constitution, applicable Federal statutes and regulations." 2 C.F.R. § 200.300(a).

55. Among other requirements, the Uniform Guidance mandates that award-making agencies reimburse award recipients for covered expenses "within 30 calendar days after receipt of the payment request unless the [agency] . . . reasonably believes the request to be improper." *Id.* § 200.305(b)(3). The Uniform Guidance further mandates that "[p]ayments for allowable costs must not be withheld at any time during the period of performance" of the award "unless required by Federal statute, [or] regulations," or if the award recipient—*i.e.*, a grantee—has failed to comply with the award terms or is delinquent on a debt to the federal government. *Id.* § 200.305(b)(6). And the Uniform Guidance specifies when and how award conditions may be adjusted and requires the award-making agency to notify the recipient about the specific conditions imposed, how to

remove the specific condition, and the method for challenging the imposed specific condition. *Id*. § 200.208.

## FACTUAL ALLEGATIONS

### President Trump and Secretary Noem illegally freeze grant funds.

56.  On January 20, 2025, President Trump issued Executive Order 14159, titled "Protecting the American People Against Invasion." *See* 90 Fed. Reg. 8443. Section 19(a) of the Executive Order requires the Secretary of Homeland Security to "[i]mmediately review and, if appropriate, audit all contracts, grants, or other agreements providing Federal funding to non-governmental organizations supporting or providing services, either directly or indirectly, to removable or illegal aliens, to ensure that such agreements conform to applicable law and are free of waste, fraud, and abuse, and that they do not promote or facilitate violations of our immigration laws." Section 19(b) of this order further instructs the Secretary to "[p]ause distribution of all further funds pursuant to such agreements pending the results" of this review, while sections 19(c) and (e) instruct the Secretary to "[t]erminate all such agreements determined to be in violation of law or to be sources of waste, fraud, or abuse," and "[i]nitiate clawback or recoupment procedures, if appropriate, for any agreements" meeting this description.

57.  On January 28, 2025, in response to the Executive Order, Secretary Noem issued a Memorandum to DHS component agency and office heads placing "on hold pending review" "all Department grant disbursements and assessments of grant applications that: (a) go to non-profit organizations or for which non-profit organizations are eligible, and (b) touch in any way on immigration, . . . except to the extent required by controlling legal authority."

58.  Secretary Noem gave three reasons for "this freeze": "(1) concerns that these grants may be funding illegal activities, such as encouraging or inducing illegal immigration, 8 U.S.C. § 1324(a)(1)(A)(iv), or illegal harboring of illegal aliens, 8 U.S.C. § 1324(a)(1)(A)(ii)-(iii); (2) concerns that there may be racially discriminatory language in certain grants; and (3) concerns that these grants may not be an efficient use of government resources."

59.  The Noem Memorandum's freeze was "[e]ffective immediately." Any DHS component that sought to keep grant funds flowing "to the extent required by controlling legal authority" was required to "obtain the express written consent of the General Counsel or his delegee" within seven days. Plaintiffs are unaware of any grants that have been paid under that exception.

60.  The Noem Memorandum stated that DHS "is committed to allocating grant funds in a manner that will achieve maximum effectiveness for the intended purposes and in fulfillment of the Department's statutory mission."

61.  The day after issuing the Memorandum, in an interview with Fox News about the funding freeze, Secretary Noem explained that she used to think of NGOs as "nonprofit[s] telling somebody about Jesus or spreading faith and salvation," but she "realized over the years, it's been perverted into this shadow government."[6]

**Plaintiffs' grants are frozen, causing immediate and irreparable harm.**

62.  All Plaintiffs applied for and were awarded CIGP grants.

---

[6] *Kristi Noem announces freeze of grants to NGO groups*, Fox News, https://perma.cc/ADF3-8TCV, (Jan. 29, 2025).

63. In Fiscal Year 2023, USCIS awarded more than $22 million in CIGP grants to 65 organizations, with a performance period of October 1, 2023 through September 30, 2025.[7] The majority of these grants were CINAS grants, which were awarded to 51 organizations around the country, including Plaintiffs CHIRLA, Michigan United, CARECEN, CCI, the English Skills Learning Center, Instituto del Progreso Latino, and HIAS PA. USCIS also awarded one CARING grant, to Plaintiff Solutions in Hometown Connections.

64. In Fiscal Year 2024, USCIS awarded nearly $10 million in CINAS grants to 36 organizations all over the country, including Plaintiff ILCM.[8] These grants have a performance period of November 22, 2024 through September 30, 2026.

65. Exactly seven days after the Noem Memorandum was issued, on February 4, 2025, all Plaintiffs were sent emails informing them that their CIGP grants had been frozen pursuant to the Memorandum. Attached to each of these emails was an identical form letter signed by Mary Jane Somerville, Grants Branch Chief, listing the Office of Citizenship's Camp Springs, Maryland address. The Freeze Letter noted that DHS "recognize[d] this will have an impact on your organization" but was "unable to provide a timeline on this freeze."

66. Plaintiffs did not receive any notice prior to the Freeze Letter that their grant funds would be frozen for the foreseeable future. Nor did the Freeze Letter provide a way to challenge the decision to freeze funds without a timeline for when the freeze would be lifted, if at all.

---

[7] *FY 2023 Grant Recipients*, U.S. Citizenship and Immigration Services, https://perma.cc/2EBL-HQDK.
[8] *FY 2024 Grant Recipients*, U.S. Citizenship and Immigration Services, https://perma.cc/K4KR-NDHE.

67.  Plaintiffs have already made difficult choices to account for this indefinite loss of DHS funding and are actively engaged in contingency planning for even harder ones ahead.

68.  Some Plaintiffs have already laid off or reassigned staff funded by their DHS grants, and others will need to do so soon if disbursements do not resume. Even if Plaintiffs end up receiving grant disbursements down the line, they may not be able to rehire or reassign these staffers. If not, they will be required to spend time and money finding and training new staff.

69.  Some Plaintiffs have also been forced or may soon be forced to terminate relationships with other organizations who have been helping them perform their obligations under their grants. These organizations may not be willing or able to resume their partnerships with Plaintiffs should Defendants resume disbursements and Plaintiffs attempt to restart their affected programming.

70.  Plaintiffs' difficult cost-cutting decisions also subject them to the risk that they will violate the terms of their grants and thus lose the remainder of their DHS funding even if Defendants lift the current freeze.

71.  Plaintiffs' credibility within the immigrant communities they serve will suffer the longer the freeze continues. Many of Plaintiffs' students and clients have paid USCIS a naturalization application fee. These students and clients will lose trust in Plaintiffs' efficacy and reliability when, because of the grant freeze, their citizenship or language classes are suddenly cancelled, or they are no longer able to receive help with the remainder of the naturalization process. This is also true for Plaintiffs who employ members of the immigrant and refugee communities they serve, some of whom have been laid off or may be laid off soon as a result of the grant freeze.

*Solutions in Hometown Connections*

72.  Plaintiff SHC applied for and received a FY2023 CARING grant for $276,575 to provide citizenship instruction, English-language learning, and digital-literacy assistance to 180 immigrants. SHC works with LPR women who are mothers of small children. These women have not previously had formal educational opportunities. Many of them lack English-language literacy and have never had formal employment. The CARING grant represents about 13% of the organization's budget.

73.  SHC has approximately $86,000 remaining of its grant for services it has planned through September 30, 2025. In reliance on its grant award, it expends money on these services and submits vouchers to USCIS for reimbursement. SHC attempted to draw down funds in February but received a notification that it could not do so. SHC most recently tried to draw down funds from this grant on March 12, 2025, but the funds remain frozen. It also emailed its grant and program officers on March 12, 2025, with no reply. SHC will need to submit additional vouchers through the remainder of the performance period.

74.  The funding freeze started in the middle of SHC's winter session for its citizenship classes. Faced with the decision of whether to abruptly cancel the remaining classes for 100 students or continue them and cover the cost from its general funding budget, SHC chose the latter. SHC also works with a subgrantee to provide legal services to SHC's clients, to meet the terms of its grant. As a direct result of the DHS funding freeze, SHC was forced to immediately terminate that relationship and transition those clients to law-school clinics unable to provide full representation. Doing so could violate the terms of SHC's CARING grant, which requires full representation in the citizenship application process. If SHC's CARING funding is not restored,

SHC will need to cancel civics education and other integration activities—for example, field trips to learn about the government—as well as its legal services.

***Central American Resource Center***

75.  Plaintiff CARECEN DC applied for and received a FY2023 CINAS grant of $450,000 to provide citizenship instruction to more than 300 LPRs, administer naturalization eligibility screenings to 300 LPRs, and file 300 naturalization applications. The CINAS grant alone was 8.8% of the organization's entire budget in 2024, and 16.4% of the legal program's budget.

76.  CARECEN DC has $169,000 remaining on its grant for services it has planned through September 30, 2025. In reliance on its grant award, it expends money on these services and submits quarterly vouchers to USCIS for reimbursement. CARECEN DC most recently reached out to its USCIS grant manager on March 12, 2025, and received no response. CARECEN DC would normally submit a voucher in April for its expenses from January through March and would submit two more through the remainder of the performance period.

77.  As a direct result of the DHS funding freeze, CARECEN DC laid off three part-time instructors who were funded by its CINAS grant. CARECEN DC had to reallocate funds from other programs to cover the salaries and benefits of the remaining two citizenship program managers funded by the grant. As a result of that reallocation, it has had to lay off an additional part-time employee working on different CARECEN DC programming. CARECEN DC must also decide whether to cut services and risk violating the terms of its CINAS grant, thus imperiling the remainder of the grant funds if the freeze is lifted, or to maintain existing services and risk not being reimbursed for them.

*Coalition for Humane Immigrant Rights*

78. Plaintiff CHIRLA applied for and received a FY2023 CINAS grant of $450,000 to provide citizenship instruction and naturalization-eligibility screenings to 200 LPRs, and to file 200 naturalization applications. The CINAS grant is crucial to the organization's provision of citizenship and naturalization services.

79. CHIRLA has $100,936.16 remaining on its grant for services it has planned through September 30, 2025. In reliance on its grant award, its normal practice is to expend money on these services and submit quarterly vouchers to USCIS for reimbursement. CHIRLA requested a disbursement of grant funding on February 4, right before it received the freeze letter. CHIRLA was able to draw down enough funds to cover its expenses from January through March. CHIRLA tried to request funds on March 13 and received no response. It also reached out to its USCIS grants manager that day but received no response. CHIRLA will need to submit additional vouchers through the remainder of the performance period.

80. As a direct result of the DHS funding freeze, CHIRLA also plans to stop taking new naturalization applications, close open cases, and potentially cancel upcoming citizenship classes. Depending on how long the freeze continues, CHIRLA may need to cancel its subcontract with the organization that conducts the citizenship classes or lay off some—or all—of the seven staff members supported by its CIGP grant. Without its CINAS funds, CHIRLA will need to divert money from other sources to continue its citizenship classes and naturalization application services, which would put its other programs and services at risk. CHIRLA must also decide whether to cut services and risk violating the terms of its CINAS grant, thus imperiling the

remainder of the grant funds if the freeze is lifted, or to maintain existing services and risk not being reimbursed for them.

***Community Center for Immigrants Incorporated***

81. Plaintiff CCI received a FY2023 CINAS grant of $300,000 to provide citizenship-preparation and naturalization-application services to 200 LPRs in the Milwaukee metropolitan region. CCI's grant was also intended to expand the number of its employees who had accredited representative status.[9] CCI's CINAS grant is 28% of the entire organization's budget.

82. CCI has $100,000 remaining on its grant for services it has planned through September 30, 2025. In reliance on its grant award, it expends money on these services and submits vouchers to USCIS for reimbursement. CCI received reimbursement for most of its January expenses and submitted a request for additional January and February expenses that has been marked "approved" but not paid. It tried to draw down $11,149.31 on February 14, 2025, and $7,200 again on March 12, 2025, neither of which has been approved. CCI also reached out to its USCIS grant program officer on March 12, 2025, and received an automated "out-of-office" reply. It will need to submit additional vouchers through the remainder of the performance period.

83. As a direct result of the DHS funding freeze, CCI has already reduced the hours of its part-time instructional staff in direct response to the funding freeze. One instructor recently quit because CCI could not guarantee future employment. Absent further DHS funding, CCI will need to lay off four staff members, including one refugee. CCI will also likely need to cut its citizenship

---

[9] Accredited representatives are non-attorney employees and volunteers who have been accredited by the Department of Justice to practice immigration law before the Federal Government. *See Recognition and Accreditation Program Frequently Asked Questions, EOIR Immigration Court Online Resource*, https://perma.cc/X6UF-2694.

classes and naturalization services, even though demand for them is higher than ever. Doing so could run afoul of CCI's ethical obligations to its clients and the terms of the CINAS grant, which requires full representation in the citizenship application process. And because CCI's CINAS grant caps what CCI can charge clients for naturalization-application assistance at $75, CCI cannot subsidize the cost of its other services by charging more for naturalization.

***Michigan United***

84.  Plaintiff Michigan United received a FY2023 CINAS grant of $300,000 to provide citizenship instruction and naturalization-application services to 200 LPRs. This grant provides the majority of the funding for Michigan United's legal department.

85.  Michigan United has $300,000 remaining on its grant for services it has planned through September 30, 2025. In reliance on its grant award, Michigan United typically expends money on these services, and submits vouchers to USCIS for reimbursement, none of which have yet been paid. It tried to draw down on the grant on March 14, 2025, but has received no funds as of yet. It will need to submit additional vouchers through the remainder of the performance period.

86.  As a direct result of the DHS funding freeze, Michigan United has had to subsidize its citizenship program from other sources to stay afloat short-term. If the freeze is not lifted, Michigan United will have to potentially terminate some or all the three full-time staffers and two part-time instructor stipends that the grant pays for. Because CINAS is the core grant funding for its legal services program, Michigan United may have to move to an unpaid volunteer model or shut down its legal services program entirely.

*English Skills Learning Center*

87. Plaintiff ESLC received a FY2023 CINAS grant of $450,000 to provide citizenship instruction to at least 200 LPRs, administer eligibility screening to 440 LPRs, and to file 400 naturalization applications. This grant alone is 14.6% of the ESLC's annual budget.

88. ESLC has $186,531.19 remaining on its grant for services it has planned through September 30, 2025. In reliance on its grant award, it expends money on these services and submits vouchers to USCIS for reimbursement. This includes $13,684.55 of money that was already spent, for which reimbursement was requested on March 12, 2025, and which has not yet been reimbursed. In ESLC's experience, reimbursements are typically processed and paid into their account within 24 hours of submitting a request. It will need to submit additional vouchers through the remainder of the performance period.

89. ESLC has had to redirect funding from other high-demand English language learning programs to continue offering its Citizenship Program classes, resulting in significant ripple effects across the organization. It has been forced to move its citizenship class instructor under a different funding stream to avoid interruption, which it can only sustain till mid-April. Upon that date, it will have to lay off its instructor. It has already had to move its Citizenship Program's coordinator into a completely new position, where they work on issues unrelated to their expertise and program. This has eradicated their outreach and recruitment capabilities for the Program. If the freeze continues, ESLC will have to run either on a volunteer model or close the Program entirely.

*HIAS Pennsylvania*

90. Plaintiff HIAS PA applied for and received a FY2023 CINAS grant of $450,000 to provide citizenship instruction to a minimum of 200 LPRs, administer naturalization eligibility

screenings to 200 LPRs (with a stated goal of 350), and to file 200 naturalization applications. This grant continued an administrative and programmatic relationship with USCIS that goes back more than a decade. Without the grant, HIAS PA will incur an estimated budget deficit of $123,505.

91.  HIAS PA has $162,507.16 remaining on its grant for services it has planned through September 30, 2025. HIAS PA requested a disbursement of grant funding on February 12, 2025, and was able to draw down enough funds to cover its expenses incurred through January 2025. HIAS PA has attempted several times, including most recently on March 13, 2025, to ascertain from USCIS when the freeze will be lifted with no response. In reliance on its grant award, it continues to expend money on these services and submits vouchers to USCIS for reimbursement. It will need to submit additional vouchers through the remainder of the performance period. This includes $46,630 of costs that HIAS PA has already incurred for grant work this quarter, for which they would ordinarily seek reimbursement.

92.  As a direct result of the funding freeze, HIAS PA has had to reallocate funds from other programs to cover the expenses of the dedicated attorney representing LPRs in their naturalization application process because the attorney has an ethical obligation to continue representing these clients. As result of this reallocation, HIAS PA is currently operating on only 90 remaining days of payroll, after which the organization will be forced to lay off staff unless they are able to submit a voucher for services and obtain a reimbursement from Defendants or are able to secure independent funding through private donations. HIAS PA's subgrantee organizations responsible for civics and citizenship education classes are still providing services despite not being paid but are unable to guarantee they can continue to provide services as early as the next quarter.

*Immigrant Law Center of Minnesota*

93.   Plaintiff ILCM applied for and received a FY2024 CINAS grant of $283,018 to provide citizenship instruction to 200 LPRs, administer naturalization eligibility screenings to 224 LPRs, and file 200 naturalization applications. The grant funds part of the work of eleven staff members.

94.   ILCM has $272,515 remaining on its grant for services it has planned through September 30, 2026. In reliance on its grant award, it expends money on these services and submits vouchers to USCIS for reimbursement. It will need to submit additional vouchers through the remainder of the performance period. This includes costs of $19,371 that ILCM has already incurred for grant work this quarter, for which they would ordinarily seek reimbursement. ILCM attempted most recently on March 12 to ascertain when the freeze will be lifted with no response. Without the grant, ILCM is estimated to be operating on a $45,000 budget deficit for the 2025 fiscal year.

95.   As a direct result of the DHS funding freeze, ILCM has been forced to rely on pro bono services that are unsustainable at the current rate of service to continue providing legal representation to LPRs applying for naturalization. Based on ILCM's current budgetary planning, if the funding is not restored, staff currently providing legal representation services to LPRs applying for naturalization will likely need to cut back on those services in the subsequent quarters of 2025. ILCM is currently assessing exactly how many staff will ultimately need to be cut without restored funding. ILCM has already stopped sub-granting to the organization that provides civics classes in furtherance of their grant. That subgrantee has reduced citizenship classes from four to only one, serving 25-40 students instead of the 75-100 as planned, and is no longer able to offer instructional support to its citizenship class teachers. These classes are currently being funded

through other means and are likely operating at a loss. The subgrantee has also cut its planned outreach to promote the citizenship class, further reducing how many LPRs it can reach to enroll.

***Instituto del Progreso Latino***

96.  Plaintiff IDPL received a FY2023 CINAS grant of $450,000 to provide legal screening eligibility for 600 LPRs, citizenship instruction to 420 LPRs, and naturalization-application services to 325 LPRs. This grant continued a long-standing, 15-year administrative and programmatic relationship with USCIS.

97.  IDPL has $145,507.57 remaining on its grant for services planned through September 30, 2025. In reliance on its grant award, it expends money on these services and submits vouchers to USCIS for reimbursement. This includes $12,416 that was submitted for reimbursement on February 19, 2025, which has not yet been reimbursed. It will need to submit additional vouchers through the remainder of the performance period.

98.  As a direct result of the DHS funding freeze, IDPL has reallocated funds to try to continue its citizenship and naturalization programs in the short term. Without its CINAS funds, IDPL can no longer provide classes, books, and materials for 200 students. Additionally, the organization has cancelled future appointments for screening services, IDPL no longer has the capacity to provide 225 legal screenings for the remainder of the grant, nor can IDPL submit 150 completed applications. Due to the loss of grant funds, IDPL will lose one full-time and four part-time staff members if unable to receive this funding. If the funds remain frozen, IDPL may move to a fee-structured program, in stark contrast to the current free services it provides to clients.

## CLAIMS FOR RELIEF

### COUNT I

**Violation of the Administrative Procedure Act, arbitrary and capricious,
5 U.S.C. § 706(2)(A)
(Against Defendants Noem, Scott, DHS, and USCIS)**

99.   Plaintiffs restate and reallege all paragraphs above as if fully set forth here.

100.  Under the APA, the Court shall "hold unlawful and set aside agency action" that is "arbitrary [and] capricious." 5 U.S.C. § 706(2)(A).

101. The Noem Memorandum freezing DHS grant disbursements, and the Agency Defendants' actions to implement this freeze—including the Freeze Letter informing Plaintiffs that their USCIS grants were frozen—are final agency actions reviewable under 5 U.S.C. §§ 702 and 706.

102. The Agency Defendants' actions are arbitrary and capricious because they have failed to adequately justify their actions; consider reasonable alternatives; consider key aspects of the problem, including substantial reliance interests at stake; and acknowledge or justify their change of position. The Agency Defendants have also relied on factors Congress did not authorize them to consider.

103. The Agency Defendants have not "examine[d] the relevant data and articulate[d] a satisfactory explanation" for imposing a sudden, blanket freeze on DHS grants. *Mayor of Balt.*, 973 F.3d at 275 (quoting *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43). Instead, they have offered implausible, pretextual justifications for their actions and ignored the significant reliance interests at issue.

104. The Noem Memorandum claims, without support or citation, that over the past four years, DHS has "spent billions of dollars funding illegal immigration," much of it via funding "to non-profit organizations, which purported to provide a variety of services to illegal aliens." Secretary Noem provides no evidence that nonprofit grantees' claims to provide services to "illegal aliens"— a term without defined meaning in the immigration code or federal statutes—are untrue. The Noem Memorandum evinces zero fact-finding by the Agency Defendants.

105. The Secretary then justifies the grant freeze based on "concerns that [they] may be funding illegal activities, such as encouraging or inducing illegal immigration," in addition to "concerns that there may be racially discriminatory language in certain grants" and "concerns that these grants may not be an efficient use of government resources." The Secretary again provides no evidence to support any of her "concerns," including claims that a previous administration awarded grants to fund illegal activities or racially discriminatory grants, or that these grants have suddenly, within eight days of a new administration taking office, become inefficient. In addition, Congress has not authorized the Secretary or other Agency Defendants to consider any of these factors when disbursing appropriated funds.

106. The Noem Memorandum fails to provide a reasonable explanation for why a total freeze on grant disbursements is necessary, despite the practical and logical consequences that will result for affected grantees. The Noem Memorandum fails to consider any reasonable alternatives to a blanket, across-the-board funding freeze. S*ee Allied Loc. & Reg'l Mfrs. Caucus v. E.P.A.*, 215 F.3d 61, 80 (D.C. Cir. 2000) ("To be regarded as rational, an agency must also consider significant alternatives to the course it ultimately chooses."). The Agency Defendants did not "examine the relevant data," including whether any DHS grants actually implicated the Secretary's stated

concerns, before selecting a course of action. *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43. By giving zero thought to the serious reliance interests at stake, the Secretary "entirely failed to consider an important aspect of the problem." *Id*. By halting disbursements of two-year grants that fund entire programs and multiple positions for Plaintiffs and dozens of other similarly situated organizations, the Agency Defendants' actions are causing irreparable harm to these organizations.

107. The Agency Defendants could have explored the Secretary's specific "concerns" without indefinitely freezing all appropriated and allocated funds that "touch in any way on immigration," and the abrupt freeze the Secretary chose—and other Agency Defendants implemented—is the epitome of arbitrary and capricious agency action.

108. The CIGP grants awarded to Plaintiffs illustrate the mismatch between the Noem Memorandum's stated, if unsupported, justifications and its extreme results. CIGP grants serve to help *lawful* permanent residents study for the citizenship test and complete the naturalization process to become American citizens. It is illogical to conclude that providing citizenship-education classes and assistance filing naturalization applications will encourage or induce *illegal* immigration (a term without definition in either the Memorandum or federal statute). Such an explanation is "so implausible that it does not represent reasonable administration of the" CIGP. *Bedford Cnty. Mem'l Hosp. v. Health & Hum. Servs.*, 769 F.2d 1017, 1022 (4th Cir. 1985).

109. While the new administration may have a different policy judgment of that spending, it is not reasonable to assert that CIGP grants are "funding illegal activities." That the Secretary disagrees with Congress's policy assessment does not give her the authority to undermine Congress's decision to appropriate funds for specific ends. *See In re Aiken Cnty.*, 725 F.3d at 261 n.1.

110. The Noem Memorandum is also arbitrary and capricious as an interpretation of Executive Order 14159 § 19(b), which directs a funding pause for all "grants, . . . providing Federal funding to non-governmental organizations supporting or providing services, either directly or indirectly, to removable or illegal aliens." The Noem Memorandum freezes funding for all grants that "touch in any way on immigration," which sweeps far more broadly than the Executive Order it purports to implement. No explanation is provided for the Agency Defendants' unilateral expansion of the funding freeze directed by the Executive Order.

111. Further, to the extent the Secretary and DHS argue that the Noem Memorandum was necessary to effectuate § 19(b) of Executive Order 14159, that portion of the Executive Order is unlawful and unconstitutional and does not save the Noem Memorandum from itself being arbitrary and capricious.

## COUNT II

### Violation of the Administrative Procedure Act, contrary to law, 5 U.S.C. § 706(2)(A)-(C) (Against Defendants Noem, Scott, DHS, and USCIS)

112. Plaintiffs restate and reallege all paragraphs above as if fully set forth here.

113. Under the APA, the Court shall "hold unlawful and set aside agency action" that is an "abuse of discretion, or otherwise not in accordance with law"; "contrary to constitutional right, power, privilege, or immunity"; or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. §§ 706(2)(A)-(C).

114. The Noem Memorandum freezing DHS grant disbursements, and the Agency Defendants' actions to implement this freeze—including the Freeze Letter informing Plaintiffs

that their USCIS grants were frozen—are final agency actions reviewable under 5 U.S.C. §§ 702 and 706.

115. The DHS grant freeze is contrary to law because it violates the Homeland Security Act, various appropriations acts, and agency regulations.

116. The Homeland Security Act sets as the "primary mission" of DHS to "ensure that the functions of the agencies and subdivisions within the Department that are not related directly to securing the homeland are not diminished or neglected except by a specific explicit Act of Congress." 6 U.S.C. § 111(b)(1)(E). That Act further mandates that USCIS "promot[e] instruction and training on citizenship responsibilities for aliens interested in becoming naturalized citizens of the United States, including the development of educational materials." 6 U.S.C. § 271(f)(2). By freezing CIGP grants, which are a primary means by which USCIS complies with this statutory mandate, the Agency Defendants have thus diminished and neglected this function of the Department absent any specific explicit Act of Congress authorizing them to do so and have violated these provisions of the Homeland Security Act.

117. Given the ongoing freeze, upon information and belief, either no DHS component invoked the "required by controlling legal authority" exception for CIGP grants, or the General Counsel refused to provide his written consent to apply this exception to CIGP grants.

118. The Consolidated Appropriations Act of 2023 mandates that $25 million of appropriated funds be obligated and disbursed "for the Citizenship and Integration Grant Program." The Further Consolidated Appropriations Act of 2024 mandates that $10 million of appropriated funds be obligated and disbursed on CIGP grants. Agency Defendants obligated those funds by awarding grants to numerous organizations around the country including Plaintiffs. By refusing to disburse

these grants—without asking Congress first or complying with the procedures laid out in the Impoundment Control and Anti-Deficiency Acts—the Agency Defendants have violated both statutes as well as the Consolidated Appropriations Act of 2023 and the Further Consolidated Appropriations Act of 2024.

119. The Uniform Guidance sets the rules for awarding and administering Federal grants to non-Federal actors, including nonprofits. *See* 2 C.F.R. § 200.01 *et seq.* Those regulations require an award-making agency to "manage and administer the Federal award in a manner so as to ensure that Federal funding is expended and associated programs are implemented in full accordance with the U.S. Constitution, applicable Federal statutes and regulations." *Id.* § 200.300(a). The regulations also mandate that award-making agencies reimburse award recipients for covered expenses "within 30 calendar days after receipt of the payment request unless [the agency] reasonably believes the request to be improper." *Id.* § 200.305(b)(3). In addition, "[p]ayments for allowable costs must not be withheld at any time during the period of performance" of the award "unless required by Federal statute[ or] regulations," or if the award recipient—*i.e.*, a grantee—has failed to comply with the award terms or is delinquent on a debt to the federal government. *Id.* § 200.305(b)(6). By unilaterally, suddenly, and without justification freezing the disbursement of CIGP grant funding due solely to its link to the topic of immigration, the Agency Defendants violated these regulations.

120. The Agency Defendants have also violated the constitutional separation of powers, which vests exclusive power over federal spending with Congress, and the Appropriations Clause, which obligates the Executive branch to spend funds that have been appropriated by Congress. U.S.

Const. art. I, § 9, cl. 7. By refusing to spend funds that Congress has duly appropriated on the purposes Congress has specified, the Agency Defendants have violated the Constitution.

121. Finally, the Agency Defendants have acted "in excess of statutory authority" by taking actions not authorized by Congress. Agencies cannot act without statutory authorization. *Nat'l Fed'n of Indep. Bus.*, 595 U.S. at 117. No statute authorizes the Agency Defendants to freeze the disbursement of broad categories of appropriated, allocated funds for any reason, much less the pretextual, implausible reasons cited.

**COUNT III**

**Violation of the Separation of Powers
(Against all Defendants)**

122. Plaintiffs restate and reallege all paragraphs above as if fully set forth here.

123. Plaintiffs have a non-statutory right of action to declare unlawful and enjoin Defendants' unconstitutional actions.

124. The Constitution vests exclusive power over federal spending with Congress. U.S. Const. art. I, § 8, cl. 1. The Constitution explicitly denies that power to the other branches via the Appropriations Clause, which forbids the expenditure of federal funds except "in Consequence of Appropriations made by Law." *Id.*, art. I, § 9, cl. 7.

125. Under Article II, the President must take care to faithfully execute the laws, including appropriations acts. *Id.*, art. II, § 3. Consistent with the constitutional division of legislative and executive powers and the requirements of bicameralism and presentment, the President and his officers have no unilateral authority to amend or ignore congressional appropriations. Nor may the President or his officers direct federal officers or agencies to act contrary to a federal statute.

126. The President and his officers also lack inherent constitutional power to decline to spend funds that Congress has appropriated. Although the President and his officers would lack that power even in the absence of any statutory prohibition, the Impoundment Control Act and Anti-Deficiency Act forbid the President and Executive-branch officers from declining to spend appropriated funds based on policy priorities, foreclosing any claim of concurrent presidential power.

127. By withholding DHS funds that Congress has appropriated from Plaintiffs and similarly situated organizations, Defendants have violated the separation of powers.

## COUNT IV

### Fifth Amendment Due Process
### (Against all Defendants)

128. Plaintiffs restate and reallege all paragraphs above as if fully set forth here.

129. Under the Fifth Amendment, the federal government may not deprive a person or entity of property "without due process of law." U.S. Const. amend. V.

130. Plaintiffs each have a constitutionally protected property interest in the CIGP grants that they applied for, have been approved for, and rely on. Plaintiffs have spent money to meet the terms of their grants in reliance on being reimbursed from their grant award. Plaintiffs' property interest in those grant awards is established and governed by terms and conditions with the federal government. *See, e.g.*, *Cnty. of Santa Clara v. Trump*, 275 F. Supp. 3d 1196, 1218 (N.D. Cal. 2017), *aff'd in part, vacated in part, remanded sub nom. City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225 (9th Cir. 2018).

131. Section 19 of the Executive Order gives Agency Defendants virtually unbound discretion to "[p]ause distribution" of or "[t]erminate" Congressionally appropriated funds, to "non-

38

governmental organizations supporting or providing services, either directly or indirectly, to removable or illegal aliens."

132. The Noem Memorandum and the Freeze Letter deprive Plaintiffs of their due-process rights because they freeze all DHS grant disbursements that go to nonprofits and "touch in any way on immigration" without any further explanation as to why these CIGP grants were frozen, when the freeze will be lifted, and what may be done to review or challenge this decision.

133. Section 19(b) of the Executive Order, the Noem Memorandum, and the Freeze Letter deprive Plaintiffs of their property interest in their grant awards. Plaintiffs have had to reallocate resources to continue abiding by the terms and conditions of their award, have incurred expenses in reliance of the grant award, and have had their operations disrupted from an indeterminate freeze of their grants. Plaintiffs had no notice of the freeze to plan for the concomitant hardships nor do they have any way to review or challenge the government's decision to withhold their grant funds.

### COUNT V

### Ultra vires
### (Against all Defendants)

134. Plaintiffs restate and reallege all paragraphs above as if fully set forth here.

135. Plaintiffs have a nonstatutory right of action to declare unlawful and enjoin Defendants' unconstitutional actions.

136. No statute, constitutional provision, or other source of law authorizes Defendants to withhold appropriated DHS funds. Defendants' actions in doing so exceed their lawful authority.

### PRAYER FOR RELIEF

Plaintiffs respectfully request that this Court:

a.      Declare the January 28, 2025 Noem Memorandum unconstitutional and unlawful;

b.      Declare Section 19(b) of Executive Order 14159 unconstitutional and unlawful;

c.      Vacate and set aside the January 28, 2025 Noem Memorandum and the Agency Defendants' other actions to implement it, pursuant to 5 U.S.C. § 706(2), and declare that these actions are arbitrary and capricious and contrary to law;

d.      Temporarily restrain and preliminarily and permanently enjoin Defendants from implementing Section 19(b) of the Executive Order and the Noem Memorandum, or from otherwise freezing the disbursement of obligated DHS funds;

e.      Postpone the effective date of the January 28, 2025 Noem Memorandum and any actions by Defendants to implement it or to otherwise freeze the disbursement of appropriated and obligated DHS funds, pursuant to 5 U.S.C. § 705;

f.      Order Defendants to file a status report within 24 hours of the entry of a temporary restraining order, preliminary injunction, or 5 U.S.C. § 705 stay, and at regular intervals thereafter, confirming compliance with the order;

g.      Enjoin Defendants from imposing any negative consequences on Plaintiffs or similarly situated organizations for noncompliance with the terms of their respective DHS grants if such noncompliance is due directly or indirectly to the funding freeze Defendants imposed;

h.      Award Plaintiffs reasonable attorneys' fees and costs; and

i.      Grant such other and further relief as the Court may deem appropriate.

## JURY DEMAND

Plaintiffs demand a jury trial of all issues so triable under Rule 38 of the Federal Rules of Civil Procedure.

March 17, 2025

Niyati Shah[+]
Shalaka Phadnis*
ASIAN AMERICANS ADVANCING
JUSTICE—AAJC
1620 L St. NW, Suite 1050
Washington, DC 20036
nshah@advancingjustice-aajc.org
sphadnis@advancingjustice-aajc.org

Jose Perez*
LATINOJUSTICE PRLDEF,
NYC Headquarters
475 Riverside Dr., Suite 1901
New York, NY 10115
jperez@latinojustice.org

Nickole Durbin-Felix*
LATINOJUSTICE PRLDEF
Southeast Regional Office
4700 Millenia Blvd., Suite 500
Orlando, FL 32839
ndurbin-felix@latinojustice.org

Respectfully submitted,

 /s/ Bradley Girard
Bradley Girard (Bar No. 31437)
Sarah M. Rich*
Adnan Perwez*
Robin F. Thurston[+]
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, DC 20043
Phone: (202) 448-9090
Fax: (202) 796-4426
bgirard@democracyforward.org
srich@democracyforward.org
aperwez@democracyforward.org
rthurston@democracyforward.org

*Counsel for Plaintiffs*

[+] *Application for full admission pending*

\* *Motion to appear* pro hac vice *forthcoming*