# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **Solutions in Hometown Connections,** *et al.*, <br><br> Plaintiffs, <br><br> **v.** <br><br><br><br> **Kristi Noem,** *et al.*, <br> Defendants. | **Civil Case No. 8:25-cv-00885-LKG** |

## MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION & APA § 705 STAY

**TABLE OF CONTENTS**

Table of Authorities .................................................................................................... ii

Introduction ................................................................................................................. 1

Factual Background ..................................................................................................... 2

    I.    To fulfill its statutory mission, DHS creates the Citizenship and Integration Grant Program to promote citizenship education and naturalization.................................. 2

    II.   Plaintiffs apply for, and receive, DHS grants to help noncitizens prepare for naturalization. .......................................................................................................... 4

    III.  Agency Defendants illegally freeze grant funds. ................................................. 6

    IV.  Plaintiffs suffer immediate and irreparable harm. .............................................. 9

Argument .................................................................................................................... 11

    I.    Plaintiffs are likely to succeed on the merits of their APA claims. ................... 12

    II.   Plaintiffs are already suffering irreparable harm. .............................................. 23

    III.  The balance of equities and public interest favor Plaintiffs............................... 27

    IV.  Standing ............................................................................................................. 28

    V.   Relief.................................................................................................................. 29

Conclusion ................................................................................................................. 30

# TABLE OF AUTHORITIES

**Cases**                                                                                                    **Page(s)**

*AIDS Vaccine Advoc. Coal. v. Dep't of State*, No. 25-00400, 2025 WL 752378 (D.D.C. Mar. 10, 2025) .................................................................................................. 16, 20, 24, 27, 28, 31

*AIDS Vaccine Advoc. Coal. v. U.S. Dep't of State*, No. 25-00400, 2025 WL 485324 (D.D.C. Feb. 13, 2025) .................................................................................................. 18, 31

*Al Otro Lado v. Mayorkas*, No. 17-cv-02366, 2021 WL 3931890 (S.D. Cal. Sept. 2, 2021) ...... 23

*Am. Ass'n of Colleges for Tchr. Educ. v. McMahon*, No. 1:25-CV-00702-JRR, 2025 WL 833917 (D. Md. Mar. 17, 2025) .................................................................................................. 18, 19

*Ass'n of Cmty. Cancer Ctrs. v. Azar*, 509 F. Supp. 3d 482  (D. Md. 2020) ................................. 30

*Bedford Cnty. Mem. Hosp. v. Health & Human Servs.*, 769 F.2d 1017 (4th Cir. 1985) .. 17, 20, 22

*Bennett v. Spear*, 520 U.S. 154 (1997) ...................................................................................... 16

*Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156 (1962) ...................................... 18, 19

*California v. U.S. Dep't of Educ.*, No. CV 25-10548-MJJ, 2025 WL 760825 (D. Mass. Mar. 10, 2025) ...................................................................................................... 18

*Casa de Maryland, Inc. v. Wolf*, 486 F. Supp. 3d 928 (D. Md. 2020) .................................... 15, 33

*Clinton v. City of New York*, 524 U.S. 417 (1998) ...................................................................... 25

*Collins v. Yellen*, 594 U.S. 220 (2021) ...................................................................................... 31

*Deese v. Esper*, 483 F. Supp. 3d 290 (D. Md. 2020) ................................................................. 24

*Dep't of Homeland Security v. Regents of the Univ. of Cal.*, 591 U.S. 1 (2020) .......................... 21

*F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009) ...................................................... 21

*Fed. Election Comm'n v. Ted Cruz for Senate*, 596 U.S. 289 (2022) .......................................... 26

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167 (2000) ................. 31

*Griffith v. Fed. Lab. Relations Auth.*, 842 F.2d 487 (D.C. Cir. 1988) ......................................... 16

*Handsome Brook Farm, LLC v. Humane Farm Animal Care, Inc.*, 700 Fed. App'x 251 (4th Cir. 2017) ...................................................................................................... 29

*HIAS, Inc. v. Trump*, 415 F. Supp. 3d 669 (D. Md. 2020) ............................................... 27, 30, 31

*HIAS, Inc. v. Trump*, 985 F.3d 309 (4th Cir. 2021) ...................................................... 32

*Hogge v. Hedrick*, 391 F. Supp. 91 (E.D. Va. 1974) ...................................................... 29

*In re Aiken County*, 725 F.3d 255 (D.C. Cir. 2013)........................................................ 26

*In re Microsoft Corp. Antitrust Litig.*, 333 F.3d 517 (4th Cir. 2003) ........................... 14

*Int'l Refugee Assistance Project v. Trump*, 883 F.3d 233 (4th Cir. 2018).................... 26

*Louisiana v. Biden*, 622 F. Supp. 3d 267 (W.D. La. 2022) .......................................... 16

*Marin Audubon Soc'y v. Fed. Aviation Admin.*, 121 F.4th 902 (D.C. Cir. 2024)......................... 26

*Mayor of Balt. v. Azar*, 973 F.3d 258 (4th Cir. 2020)................................................... 17

*Michigan v. E.P.A.*, 576 U.S. 743 (2015) ...................................................................... 17

*Miranda v. Garland*, 34 F.4th 338 (4th Cir. 2022) ........................................................ 30

*Moore v. Kempthorne*, 464 F. Supp. 2d 519 (E.D. Va. 2006) ……………………………...14

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) .................................................................................................... 17, 19, 20, 22, 23

*Mountain Valley Pipeline, LLC v. 6.56 Acres of Land, Owned by Sandra Townes Powell*, 915 F.3d 197 (4th Cir. 2019) .......................................................................... 27

*Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*, No. 25-CV-333, 2025 WL 573764 (D. Md. Feb. 21, 2025) ...................................................................... 33

*Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, No. 25-239, 2025 WL 368852 (D.D.C. Feb. 3, 2025) ....................................................................................... 16, 18, 27

*Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, No. CV 25-239, 2025 WL 597959 (D.D.C. Feb. 25, 2025) .......................................................................... 33

*Nat'l Fed'n of Indep. Bus. v. Occupational Safety & Health Admin.*, 595 U.S. 109 (2022)........ 26

*New York v. Trump*, No. 25-cv-39, 2025 WL 715621 (D.R.I. Mar. 6, 2025).............................. 21

*Nken v. Holder*, 556 U.S. 418 (2009) ............................................................................ 30

*Ohio v. EPA*, 603 U.S. 279 (2024)........................................................................... 17, 18

*Open Communities All. v. Carson*, 286 F. Supp. 3d 148  (D.D.C. 2017) ............................... 30, 32

*Pashby v. Delia*, 709 F.3d 307 (4th Cir. 2013) ............................................................. 33

*PFLAG, Inc v. Trump*, No. 25-337, 2025 WL 510050 (D. Md. Feb. 14, 2025) ........................... 17

*Pursuing Am. Greatness v. Fed. Election Comm'n*, 831 F.3d 500 (D.C. Cir. 2016) ................... 30

*Rochester Pure Waters Dist. v. EPA*, 960 F.2d 180 (D.C. Cir. 1992) ........................................... 26

*Rodriguez v. Robbins*, 715 F.3d 1127 (9th Cir. 2013) ...................................................................... 30

*Roe v. Dep't of Def.*, 947 F.3d 207 (4th Cir. 2020) ............................................................... 18, 32

*Strickland v. United States*, 32 F.4th 311 (4th Cir. 2022) .......................................................... 16

*U.S. Dep't of Navy v. Fed. Lab. Rels. Auth.*, 665 F.3d 1339  (D.C. Cir. 2012) ........................... 25

*United States v. South Carolina*, 720 F.3d 518 (4th Cir. 2013) ................................................... 14

*Winter v. Nat. Res. Def. Council*, 555 U.S. 7 (2008) .................................................................... 14

*Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952) ................................................... 25

**Statutes**

2 U.S.C. §§ 683-684 ..................................................................................................................... 26

31 U.S.C. § 1301 ........................................................................................................................... 26

5 U.S.C. § 704 ............................................................................................................................... 15

5 U.S.C. § 705 ............................................................................................................................... 15

5 U.S.C. § 706 .............................................................................................................. 17, 22, 25, 26

6 U.S.C. § 111 ............................................................................................................................... 23

6 U.S.C. § 271 ............................................................................................................................. 5, 23

8 U.S.C. § 1382 ............................................................................................................................... 6

Consolidated Appropriations Act of 2023, Pub. L. No. 117-328, 136 Stat. 4459 (2022) ........ 6, 24

Further Consolidated Appropriations Act of 2024, Pub. L. No. 118-47, 138 Stat. 460 (2024) 6, 24

**Regulations**

2 C.F.R. § 200.300 ......................................................................................................................... 24

2 C.F.R. § 200.305 ......................................................................................................................... 25

2 C.F.R. § 200.340 ......................................................................................................................... 29

2 C.F.R. §§ 200 *et seq.*, 3002.10 ........................................................................... 24

**Constitutional Provisions**

U.S. Const., art. I, § 8 ............................................................................................. 25

U.S. Const., art. I, § 9 ............................................................................................. 25

U.S. Const., art. II, § 3 ............................................................................................ 25

**Other Authorities**

Exec. Order 14159, 90 Fed. Reg. 8443 (Jan. 20, 2025) ..................................... 9, 10

*Fiscal Year 2024 Citizenship and Integration Grant Program*, U.S. Citizenship and Immigration
    Services, https://perma.cc/H8D4-HYRH (last visited Mar. 24, 2025) ...................................... 7

*FY 2023 Grant Recipients*, U.S. Citizenship and Immigration Services,
    https://perma.cc/2EBL-HQDK (last visited Mar. 16, 2025) ..................................................... 8

*Grant Program Impact,* U.S. Citizenship and Immigration Services,
    https://perma.cc/WZM4-EGLF (last visited Mar. 16, 2025) ........................................... 5, 6, 21

Hannah Allam, *Killing Grants That Have Saved Lives: Trump's Cuts Signal End to Government
    Work on Terrorism Prevention*, ProPublica (Mar. 20, 2025), https://perma.cc/M7TX-ZWWE
    ................................................................................................................................ 10

Letter from 35 Members of Congress to Acting USCIS Director Kika Scott (Mar. 7, 2025),
    https://perma.cc/M67S-A8YZ ...................................................................................... 21

*Murphy, Underwood Demand Answers On Reported FEMA Grant Freeze*, Chris Murphy (Feb.
    14, 2025), https://perma.cc/DG6T-3JJE ...................................................................... 10

## INTRODUCTION

For the past 15 years, U.S. Citizenship and Immigration Services (USCIS)—a component of the Department of Homeland Security—has issued grants to nonprofits to assist eligible Lawful Permanent Residents (LPRs) with learning English, studying for the citizenship test, and applying to be naturalized U.S. citizens. This work not only helps LPRs navigate the naturalization process; it also helps them integrate into American society. Plaintiffs are nonprofits across the country that have received these grants and rely on them to provide critical naturalization services.

But in early February, USCIS emailed Plaintiffs that their grants had been frozen for an indefinite period of time. The harm to Plaintiffs was immediate and irreparable. Plaintiffs rely on the grant funds to continue their programming and services. As a result of the freeze, they have had to lay off and reassign staff, cancel partnerships with other organizations, shrink their citizenship programming, or find other ways to continue to provide services for the communities that have come to count on them.

The only explanation Plaintiffs were given for the freeze was that it was required by an unpublished memorandum by Secretary of Homeland Security Kristi Noem. Attempting to implement one of President Trump's executive orders, Secretary Noem froze *all* grant funds to nonprofits that "touch in any way on immigration." She gave three reasons—that the funds might be used to support illegal immigration, that the grants might contain racially discriminatory language, and that the grants might not be the most efficient use of government resources. Secretary Noem did not explain why a list of vague, potential concerns justified freezing *all* grants. Nor did she provide even a scrap of data or factual findings to support her decision. She ignored that Plaintiffs and others have genuine reliance interests on the grant funds. And she ignored the statutory and constitutional limits on her authority. Any of those failures is alone enough to

conclude that the freeze violated the Administrative Procedure Act. Taken together, there can be no question.

Given the immense and immediate harm caused by the grant freeze, and the utter lack of justification for it, Plaintiffs seek to temporarily restrain or preliminarily enjoin Defendants from taking any actions implementing the freeze. Alternatively, Plaintiffs request that the Court postpone the effective date of Noem's memorandum under Section 705 of the APA.

## FACTUAL BACKGROUND

### I.    To fulfill its statutory mission, DHS creates the Citizenship and Integration Grant Program to promote citizenship education and naturalization.

When DHS and its component agency USCIS were created in 2003, Congress tasked the agency with "promoting instruction and training on citizenship responsibilities for aliens interested in becoming naturalized citizens of the United States, including the development of educational materials." 6 U.S.C. § 271(f)(2). In 2009, USCIS's Office of Citizenship created the Citizenship and Integration Grant Program (CIGP) to "provide[] support to community-based, non-profit organizations and educational institutions actively working to remove barriers to naturalization."[1] Grant recipients, which include "community and faith-based groups, public libraries, and adult education and literacy organizations," provide "English language and civics instruction, legal assistance with naturalization applications, and … community space for immigrant [integration]" to qualified LPRs, known colloquially as green card holders.[2]

---

[1] *Grant Program Impact,* U.S. Citizenship and Immigration Services, https://perma.cc/WZM4-EGLF (last visited Mar. 16, 2025).

[2] *Id.* It appears that the Agency Defendants may have replaced "integration" and variations thereon with "assimilation" and its variations on Agency websites discussing the CIGP. This USCIS webpage does not indicate the date it was last updated, so it is unclear to Plaintiffs when this change in terminology was implemented.

Since 2009, USCIS has awarded more than $155 million through 644 competitive CIGP grants to organizations in 41 states and the District of Columbia. These grants have helped more than 350,000 LPRs prepare for citizenship.[3]

The CIGP is funded largely through Congressional appropriations.[4] In Fiscal Year 2023, Congress appropriated $25 million "for the Citizenship and Integration Grant Program, … to remain available until September 30, 2024." Consolidated Appropriations Act of 2023, Pub. L. No. 117-328, 136 Stat. 4459, 4745 (2022). In Fiscal Year 2024, Congress appropriated $10 million "for the Citizenship and Integration Grant Program, … to remain available until September 30, 2025." Further Consolidated Appropriations Act of 2024, Pub. L. No. 118-47, 138 Stat. 460, 612 (2024).

The CIGP awards various types of grants. The most common are Citizenship Instruction and Naturalization Application Services (CINAS) grants, which help public or nonprofit organizations offer citizenship instruction and assistance filing applications for naturalization.[5] CINAS recipients receive funds over the course of a two-year performance period and report their performance metrics quarterly to USCIS, including the number of LPRs enrolled in citizenship-instruction classes and these students' educational gains, as well as the number of LPRs the

---

[3] *Id.*

[4] In May 2017, Congress authorized USCIS to supplement its CIGP appropriations with "gifts, including donations of property, for the purpose of providing an immigrant integration grants program and related activities to promote citizenship and immigrant integration." 8 U.S.C. § 1382. Congress stipulated that gifts received for CIGP "shall remain available until expended, and shall be available in addition to any funds appropriated or otherwise made available for an immigrant integration grants program or other activities to promote citizenship and immigrant integration." *Id.*

[5] *Fiscal Year 2024 Citizenship and Integration Grant Program*, U.S. Citizenship and Immigration Services, https://perma.cc/H8D4-HYRH (last visited Mar. 24, 2025).

recipients screen for naturalization eligibility and help apply for naturalization. *See. e.g.*, Ex. L, J.R. 046-47.

The CIGP also awards Community and Regional Integration Network (CARING) Grants, which are similar to CINAS grants but are specifically focused on helping the most vulnerable immigrants, including refugees, asylees, Cuban and Haitian nationals, and victims of human trafficking. Ex. M, J.R. 100. In addition to citizenship instructions and naturalization services, CARING grants also support extended civic integration services. *Id*., J.R. 099. CARING grantees also develop individualized integration plans for each immigrant who participates in the program. *Id*., J.R. 099, 103. Like CINAS recipients, CARING recipients receive funding over the course of a two-year performance period and are evaluated on the same performance metrics plus the number of integration plans developed. *Id*., J.R. 101.

## II. Plaintiffs apply for, and receive, DHS grants to help noncitizens prepare for naturalization.

Plaintiffs are nonprofit organizations from across the country that work with LPRs to prepare them to become U.S. citizens. From Greenbelt to Los Angeles and in between, Plaintiffs serve low-income immigrant communities where they are located, collectively helping thousands of people reach the difficult and meaningful goal of U.S. citizenship. To accomplish this work, Plaintiffs applied for and were awarded CIGP grants. Compl. ¶ 62; *see, e.g.*, Ex. C, J.R. 004 ¶ 6.

USCIS awarded more than $22 million in CIGP grants from fiscal year 2023 funding to 65 organizations, with a performance period of October 1, 2023, through September 30, 2025.[6] A majority of these grants were CINAS grants, which were awarded to 51 organizations around the country, including Plaintiffs Coalition for Humane Immigrant Rights (CHIRLA), Michigan

---

[6] *FY 2023 Grant Recipients*, U.S. Citizenship and Immigration Services, https://perma.cc/2EBL-HQDK (last visited Mar. 16, 2025).

United, the Central American Resource Center (CARECEN), Community Center for Immigrants (CCI), the English Skills Learning Center (ESLC), Instituto del Progreso Latino (IDPL), and HIAS Pennsylvania (HIAS PA). Compl. ¶ 63, *see also* Exs. D-H, I, K, J.R. 008, 012, 016, 020–21, 025, 029, 042. USCIS also awarded its only CARING grant to Plaintiff Solutions in Hometown Connections (SHC), which invested more than a year in planning to receive the funds. Ex. C, J.R. 004 ¶ 8.

USCIS also awarded millions of dollars in grants in fiscal year 2024, including $283,018 to Plaintiff Immigrant Law Center of Minnesota (ILCM). Ex. J, J.R. 035–36 ¶ 4. The 2024 grants have a performance period of November 22, 2024, through September 30, 2026. *Id.*

Plaintiffs each received a grant award letter from Agency Defendants memorializing the terms and conditions of the grant. Each of those award letters included a provision stating that "2 CFR Part 200," the "Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Award," is "incorporated into this Award by this reference." *See, e.g.*, Ex. C, J.R. 004 ¶ 6; Ex. D, J.R. 008 ¶ 5; Ex. E, J.R. 012 ¶ 5.

For many Plaintiffs, their CIGP grant continued years-long programmatic relationships with USCIS. *See, e.g.*, Ex. G, J.R. 020 ¶ 8; Ex. K, J.R. 043 ¶ 10. Plaintiffs use their CIGP grant funding to provide comprehensive naturalization services to LPRs, including eligibility screening, legal representation in the naturalization process, and citizenship and English language classes. *See, e.g.*, Ex. D, J.R. 007–08 ¶¶ 3-4; Ex. F, J.R. 015 ¶ 3; Ex. G, J.R. 019 ¶ 3; Ex. K, J.R. 019 ¶ 3. They have hired dedicated staff and have built programs, developed educational materials, and contracted with third parties to provide high-quality citizenship and naturalization services. *See, e.g.*, Ex. C, J.R. 004 ¶¶ 4-5 (programs tailored to specific client population, services provided over course of years, former students hired as childcare providers for current students); Ex. J, J.R. 035 ¶ 4 (grant

funds portion of 11 employees' work and subgrantee that provides citizenship classes). Plaintiffs serve a broad variety of communities, including several that are historically difficult to reach and where Plaintiffs have invested time and other organizational resources to establish their good reputations as service providers. *See, e.g.*, Ex. C, J.R. 003 ¶ 3, 006 ¶ 18 (years of work with Afghan and Iraqi wives of Special Immigrant Visa holders); Ex. E, J.R. 011–12 ¶ 4 (years of building trust with low-income, naturalization-eligible Latino immigrants); Ex. J, J.R. 039 ¶ 16 (29 years' investment in serving immigrants in Minnesota, North Dakota). Plaintiffs regularly reported their performance metrics to USCIS and were in good standing with Agency Defendants until their programs were turned upside down in early February. *See, e.g.*, Ex. I, J.R. 029–30 ¶ 5.

### III. Agency Defendants illegally freeze grant funds.

On January 20, 2025, President Trump issued Executive Order 14159, titled "Protecting the American People Against Invasion." *See* 90 Fed. Reg. 8443. Section 19(a) of the Executive Order requires the Secretary of Homeland Security to "[i]mmediately review and, if appropriate, audit all contracts, grants, or other agreements providing Federal funding to non-governmental organizations supporting or providing services, either directly or indirectly, to removable or illegal aliens, to ensure that such agreements conform to applicable law and are free of waste, fraud, and abuse, and that they do not promote or facilitate violations of our immigration laws." *Id.* at 8447. Section 19(b) further instructs the Secretary to "[p]ause distribution of all further funds pursuant to such agreements pending the results" of review, while sections 19(c) and (e) instruct the Secretary to "[t]erminate all such agreements determined to be in violation of law or to be sources of waste, fraud, or abuse," and "[i]nitiate clawback or recoupment procedures, if appropriate, for any agreements" meeting this description. *Id.*

Following the Executive Order, Secretary Noem issued a Memorandum to DHS component agency and office heads on January 28, 2025, placing "on hold pending review" "all Department grant disbursements and assessments of grant applications that: (a) go to non-profit organizations or for which non-profit organizations are eligible, and (b) touch in any way on immigration, . . . except to the extent required by controlling legal authority." Ex. A, J.R. 001. Secretary Noem gave three reasons for "this freeze": "(1) concerns that these grants may be funding illegal activities, such as encouraging or inducing illegal immigration, 8 U.S.C. § 1324(a)(1)(A)(iv), or illegal harboring of illegal aliens, 8 U.S.C. § 1324(a)(1)(A)(ii)-(iii); (2) concerns that there may be racially discriminatory language in certain grants; and (3) concerns that these grants may not be an efficient use of government resources." *Id.* The Noem Memorandum made the funding freeze "[e]ffective immediately."[7] *Id.* Any DHS component that sought to keep grant funds flowing "to the extent required by controlling legal authority" was required to "obtain the express written consent of the General Counsel or his delegee" within seven days. *Id.*

Seven days later, on February 4, 2025, Plaintiffs were sent an email from USCIS's CIGP email address, attaching a letter from Mary Jane Sommerville. *See, e.g.*, Ex. D, J.R. 008 ¶ 6; *see also* Ex. B, J.R. 002. The attached letter stated that, "[p]ursuant to the Department of Homeland Security Secretary Kristi Noem's memorandum dated January 28, 2025, and effective immediately, your grant from U.S. Citizenship & Immigration Services is frozen." Ex. B, J.R. 002. The Freeze Letter stated further that "payments are not available at this time," and that USCIS "recognize[d] this will

---

[7] Based on public reporting and information, the funding freeze resulting from the Noem memorandum seems to have impacted DHS grants in addition to CIGP grants, including grants awarded by the Federal Emergency Management Agency. *See Murphy, Underwood Demand Answers On Reported FEMA Grant Freeze*, Chris Murphy (Feb. 14, 2025), https://perma.cc/DG6T-3JJE; Hannah Allam, *Killing Grants That Have Saved Lives: Trump's Cuts Signal End to Government Work on Terrorism Prevention*, ProPublica (Mar. 20, 2025), https://perma.cc/M7TX-ZWWE.

have an impact on your organization" but was "unable to provide a timeline on this freeze." *Id.* The Freeze Letter did not, however, instruct Plaintiffs to stop their grant-required, (previously) grant-funded work.

Plaintiffs did not receive any notice from Agency Defendants prior to the Freeze Letter that their grant funds would be frozen for the foreseeable future. S*ee, e.g.*, Ex. D, J.R. 008 ¶ 7; Ex. J, J.R. 037 ¶ 9. Neither did the Freeze Letter provide Plaintiffs any means to challenge the decision to freeze funds or a timeline for when the freeze would be lifted, if at all. *See* Ex. B, J.R. 002. Plaintiffs have received no information from Agency Defendants since February 4, 2025, regarding a timeline for the freeze or providing them any means to contest or appeal it. *See, e.g.*, Ex. C, J.R. 005 ¶ 13; Ex. I, J.R. 032 ¶ 11; Ex. J, J.R. 038 ¶ 13. And no Plaintiffs were even provided with the Noem Memorandum—the basis for the funding freeze—nor has the Memorandum been published on any government website.[8]

Most Plaintiffs have outstanding requests for reimbursement, and all will need to submit additional reimbursement requests shortly. *See, e.g.*, Ex. G, J.R. 021 ¶ 12 ($13,684.55 in expenses they cannot submit reimbursement for); Ex. H, J.R. 026 ¶ 11 (awaiting reimbursement for over a year's expenses); Ex. K, J.R. 043 ¶ 9 (awaiting $12,416 in reimbursement). Several plaintiffs have made multiple attempts to contact USCIS and ascertain when, or if, the freeze will be lifted, or to draw down their grant funds, all with no response. *See, e.g.*, Ex. H, J.R. 026 ¶¶ 9-10 (reimbursement requests in February and March were automatically rejected); Ex. I, J.R. 032 ¶ 11 (several unanswered attempts to contact USCIS).

---

[8] Plaintiffs' Exhibit A is a copy of the memo submitted by the government as evidence in a different case. *State of New York, et al. v. Trump, et al.*, No. 25-cv-39 (D.R.I. Feb. 11, 2025) (Dkt. 102-2).

## IV. Plaintiffs suffer immediate and irreparable harm.

The DHS funding freeze caused immediate harm to Plaintiffs and communities across the nation. Plaintiffs have not been able to access their grant funding since this freeze started (with one exception that appears to have been inadvertent).[9] *See, e.g.*, Ex. D, J.R. 009 ¶¶ 9-10. Plaintiffs are facing escalating bills and a refusal by DHS to provide any information about when or if the freeze will be lifted, despite making various attempts to contact their respective grant administrators and submitting invoices for payment. *See, e.g.*, Ex. C, J.R. 005 ¶ 11-13; Ex. J, J.R. 037-038 ¶ 11-13.

Without access to their funding, several Plaintiffs have already been forced to eliminate or restrict the services they provide under the grant, including by cutting citizenship classes, canceling future appointments for screening services, refusing new clients, and turning to fee-based models. *See, e.g.*, Ex. C, J.R. 005 ¶ 15; Ex. D, J.R. 009 ¶ 14; Ex. F, J.R. 017 ¶ 14; Ex. J, J.R. 038 ¶ 14; Ex. K, J.R. 042-043 ¶ 7. Additionally, some Plaintiffs have been forced to lay off or reassign staff whose salaries were funded by CIGP grant money, or have seen key staff members resign due to the uncertainty caused by the funding freeze. *See, e.g.*, Ex. D, J.R. 009 ¶ 11 (laid off all part-time citizenship instructors and one additional part-time employee); Ex. F, J.R. 017 ¶ 13 (part-time instructor left due to funding uncertainty); Ex. G, J.R. 021-022 ¶¶ 13, 15 (moved citizenship staff to short-term funding stream and unrelated program that does not use their skills, and one staff member left due to funding uncertainty).

---

[9] HIAS PA's disbursement of grant funds on February 12 appears to have been a fluke, not a sign that their freeze was lifted. Ex. I, J.R. 031-032 ¶¶ 10-11. HIAS PA has received no notification from Agency Defendants that their funding freeze is over, and the organization's multiple attempts to contact USCIS to inquire about the freeze have gone unanswered. *Id.* ¶ 11.

In many cases, the communities that Plaintiffs serve will be effectively left without access to critical naturalization services, including legal representation and citizenship or English classes. Ex. H, J.R. 025 ¶ 6; Ex. I, J.R. 033 ¶ 15; Ex. J, J.R. 040 ¶ 17. Plaintiffs fear that their clients will be forced to turn to unaffordable private firms, or predatory firms that have made mistakes with naturalization applications in the past. Ex. F, J.R. 017 ¶ 13. Because Plaintiff SHC is the sole CARING grant recipient in the country, the vulnerable community they serve in Maryland—especially Afghan and Iraqi women—would be left with no other organization to turn to for access to services. Ex. C, J.R. 006 ¶ 21. SHC has already been forced to turn away a client whose husband abused and abandoned her, and who cannot speak or read English, for lack of funds to provide additional clients with services. *Id.* ¶ 20.

All Plaintiffs, even those who have managed to continue offering services for now, are facing imminent staff cuts, elimination of programs, and reliance on unpredictable volunteer efforts to sustain themselves. *See, e.g.*, Ex. C, J.R. 006 ¶ 17; Ex. D, J.R. 010 ¶ 15; Ex. E, J.R. 014 ¶ 14; Ex. F, J.R. 017 ¶ 14; Ex. G, J.R. 022 ¶ 18; Ex. H, J.R. 026-027 ¶ 12; Ex. I, J.R. 032 ¶ 12; Ex. J, J.R. 037-038 ¶¶ 10-11; Ex. K, J.R. 043 ¶ 10. Plaintiffs' cost-cutting decisions in response to the freeze subject them to the possibility of violating the terms of their grants and thus losing the remainder of their CIGP funding even if Defendants lift the current freeze. *See, e.g.*, Ex. G, J.R. 022 ¶ 15; Ex. I, J.R. 032 ¶ 12; Ex. J, J.R. 038-039 ¶ 14; Ex. K, J.R. 043 ¶ 10.

And crucially, the changes wrought by this sudden, unexplained funding freeze damage the reputations that Plaintiffs have built over years in their communities, particularly with hard-to-reach client populations. *See* Ex. C, J.R. 006 ¶ 18 (organization spent years building trust with Afghan, Iraqi communities); Ex. D, J.R. 009-010 ¶¶ 14, 16 (charging for classes, firing instructors, and scaling back program will tarnish reputation); Ex. E, J.R. 013-014 ¶¶ 12-14 (citizenship

program builds trust and credibility with clients and serves as "talent pipeline"); Ex. F, J.R. 017-018 ¶¶ 15-16 (funding freeze hurting long-term ability to build relationships and trust); Ex. G, J.R. 022 ¶ 16 (students will be worried if organization is perceived to be under scrutiny by federal government); Ex. I, J.R. 033 ¶ 14 (students will lose trust if classes and services are canceled after they already paid USCIS fee).

## ARGUMENT

Granting a temporary restraining order or preliminary injunction can "protect the status quo," "prevent irreparable harm during the pendency of a lawsuit," and give the Court time to "render a meaningful judgment on the merits." *United States v. South Carolina*, 720 F.3d 518, 524 (4th Cir. 2013) (quoting *In re Microsoft Corp. Antitrust Litig.*, 333 F.3d 517, 525 (4th Cir. 2003)). The substantive standard for granting a temporary restraining order is the same as for a preliminary injunction. *Moore v. Kempthorne*, 464 F. Supp. 2d 519, 525 (E.D. Va. 2006).

Preliminary relief—whether a temporary restraining order or a preliminary injunction—is appropriate if plaintiffs show that: "(1) there is a likelihood of success on the merits; (2) there is a likelihood the movant will suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in movant's favor; and (4) the injunction is in the public interest." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008). All four factors weigh in Plaintiffs' favor here.

In APA cases, courts may "issue all necessary and appropriate process to . . . preserve status or rights pending conclusion of the review proceedings" when doing so is "necessary to prevent irreparable injury." 5 U.S.C. § 705. The standard for relief under Section 705 is the same as for a preliminary injunction under Federal Rule of Procedure 65(a). *Casa de Maryland, Inc. v. Wolf*, 486 F. Supp. 3d 928, 949-50 (D. Md. 2020).

Secretary Noem's decision to freeze all immigration-related grants is unlawful. It is arbitrary and capricious on its face—wholly lacking in factfinding, reasoning, or any link between its stated rationale and the course of action it immediately effectuates. It fails to consider reliance interests in the slightest. It is contrary to law, regulations, and the Constitution, and entirely in excess of DHS's statutory authority. For these reasons, Plaintiffs are likely to succeed on their APA claims. Plaintiffs have also established that Defendants' funding freeze is already causing irreparable harm to their operations and ability to fulfill their missions. Because enjoining this freeze would merely require Defendants to respect statutory and constitutional law and maintain the status quo, the balance of equities and the public interest tilt in Plaintiffs' favor and demand injunctive relief.

## I.  Plaintiffs are likely to succeed on the merits of their APA claims.

Agency Defendants' final agency action of suddenly and indefinitely freezing Plaintiffs' grant disbursements is the essence of arbitrary and capricious government policy. It also flatly contradicts the Constitution, various laws, and the agency's own regulations, and is utterly without statutory authorization.

***Final Agency Action***: As an initial matter, the Noem Memorandum and the Freeze Letters (the "DHS funding freeze") constitute final agency action. *See* 5 U.S.C. § 704. Final agency actions are those (1) that "mark the consummation of the agency's decisionmaking process," and (2) "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (quotation marks omitted). "[A] 'final agency action' does not have to be defined as permanent to be considered final." *Louisiana v. Biden*, 622 F. Supp. 3d 267, 292 (W.D. La. 2022) (collecting over a dozen cases in which courts found final agency action where agencies paused or delayed programs).

12

The DHS funding freeze meets both prongs because it immediately and conclusively directed the termination of federal grant disbursements to Plaintiffs for an unknown period of time. *See id.* As far as Plaintiffs know, their grants are frozen indefinitely. Ex. B, J.R. 002. Moreover, the Noem Memorandum gave DHS components seven days to invoke any legal authority that required grant disbursements. *See* Ex. A, J.R. 001. By issuing the Freeze Letter seven days later, Defendants consummated the decision-making process.

The DHS funding freeze has necessarily affected Plaintiffs' "rights or obligations"—forcing them to lay off staff and cut programming—and may well lead to "legal consequences," including but not limited to violating their grant terms. *Id.*; *see Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, No. 25-239, 2025 WL 368852, at *10 (D.D.C. Feb. 3, 2025) (holding that Office of Management and Budget memorandum directing agencies to immediately freeze "all Federal financial assistance" was "a directive that immediately produced legal consequences" and thus final agency action); *see also AIDS Vaccine Advoc. Coal. v. Dep't of State*, No. 25-00400, 2025 WL 752378, at *7 (D.D.C. Mar. 10, 2025) (agency actions suspending congressionally appropriated foreign aid funding is final agency action).[10]

---

[10] Even if the Court were to conclude that there was no final agency action, it could still grant Plaintiffs' motion. Where an agency has "disregarded a specific and unambiguous statutory directive" or "'violated some specific command' of a statute," its actions are *ultra vires* and reviewable by courts. *Griffith v. Fed. Lab. Relations Auth.*, 842 F.2d 487, 493 (D.C. Cir. 1988); *see also Strickland v. United States*, 32 F.4th 311, 363 (4th Cir. 2022) (plaintiffs may seek "equitable relief against federal officials in their official capacities … alleging that those officials exceeded the scope of their authority and/or acted unconstitutionally"). In addition to flying in the face of Congress's specific appropriations for CIGP, Defendants' actions are *ultra vires* because they stymy Congress's directive that USCIS provide citizenship instruction and resources. *See PFLAG, Inc v. Trump*, No. 25-337, 2025 WL 510050, at *20 (D. Md. Feb. 14, 2025) (finding likelihood of success on *ultra vires* claim where executive orders violated federal statutes and were thus "incompatible with the will of Congress").

**Arbitrary and Capricious**: Plaintiffs are likely to succeed on their claim that the DHS funding freeze is arbitrary and capricious. *See* 5 U.S.C. § 706(2)(A); *Bedford Cnty. Mem. Hosp. v. Health & Human Servs.*, 769 F.2d 1017, 1022 (4th Cir. 1985). An agency action is arbitrary or capricious if it is not "reasonable and reasonably explained." *Ohio v. EPA*, 603 U.S. 279, 292 (2024). The APA requires an agency to "examine the relevant data and articulate a satisfactory explanation for its action including 'a rational connection between the facts found and the choice made.'" *Mayor of Balt. v. Azar*, 973 F.3d 258, 275 (4th Cir. 2020) (quoting *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). That "satisfactory explanation" cannot rely "on factors which Congress has not intended it to consider, entirely fail[] to consider an important aspect of the problem, offer[] an explanation for its decision that runs counter to the evidence before the agency, or [be] so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.* (quoting *State Farm*, 463 U.S. at 43). Agency action can be upheld "only upon the grounds on which the agency acted," not based on post hoc rationalizations. *Michigan v. E.P.A.*, 576 U.S. 743, 760 (2015).

The Noem Memorandum neither cites nor examines any data. The Memorandum alleges, without support or explanation, that over the past four years, DHS has "spent billions of dollars funding illegal immigration," much of it via funding "to non-profit organizations, which purported to provide a variety of services to illegal aliens." Ex. A, J.R. 001. The Memorandum justifies the funding freeze based on three claimed concerns, all of which are speculative: (1) "that these grants may be funding illegal activities, such as encouraging or inducing illegal immigration"; (2) "that there may be racially discriminatory language in certain grants"; and (3) "that these grants may not be an efficient use of government resources." *Id.* Without any fact-finding or discussion,

14

Secretary Noem's reasons for freezing all grants "touch[ing] in any way on immigration" have not

been "reasonably explained," nor are they substantively reasonable. *See Ohio*, 603 U.S. at 292.[11]

**1.** Defendants have provided no explanation as to why vague, speculative concerns "required

an immediate and wholesale suspension of appropriated" grant funds. *AIDS Vaccine Advoc. Coal.

v. U.S. Dep't of State*, No. 25-00400, 2025 WL 485324, at *5 (D.D.C. Feb. 13, 2025); *see also

Nat'l Council of Nonprofits*, 2025 WL 368852, at *11 ("Defendants have offered no rational

explanation for why they needed to freeze all federal financial assistance—with less than twenty-

four-hours' notice—to 'safeguard valuable taxpayer resources.'"). Providing a list of ways a grant

might be objectionable "is so broad and vague as to be limitless; devoid of import, even," and "at

once accuses a Grant Recipient of nothing and everything." *See Am. Ass'n of Colleges for Tchr.

Educ. v. McMahon*, No. 1:25-CV-00702-JRR, 2025 WL 833917, at *21 (D. Md. Mar. 17, 2025),

*reconsideration denied*, 2025 WL 863319 (D. Md. Mar. 19, 2025). And a "categorical predictive

assessment" is not "a satisfactory explanation" for a decision that eliminates the possibility of

individualized determinations based on an individualized assessment of relevant facts. *Roe v.

Dep't of Def.*, 947 F.3d 207, 224 (4th Cir. 2020), *as amended* (Jan. 14, 2020).

Worse yet, DHS made no factual findings to substantiate any of its broad and vague concerns.

*See Am. Ass'n of Colleges for Tchr. Educ.*, 2025 WL 833917, at *21 (use of template termination

letter illustrates lack of individualized, or any, factfinding by agency). Because Defendants have

---

[11] This Court could grant Plaintiffs' motion based solely on the failure of the boilerplate Freeze Letters to provide any independent reasoning and to attach or explain the Noem Memorandum. After all, agency action must be "upheld, if at all, on the same basis articulated in the order by the agency itself." *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 169 (1962). Because the Freeze Letters rely only on the Noem Memorandum, which was not—and is still not—public, they "do[] not reach the level of a reasoned explanation; indeed [they] amount[] to no explanation at all." *California v. U.S. Dep't of Educ.*, No. CV 25-10548-MJJ, 2025 WL 760825, at *3 (D. Mass. Mar. 10, 2025).

not even tried to find facts—never mind articulate a "rational connection between the facts found" and the blanket freeze on all DHS grant disbursements—the freeze is arbitrary and capricious. *See State Farm*, 463 U.S. at 43 (quoting *Burlington Truck Lines*, 371 U.S. at 168).

**2.** The arbitrariness of DHS's across-the-board freeze is particularly clear with CIGP grants. The Noem Memorandum justified the freeze with three concerns. None are reasonable.

First, CIGP grants do not "encourag[e] or induc[e] illegal immigration" (a term the Memorandum does not define and that has no definition in immigration law). Ex. A, J.R. 001. These grants fund services that are available only to eligible *lawful* permanent residents who are working toward citizenship. *See, e.g.*, Ex. L, J.R. 045 ("The goal of the Citizenship and Integration Grant Program is to expand the availability of high-quality citizenship preparation services for lawful permanent residents (LPRs) across the nation and to provide opportunities for immigrants to gain the knowledge and skills necessary to integrate into the fabric of American society."). Indeed, the 2023 CINAS Notice of Funding Opportunity notes that the CIGP supports DHS' objectives "by promoting integration, inclusion, and citizenship." *Id.* And the goals of the CIGP "address the DHS mission to enforce and administer our immigration laws . . . and USCIS' mission and values, as the program provides immigrants instruction on the rights and responsibilities of U.S. citizenship and information and support on how to apply for naturalization within the authorized practice of immigration law." *Id.* There is no basis to conclude (nor do Defendants even attempt to) that providing citizenship-education classes and assistance filing naturalization applications will encourage or induce *illegal* immigration, however they define that term. Such an explanation is "so implausible that it does not represent reasonable administration of the" CIGP. *Bedford Cnty. Mem. Hosp.*, 769 F.2d at 1022.

16

Second, the Noem Memorandum does not explain what is meant by "racially discriminatory language" or provide any examples of grant programs with this language. Nor did it explain why DHS's unexplained fear of racially discriminatory language "in certain grants" justified freezing *all* grants. DHS "offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *State Farm*, 463 U.S. at 43. Emphasizing the overbreadth and arbitrariness of this justification, Plaintiffs' grants do not include "racially discriminatory" language of any kind.[12] The justification is plainly incorrect as applied to *Plaintiffs'* grants, and overbroad as to the suite of DHS grant programs impacted, rendering it arbitrary and capricious.

Finally, the Noem Memorandum's assertion that any grant that "touch[es] in any way on immigration" may not be an efficient use of government resources is facially unreasonable: "The desire to review programs for efficiency or consistency . . . does not have a rational connection to the directives to proceed with a sudden, blanket suspension of congressionally appropriated" funds. *Aids Vaccine Advoc. Coal.*, 2025 WL 752378, at *10. Nor is there any factfinding or explanation of why CIGP grants are potentially inefficient, even though the ability to audit grant programs is well within Defendants' capacity. "Rather than taking a deliberate, thoughtful approach" to addressing potential inefficiencies, "the Defendants abruptly froze" grant funds "for an indefinite period. It is difficult to perceive any rationality in this decision—let alone thoughtful consideration of practical consequences." *New York v. Trump*, No. 25-cv-39, 2025 WL 715621, at *12 (D.R.I. Mar. 6, 2025).

---

[12] The Notices of Funding Opportunity for CIGP grants make clear that grant funds may be used only for permitted purposes, including "[p]roviding services to qualified LPRs only, regardless of race, color, religion, sex, or national origin." *See* Ex. L, J.R. 060; Ex. M, J.R. 118; Ex. N, J.R. 176.

The failure to provide a reasoned explanation for the across-the-board freeze or any factual support is especially dubious because the freeze is not "a new policy created on a blank slate." *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). It is, instead, a reversal of a 16-year commitment to a program that DHS has itself promoted. For example, USCIS's own website about the impact of CIGP grants "recognizes that naturalization is a key milestone in the civic integration of immigrants. Naturalization requirements . . . encourage civic learning and build a strong foundation upon which immigrants can fully integrate into American society. Through preparing for naturalization, immigrants gain tools to become successful and meet their responsibilities as United States citizens."[13] USCIS's website further explains that "[t]he goal of the CIGP is to expand the availability of high-quality citizenship preparation services for LPRs across the nation and to provide opportunities for immigrants to gain the knowledge and skills necessary to assimilate into the fabric of American society."[14]

**3.** Further, "[w]hen an agency changes course, as DHS did here," it must "consider the serious reliance interests" of stakeholders. *Dep't of Homeland Security v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020) (internal quotation marks and citations omitted). "It would be arbitrary and capricious to ignore such matters." *Id.* Plaintiffs structured their organizations, offered services, and entered subcontractor relationships reasonably relying on receipt of the funds they were guaranteed. Planning multiple years ahead, they hired staff and took on new clients. *See, e.g.*, Ex.

---

[13] *Grant Program Impact,* U.S. Citizenship and Immigration Services, https://perma.cc/WZM4-EGLF (last visited Mar. 16, 2025).

[14] *Id.* As recently highlighted by 35 members of Congress, CIGP "improves efficiency within the system, saving USCIS valuable time and resources otherwise spent resolving errors, issuing requests for evidence, or reprocessing applications. Cutting funding for this program will only increase administrative inefficiencies and add to existing case backlogs." Letter from 35 Members of Congress to Acting USCIS Director Kika Scott (Mar. 7, 2025), https://perma.cc/M67S-A8YZ.

J, J.R. 041 ¶ 4. Now, some have had to cancel classes. Ex. J, J.R. 043 ¶ 11. Some have had to lay

off teachers. *See, e.g.*, Ex. D, J.R. 009 ¶ 11. All are contemplating drastic cuts to their citizenship

and naturalization programs or are redirecting staff time and resources away from programmatic

work towards finding new funding to fill in for the funding that Defendants suddenly and

indefinitely froze. *See, e.g.*, *id.* at ¶ 15. The only indication that Defendants gave any thought

whatsoever to these serious reliance interests was the passing mention in the Freeze Letter that

"[w]e recognize this will have an impact on your organization." Ex. B, J.R. 002. That throwaway

mention of "impact" highlights that Defendants "entirely failed to consider an important aspect of

the problem." *State Farm*, 463 U.S. at 43. *See also infra* Section II (describing irreparable harm

caused by Defendants' actions).

**Contrary to Law:** Plaintiffs are also likely to succeed on their claim that the DHS funding

freeze is contrary to law. Under the APA, the Court "shall . . . hold unlawful and set aside agency

action" that is an "abuse of discretion, or otherwise not in accordance with law"; "contrary to

constitutional right, power, privilege, or immunity"; or "in excess of statutory jurisdiction,

authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A)-(C). *See Bedford Cnty.*

*Mem. Hosp*, 769 F.2d at 1023-24 (where statute "expressly require[d]" agency to do something it

failed to do, agency action was contrary to law under the APA).

**1.** The DHS funding freeze contravenes numerous laws, including the Homeland Security Act,

the Consolidated Appropriations Act of 2023, the Further Consolidated Appropriations Act of

2024, and regulations that Agency Defendants adopted and incorporated into all their grants.

To begin, the Homeland Security Act mandates that USCIS "promot[e] instruction and

training on citizenship responsibilities for aliens interested in becoming naturalized citizens of the

United States, including the development of educational materials." 6 U.S.C. § 271(f)(2). It also

sets as a "primary mission" of DHS to "ensure that the functions of the agencies and subdivisions within the Department that are not related directly to securing the homeland are not diminished or neglected except by a specific explicit Act of Congress."[15] 6 U.S.C. § 111(b)(1)(E). As important as instruction and training on citizenship and naturalization are, they "are not related directly to securing the homeland," and thus are subject to this limitation. Agency Defendants cite no "specific explicit Act of Congress" that allows them to "diminish[] or neglect[]" their citizenship and naturalization instruction duties—nor could they, as none exists. *See Al Otro Lado v. Mayorkas*, No. 17-cv-02366, 2021 WL 3931890, at *12 (S.D. Cal. Sept. 2, 2021) (finding that the language of § 111(b)(1)(E) "belies [DHS's] entire argument" that they have discretion to neglect statutory duties related to inspecting and processing arriving asylum seekers in favor of other agency priorities). By freezing CIGP grants, Defendants have "diminished [and] neglected" their statutory duties without Congressional authorization and have violated the Homeland Security Act's clear charge.

Defendants also acted contrary to the appropriations laws that Congress passed for fiscal years 2023 and 2024, which required them to spend specific amounts of money for the CIGP, among other DHS grant programs frozen by the Noem Memorandum. In fiscal year 2023, Congress appropriated $25 million to USCIS "for the Citizenship and Integration Grant Program, … to remain available until September 30, 2024." Consolidated Appropriations Act of 2023, Pub. L. No. 117-328, 136 Stat. 4745, 4745 (2022). In fiscal year 2024, Congress appropriated $10 million to USCIS "for the Citizenship and Integration Grant Program, … to remain available until September 30, 2025." Further Consolidated Appropriations Act of 2024, Pub. L. No. 118-47, 138

---

[15] Failure to consider these statutory obligations is yet another example of how Defendants entirely ignored an important aspect of this issue when deciding to implement the DHS funding freeze. *See State Farm*, 463 U.S. at 43.

Stat. 460, 612 (2024). USCIS issued a Notice of Funding Opportunity for both fiscal years, Plaintiffs and other nonprofits applied for and were awarded that funding, and until early February, that funding was being disbursed as the law required. Now, however, Defendants are not disbursing these funds, and it is unclear if they have any intention of ever doing so. This violates these appropriations acts. *See AIDS Vaccine Advoc. Coal.*, 2025 WL 752378, *14-15 (discussing similar "pause" on foreign aid funding in contravention of appropriations act).

The funding freeze also contradicts regulations known as the Uniform Guidance that Defendant DHS expressly adopted and explicitly incorporated into every CIGP grant.[16] 2 C.F.R. §§ 200 *et seq.*, 3002.10; *see also, e.g.*, Ex. E, J.R. 012 ¶ 5; Ex. H, J.R. 025 ¶ 7. The Uniform Guidance requires an award-making agency to "manage and administer the Federal award in a manner so as to ensure that Federal funding is expended and associated programs are implemented in full accordance with the U.S. Constitution, applicable Federal statutes and regulations." 2 C.F.R. § 200.300(a). As discussed throughout this section, Defendants failed to comply with those obligations.

The Uniform Guidance prohibits what Defendants have done to Plaintiffs and other CIGP grantees. The regulations state that "[p]ayments for allowable costs must not be withheld at any time during the period of performance" of a grant "unless required by Federal statute, [or] regulations," or if the award recipient—*i.e.*, a grantee—has failed to comply with the terms or is delinquent on a debt to the federal government. *Id.* § 200.305(b)(6). As to disbursements, the Uniform Guidance is clear: agencies must reimburse award recipients for covered expenses "within 30 calendar days after receipt of the payment request unless the [agency] . . . reasonably

---

[16] Violating regulations constitutes an APA 706 § (2) violation. *Deese v. Esper*, 483 F. Supp. 3d 290, 314 (D. Md. 2020).

believes the request to be improper." *Id.* § 200.305(b)(3). Here, Defendants have not challenged any Plaintiff's compliance or the propriety of any specific payment request; rather, they have applied an across-the-board funding freeze in direct contravention of their own regulations.

**2.** The DHS funding freeze violates the Constitution's bedrock principle of separation of powers, and thus the APA. *See* 5 U.S.C. § 706(2)(B). The Constitution vests exclusive power over federal spending with Congress. U.S. Const., art. I, § 8, cl. 1; *see also id.* art. I, § 9, cl. 7 ("No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law"). The President's constitutional role is to spend the money Congress appropriates for the purposes Congress identifies—to "take Care that the Laws be faithfully executed." *Id.* art. II, § 3; *Clinton v. City of New York*, 524 U.S. 417, 438 (1998) ("There is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes.").

Given that Congress already exercised its exclusive appropriations power to fund CIGP grants and other DHS grant programs impacted by the freeze, and Defendants are "tak[ing] measures incompatible with the expressed or implied will of Congress," the executive branch's power "is at its lowest ebb." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring). To defend this funding freeze, Defendants can rely only on the President's "own constitutional powers minus any constitutional powers of Congress over the matter." *Id.* With appropriations, Congress has exclusive power, and the executive branch has none. *U.S. Dep't of Navy v. Fed. Lab. Rels. Auth.*, 665 F.3d 1339, 1346 (D.C. Cir. 2012) (Kavanaugh, J.) (discussing "Congress's 'exclusive power over the federal purse'" (quoting *Rochester Pure Waters Dist. v. EPA,* 960 F.2d 180, 185 (D.C. Cir. 1992))). While the President and his officers may have "policy reasons . . . for wanting to spend less than the full amount appropriated by Congress for a particular

project or program[,]" they "do[] not have unilateral authority to refuse to spend the funds."[17] *In re Aiken County*, 725 F.3d 255, 261 n.1 (D.C. Cir. 2013).

**3.** The DHS funding freeze is also "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(C). Agencies "are creatures of statute" and are therefore subject to the limits prescribed by Congress. *Nat'l Fed'n of Indep. Bus. v. Occupational Safety & Health Admin.*, 595 U.S. 109, 117 (2022) (per curiam). Agencies "'literally ha[ve] no power to act' except to the extent Congress [has] authorized." *Marin Audubon Soc'y v. Fed. Aviation Admin.*, 121 F.4th 902, 912 (D.C. Cir. 2024) (first alteration in original) (quoting *Fed. Election Comm'n v. Ted Cruz for Senate*, 596 U.S. 289, 301 (2022)). When an agency exceeds its statutory authorization, and steps outside the boundaries set for it by Congress, the court must vacate and set aside that agency action. In the absence of statutory authorization for their actions, Defendants' funding freeze is unlawful.

## II.  Plaintiffs are already suffering irreparable harm.

Irreparable harm occurs "when the threatened injury impairs the court's ability to grant an effective remedy," *Int'l Refugee Assistance Project v. Trump*, 883 F.3d 233, 270 (4th Cir. 2018), *vacated on other grounds*, 585 U.S. 1028 (2018), especially when the harm cannot be "fully rectified by the final judgment after trial" or through money damages. *Mountain Valley Pipeline,*

---

[17] While this limitation is established by the Constitution alone, Congress has confirmed via the Impoundment Control and Anti-Deficiency Acts that the executive branch may not withhold appropriated funds for policy reasons. *See* 2 U.S.C. §§ 683-684 (appropriated funds "shall be made available for obligation" unless the President transmits a special message to Congress and Congress rescinds the appropriation, and may be deferred only via similar process); 31 U.S.C. § 1301(a) ("Appropriations shall be applied only to the objects for which the appropriations were made except as otherwise provided by law."). The existence of these statutes reinforces that withholding appropriated funds places the executive branch's power at its lowest ebb.

*LLC v. 6.56 Acres of Land, Owned by Sandra Townes Powell*, 915 F.3d 197, 216-18 (4th Cir. 2019). Irreparable harm must be "neither remote nor speculative, but actual and imminent." *Id*.

A loss of critical funds is an irreparable harm when it forces an organization "to significantly cut down on staff or otherwise reduce core operations." *AIDS Vaccine Advoc. Coal.*, 2025 WL 752378, \*18. So too when "blanket suspension of funds [has] undermined [plaintiffs'] core missions and jeopardized vital services to vulnerable populations." *Id.* at \*19; *Nat'l Council of Nonprofits*, 2025 WL 368852, at \*12. And an "almost inevitable loss of good will and harm to reputation" adds to that harm. *HIAS, Inc. v. Trump*, 415 F. Supp. 3d 669, 685 (D. Md. 2020), *aff'd*, 985 F.3d 309 (4th Cir. 2021). Plaintiffs are suffering these injuries and more.

**1.** The indefinite loss of CIGP grant funding has already forced—or will imminently force—Plaintiffs to close programs, cut down on staff, and scrounge for funds. Plaintiff Michigan United, for example, may have to shutter its entire legal services program unless the freeze is lifted. *See, e.g.*, Ex. H, J.R. 026–27 ¶ 12; *see also* Compl. ¶¶ 72, 75, 81, 84, and 87; *AIDS Vaccine Advoc. Coal.*, 2025 WL 752378, \*18 (finding irreparable harm where frozen foreign-aid funding made up 38 percent of nonprofit plaintiff's budget). Some Plaintiffs have already laid off, reassigned, or lost staff funded by their CIGP grants. *See* Compl. ¶¶ 77, 89; Ex. D, J.R. 009 ¶ 11; Ex. G, J.R. 021, 022 ¶¶ 13, 15. Others will need to do so soon if disbursements do not resume. *See* Compl. ¶¶ 80, 83, 86, 89, 92, 95, and 98; Ex. F, J.R. 017 ¶ 14; Ex. G, J.R. 022 ¶ 14; Ex. H, J.R. 026–27 ¶ 12; Ex. I, J.R. 030–31 ¶ 8, 13; Ex. J, J.R. 037 ¶ 10; and Ex. K, J.R. 042–43 ¶ 7.

These injuries go beyond monetary harms that can be solved through an award of damages. Even if Plaintiffs end up receiving grant disbursements down the line, they may not be able to rehire or reassign these staffers, which would compel them to spend time and money training new staff. *See, e.g.*, Ex. D, J.R. 009 ¶13; Ex. G, J.R. 022 ¶ 15. And a number of staff who work on

24

CIGP-funded activities possess talents or experience that make them uniquely valuable and irreplaceable to the organization. For example, ESLC will be forced to move to a volunteer-led program and lose an award-winning instructor with over 40 years of experience, who helped brainstorm the organization's innovative curriculum. Ex. G, J.R. 022 ¶ 14. Several Plaintiffs have tapped into their limited unrestricted funds to continue providing the services required by the CIGP grants, *see, e.g.*, Ex. I, J.R. 030–31 ¶ 8, and even a restoration of CIGP grants will not recover these expenditures because CIGP grant funds may be used only for specific purposes and cannot make up for the loss of those other unrestricted funds.

What's more, for many Plaintiffs, the citizenship and naturalization programs are the lifeblood of their recruitment pipeline. For CHIRLA, the citizenship program builds trust and credibility that leads participants to become members and contribute to the organization in myriad ways. *See* Ex. E, J.R. 013 ¶ 12. For Michigan United, it is the prime means for staff to build rapport and trust with clients. Ex H, J.R. 025 ¶¶ 4-5. And for SHC, many former clients—who have never been employed before—become valued employees, offering the services that they themselves benefitted from. Ex. C, J.R. 006 ¶ 19. These are just a few examples of how the loss of grant funds deals a crippling blow to Plaintiffs.

**2.** Plaintiffs' forced cuts to the core services they provide also constitutes irreparable harm. *See AIDS Vaccine Advoc. Coal.*, 2025 WL 752378, *18. This includes terminating future eligibility screening appointments, Ex. K, J.R 042–43 ¶ 7, reducing the number of citizenship classes, Ex. J, J.R. 037–38 ¶ 11, eliminating the provision of paid legal representation, Ex. C, J.R. 005 ¶ 15, and declining to accept new clients, Ex. F, J.R. 017 ¶ 13. Some Plaintiffs have also been forced or may soon be forced to terminate relationships with other organizations who have been helping them perform their obligations under their CIGP grants. *See, e.g.*, Ex. J, J.R. 037–38 ¶ 11, Ex. I, J.R.

031 ¶ 9. These organizations may not be willing or able to resume their partnerships with Plaintiffs should Defendants resume disbursements and Plaintiffs attempt to restart their affected programming.

Ultimately, as a result of Agency Defendants' funding freeze and the forced cost cutting and reduction of services flowing directly from that freeze, Plaintiffs will be unable to meet their performance requirements for the grant award. *See, e.g.*, Ex. J, J.R. 038–39 ¶ 14, Ex. I, J.R. 032 ¶ 12. That means that not only are Plaintiffs harmed in their ability to offer core services, but if Plaintiffs fail to meet their performance metrics, they could even lose their CIGP grants. *See* 2 C.F.R. § 200.340(a)(1) (permitting USCIS to terminate grant if recipient "fails to comply with [its] terms and conditions"); *cf. Hogge v. Hedrick*, 391 F. Supp. 91, 97 (E.D. Va. 1974) (recognizing irreparable harm to plaintiffs where enforcing allegedly unconstitutional ordinance would place plaintiffs "in the position of having to choose between closing down their operations" and "operating within the terms of the ordinance, or operating in violation of the ordinance"). Moreover, potential termination of their grants would also impede Plaintiffs' ability to qualify for future grants. *See*, *e.g.*, Ex. I, J.R. 032 ¶ 12.

**3.** Plaintiffs' credibility within the immigrant communities they serve will suffer the longer the freeze continues. *See Handsome Brook Farm, LLC v. Humane Farm Animal Care, Inc.*, 700 Fed. App'x 251, 263 (4th Cir. 2017) ("The possibility of permanent loss of customers to a competitor or the loss of goodwill may give rise to irreparable harm.") (cleaned up). Plaintiffs' clients will lose trust in Plaintiffs' efficacy and reliability when their citizenship or language classes are suddenly cancelled, or they are no longer able to receive help with their naturalization applications. *See, e.g.*, Ex. D, J.R. 009–10 ¶¶ 14, 16; Ex. E, J.R. 013–14 ¶ 13. For some Plaintiffs like SHC and ESLC, which employ their former students and clients, staff and programmatic

reductions could hit their reputations especially hard. But all Plaintiffs have put time, resources, and creativity into building reputations as trustworthy, reliable partners in the difficult process of integration and naturalization. *See, e.g.*, Ex. F, J.R. 018 ¶ 16; Ex. H, J.R. 027 ¶ 13. They work with poor communities and compete with less scrupulous players who have taken advantage of these communities in the past. Ex. F, J.R. 017 ¶ 15. Some Plaintiffs have taken on the mission of serving minority language communities or the survivors of war and displacement. Ex. E, J.R. 011 ¶ 4; Ex. F, J.R. 016 ¶ 4. For Plaintiffs who subcontract with other organizations, their reputation among service providers could be damaged for years to come. *See, e.g.*, Ex. G, J.R. 022 ¶ 18; Ex. H, J.R. 027 ¶ 13. The sudden, and potentially lasting, funding freeze imposed by Defendants will result in a "loss of good will and harm to reputation" in ways that may never be repaired. *See HIAS, Inc.*, 415 F. Supp. 3d at 685.

### III.  The balance of equities and public interest favor Plaintiffs.

The final two factors—the balance of equities and the public interest—"merge when the Government is the opposing party." *Miranda v. Garland*, 34 F.4th 338, 365 (4th Cir. 2022) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)). That is because "the government's interest *is* the public interest" in such cases. *Ass'n of Cmty. Cancer Ctrs. v. Azar*, 509 F. Supp. 3d 482, 501 (D. Md. 2020) (quoting *Pursuing Am. Greatness v. Fed. Election Comm'n*, 831 F.3d 500, 511 (D.C. Cir. 2016)). The Government "cannot suffer harm from an injunction that merely ends an unlawful practice." *Open Communities All. v. Carson*, 286 F. Supp. 3d 148, 179 (D.D.C. 2017) (quoting *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013)). There is also "a substantial public interest in having governmental agencies abide by federal laws that govern their existence and operations." *HIAS, Inc.*, 415 F. Supp. 3d at 686. There is "without a doubt public interest in

27

keeping 'the President from slipping the boundaries of a statutory policy and acting based on irrelevant policy preferences.'" *Id.* (citation omitted).

On the other hand, Plaintiffs and the communities they serve will suffer irreparable injury as a result of Defendants' illegal actions. *See AIDS Vaccine Advoc. Coal.*, 2025 WL 485324, at *6 (holding that equities and public interest tilted toward plaintiffs where they had established harm "ranging from shutting down programs, to furloughing and laying off employees, to shuttering altogether," as well as "existential consequence[s] to their missions"). Defendants, meanwhile, would suffer no harm by being required to comply with the APA and continue disbursing appropriated and previously approved grants. *See HIAS, Inc.*, 415 F. Supp. 3d at 686 ("There is no imminent harm to the Government if it is simply required to keep on doing what it has been doing for decades."). Accordingly, the balance of equities and public interest weigh in favor of Plaintiffs.

## IV. Standing

Plaintiffs all establish standing by showing that (1) they have "suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical;" "(2) the injury is fairly traceable to the challenged action of the defendant;" and (3) "it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000). "[W]hen considering injury in fact, financial injury, or 'pocketbook injury,' is generally considered the gold standard or 'prototypical form of injury in fact.'" *AIDS Vaccine Advoc. Coal.*, 2025 WL 752378, *6 (quoting *Collins v. Yellen*, 594 U.S. 220, 243 (2021)). Here, each Plaintiff applied for and received a CIGP grant. Compl. ¶ 62; *see, e.g.*, Ex. D, J.R. 008 ¶ 5. Plaintiffs have incurred expenses in reliance on and in the performance of the terms of their CIGP grants. *See, e.g.*, Ex. I, J.R. 031 ¶ 10; Ex. K, J.R. 043 ¶ 9. But Plaintiffs have not been able to obtain reimbursements for these costs because Defendants have frozen their grant awards. Compl. ¶ 65; *see, e.g.*, Ex. G, J.R. 021 ¶ 12;

Ex. K, J.R. 043 ¶ 9. And Plaintiffs' injury will be redressed by a favorable decision that requires Defendants to unfreeze their grant awards and reimburse Plaintiffs for their costs.

### V.  Relief

A district court has "broad discretion to craft remedies based on the circumstances of a case," and should "mold[] its decree to meet the exigencies of the particular case." *HIAS, Inc. v. Trump*, 985 F.3d 309, 326-27 (4th Cir. 2021) (internal quotation marks omitted) (quoting *Roe*, 947 F.3d at 232). The court should also ensure that "a preliminary injunction is no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *HIAS, Inc.*, 985 F.3d at 326-27 (internal quotation marks omitted) (quoting *Roe*, 947 F.3d at 231). As noted above, it is no burden on the government to comply with the Constitution, federal law, and its own regulations. *Open Communities All.*, 286 F. Supp. 3d at 179. Plaintiffs, by contrast, are suffering irreparable harm from this across-the-board, unfounded and unlawful funding freeze—losing staff, enduring reputational damage, and letting down the clients they have legal obligations to represent. That harm could be arrested if Defendants simply began disbursing the awarded grant funds as they were doing until early February.

Both an equitable order enjoining Defendants and a temporary stay of the DHS funding freeze pursuant to APA § 705 support the issuance of broadly applicable relief to Plaintiffs and similarly situated parties. First, nationwide injunctions are "appropriate when the government relies on a 'categorical policy,' and when the facts would not require different relief for others similarly situated to the plaintiffs." *HIAS, Inc.*, 985 F.3d at 326. Defendants issued a memorandum applicable to all nonprofit grants that "touch in any way on immigration," and a single boilerplate Freeze Letter addressed to "grant recipient." Nothing could be more categorical. Second, a § 705 stay runs against the agency action itself and not the specific defendants in a case; as such, it effectuates nationwide relief. *See Casa de Maryland, Inc. v. Wolf*, 486 F. Supp. 3d 928, 970-71

(D. Md. 2020) (discussing distinctions between injunctions and stays). Here, a nationwide injunction or § 705 stay of the Noem Memorandum and all actions by Agency Defendants to implement it, including the Freeze Letters, would provide complete relief to Plaintiffs and similarly situated organizations suffering irreparable harm from Agency Defendants' categorical policy. Such an injunction or stay would be on all fours with *HIAS* and would "meet the exigencies" of this particular case.

## CONCLUSION

For these reasons, the Court should grant the motion and temporarily and preliminarily enjoin Agency Defendants from freezing the disbursement of awarded grant funds, or postpone the effective date of this freeze pursuant to APA § 705, until the Court can further consider the merits.[18]

---

[18] The Court should exercise its discretion to waive or set at $0 the security requirement of Fed. R. Civ. P. 65(c). *Pashby v. Delia*, 709 F.3d 307, 332 (4th Cir. 2013) ("[T]he district court retains the discretion to set the bond amount as it sees fit or waive the security requirement." (citations omitted)). In similar cases, courts in this jurisdiction and others have determined bond unnecessary. *See, e.g.*, *Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*, No. 25-CV-333, 2025 WL 573764, at *29 (D. Md. Feb. 21, 2025) (setting a nominal bond of zero dollars); *Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, No. CV 25-239, 2025 WL 597959, at *19 (D.D.C. Feb. 25, 2025) (declining to set a bond).

March 25, 2025

Respectfully submitted,

_/s/ Bradley Girard_

Niyati Shah[+]
Shalaka Phadnis**
ASIAN AMERICANS ADVANCING
JUSTICE—AAJC
1620 L St. NW, Suite 1050
Washington, DC 20036
Phone: (202) 296-2318
nshah@advancingjustice-aajc.org
sphadnis@advancingjustice-aajc.org

Jose Perez**
LATINOJUSTICE PRLDEF,
475 Riverside Dr., Suite 1901
New York, NY 10115
Phone: (212) 219-3360
Fax: (212) 431-4276
jperez@latinojustice.org

Nickole Durbin-Felix**
LATINOJUSTICE PRLDEF
4700 Millenia Blvd., Suite 500
Orlando, FL 32839
Phone: (321) 247-6657
ndurbin-felix@latinojustice.org

Bradley Girard (Bar No. 31437)
Sarah M. Rich*
Adnan Perwez*
Robin F. Thurston[+]
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, DC 20043
Phone: (202) 448-9090
Fax: (202) 796-4426
bgirard@democracyforward.org
srich@democracyforward.org
aperwez@democracyforward.org
rthurston@democracyforward.org

*Counsel for Plaintiffs*

[+]*Application for full admission pending*
**Admitted* pro hac vice
** *Motion to appear* pro hac vice *forthcoming*

31