**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| SOLUTIONS IN HOMETOWN CONNECTIONS, ET AL., | |
| Plaintiffs, | |
| v. | Case No.: 8:25-cv-00885-LKG |
| KRISTI NOEM, SECRETARY OF THE DEPARTMENT OF HOMELAND SECURITY, ET AL., | |
| Defendants. | |

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION
TO PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER,
<u>PRELIMINARY INJUNCTION & APA § 705 STAY</u>**

**TABLE OF CONTENTS**

INTRODUCTION ..................................................................................................... 1

BACKGROUND ...................................................................................................... 2

   A.  The Statutory Framework for the Citizenship and Integration Grant Program ................... 2

   B.  Plaintiffs' CIGP Grants ................................................................................. 4

   C.  EO 14159; the Noem Memorandum; the Freeze Letters; and the Termination Letters ...... 6

   D.  The Complaint and the Instant Motion ............................................................. 9

ARGUMENT .......................................................................................................... 10

   I.  Legal Standard for a Preliminary Injunction. ................................................... 10

   II.  Plaintiffs Have Not Demonstrated Irreparable Harm ......................................... 10

   III.  Plaintiffs Are Not Likely to Succeed on the Merits ............................................ 15

      A. Plaintiffs' Claims Related to FY2023 Grants Are Contract Claims Over Which the U.S. Court of Federal Claims Has Exclusive Jurisdiction ........................................... 15

      B.  Funding Decisions Are Committed to Agency Discretion and Are Not Subject to Arbitrary-and-Capricious Review ....................................................................... 20

      C.  Neither the Funding Freeze Nor the Terminations Are Contrary to Law ............... 21

         1.  Neither the funding freeze nor the terminations violate the Homeland Security Act ................................................................................................. 21

         2.  Neither the funding freeze nor the terminations violate the Appropriations Acts ......................................................................................................... 23

         3.  To the extent Plaintiffs rely upon alleged violations of the Uniform Guidance, Plaintiffs state a breach of contract claim over which this Court lacks subject matter jurisdiction. Nevertheless, the terminations complied with the grant terms and conditions, including the Uniform Guidance. .......................... 23

         4.  The funding freeze and terminations are consistent with constitutional separation of powers and are not ultra vires. .................................................... 25

   IV.  The Balance of Equities Does Not Favor Plaintiffs ............................................ 26

V.  The Relief Sought By Plaintiffs Is Overbroad ........................................................... 26

VI. The Court Should Require Plaintiffs to Post Security ............................................... 29

CONCLUSION ......................................................................................................................... 30

Defendants, by and through undersigned counsel, hereby submit this Memorandum of Law in Opposition to Plaintiffs' Motion for Temporary Restraining Order, Preliminary Injunction & APA § 705 Stay (ECF No. 30; the "Motion").

## INTRODUCTION[1]

Plaintiffs are non-profit organizations who help lawful permanent residents learn English, study for the citizenship test, and apply to be naturalized United States citizens. Plaintiffs were awarded grants through USCIS's Citizenship and Integration Grant Program to support their provision of these services. On February 4, 2025, Plaintiffs' grants were frozen pending review. On March 27, 2025, Plaintiffs' grants were terminated pursuant to the terms and conditions of the grants and 2 C.F.R. § 200.340(a)(4), which allows an agency to terminate an award if it "no longer effectuates the program goals or agency priorities." Through this Motion, Plaintiffs seek to temporarily restrain or preliminarily enjoin the funding freeze and the subsequent grant terminations. Otherwise stated, Plaintiffs want to be paid the money they claim is due to them under the grants. Plaintiffs seek this relief not only for themselves, but for all other "similarly situated parties" through a nationwide injunction.

Plaintiffs' request for extraordinary injunctive relief should be denied. At the outset, Plaintiffs do not establish irreparable harm caused by the freezing/termination of their CIGP grants. The harms Plaintiffs point to – having to lay off or reassign staff and shrink citizenship programming or turn to fee-based models – are monetary losses for which injunctive relief is not appropriate. Indeed, the aggregate amount of money at issue in this case (*i.e.*, the amount remaining on Plaintiffs' grants) is easily ascertainable and equals, according to Plaintiffs'

---

[1] Capitalized terms used but not defined in this Introduction shall have the meanings set forth in the Background section of this brief. Citations herein to "Mem." are to the Memorandum in Support of Plaintiffs' Motion, ECF No. 30-1.

statements, exactly $1,522,997.08.

Furthermore, Plaintiffs do not demonstrate a likelihood of success on the merits because (1) this action is essentially a breach of contract claim over which the United States Court of Federal Claims has exclusive jurisdiction under the Tucker Act; (2) a federal agency's funding decisions are committed to agency discretion by law and not subject to arbitrary-and-capricious review under the APA; and (3) neither the funding freeze nor the grant terminations are contrary to law.  The balance of equities also does not weigh in Plaintiffs' favor.

For these reasons and those discussed below, Defendants respectfully request that the Motion be denied.  If, nevertheless, the Court is inclined to grant injunctive relief in this case, Defendants submit that such relief should be limited to that necessary to afford relief to the named Plaintiffs, in accordance with Fourth Circuit precedent.

## BACKGROUND

A.    <u>The Statutory Framework for the Citizenship and Integration Grant Program</u>

In the aftermath of September 11, Congress enacted the Homeland Security Act of 2002, 6 U.S.C. § 101, *et seq.*, which disbanded the U.S. Immigration and Naturalization Service and established in its place the U.S. Department of Homeland Security ("<u>DHS</u>").  U.S. Citizenship and Immigration Services ("<u>USCIS</u>") was created as a component agency of DHS.  *See* 6 U.S.C. § 271(a).  On March 1, 2003, USCIS assumed responsibility over lawful immigration to the United States and naturalization of new American citizens.  *See Overview of INS History*, USCIS History Office and Library, at 11, *available at* https://www.uscis.gov/sites/default/files/document/fact-sheets/INSHistory.pdf (last visited Apr. 1, 2025).

Pursuant to 6 U.S.C. § 271(f), USCIS includes an Office of Citizenship.  The Chief of the Office of Citizenship "shall be responsible for promoting instruction and training on citizenship

responsibilities for aliens interested in becoming naturalized citizens of the United States, including the development of educational materials." 6 U.S.C. § 271(f)(2). Consistent with this statutory obligation, the Office of Citizenship manages an online "Citizenship Resource Center," on which it shares a comprehensive collection of helpful resources and free study materials for a variety of users, including lawful permanent residents (also known as "LPRs"), who can find "information about the naturalization process, eligibility requirements, and study materials to prepare for the naturalization interview and test"; educators, who can find "several resources for the classroom" and "free USCIS training seminars designed to enhance the skills needed to teach U.S. history, civics, and the naturalization process to immigrant students"; and organizations, who can find "resources to help enhance their overall efforts and programs." *See* https://www.uscis.gov/citizenship (last visited Apr. 1, 2025).

In addition, beginning in 2009, the Office of Citizenship has administered the Citizenship and Integration Grant Program ("CIGP"). According to its website,

> The goal of the CIGP is to expand the availability of high-quality citizenship preparation services for LPRs across the nation and to provide opportunities for immigrants to gain the knowledge and skills necessary to assimilate into the fabric of American society. USCIS grant recipients provide English language and civics instruction, legal assistance with naturalization applications, and create community space for immigrant assimilation.

*Grant Program Impact*, USCIS, https://perma.cc/9F4L-SVLG (last visited Apr. 1, 2025).

CIGP is authorized and funded through an annual appropriation by Congress. The Consolidated Appropriations Act of 2023, Pub. L. No. 117-117-328 (the "2023 Appropriations Act"), contains the following:

> For necessary expenses of U.S. Citizenship and Immigration Services for Federal assistance for the Citizenship and Integration Grant Program, $25,000,000, to remain available until September 30, 2024.

2023 Appropriations Act, 136 Stat. 4745. Similarly, the Further Consolidated Appropriations Act

of 2024, Pub. L. No. 118-47 (the "2024 Appropriations Act," and together with the 2023 Appropriations Act, the "Appropriations Acts"), contains the following:

> For necessary expenses of U.S. Citizenship and Immigration Services for Federal assistance for the Citizenship and Integration Grant Program, $10,000,000, to remain available until September 30, 2025.

2024 Appropriations Act, 138 Stat. 612.[2]

## B.    Plaintiffs' CIGP Grants

In Fiscal Year 2023 ("FY2023"),[3] USCIS awarded $22 million in CIGP grants to 65 organizations, including eight of the nine Plaintiffs in this action.  Mem. at 4-5.  The performance period for these grants is from October 1, 2023 to September 30, 2025.  *Id.* at 4.  According to Plaintiffs' declarations, an aggregate of $1,250,482 remains unpaid on Plaintiffs' FY2023 grants.[4]

In Fiscal Year 2024 ("FY2024"), USCIS awarded $10 million in CIGP grants to 36 organizations, including one of the nine Plaintiffs in this action—Plaintiff Immigrant Law Center of Minnesota ("ILCM").  Mem. at 5; Compl. ¶ 64.  The performance period for these grants is from October 1, 2024 to September 30, 2026.  Mem. at 5.  ILCM received a FY2024 grant of $283,018.  *Id.*  According to ILCM's Declaration, $272,515 remains unpaid on its FY2024 grant,

---

[2] In addition, pursuant to 8 U.S.C. § 1382, the USCIS Director "is authorized" "to solicit, accept, administer, and utilize gifts . . . for the purpose of providing an immigrant integration grants program and related activities to promote citizenship and immigrant integration."  Although Plaintiffs cite this provision in a footnote (Mem. at 3 n. 4), there is no indication in the record that any of Plaintiffs received or were entitled to receive any funds under it.  Accordingly, this statute appears to be irrelevant to this action.  In any event, the statutory language—"is authorized"— plainly bestows significant discretion upon the USCIS Director to act or not act pursuant to this statutory provision, which is unreviewable for the reasons stated *infra* at 20-21.

[3] The federal government's fiscal year runs from October 1 of one calendar year through September 30 of the next.  Pertinent here, Fiscal Year 2023 refers to October 1, 2022 – September 30, 2023, and Fiscal Year 2024 refers to October 1, 2023 – September 30, 2024.

[4] *See* Ex. C ¶ 14, J.R.005; Ex. D ¶ 8, J.R.009; Ex. E ¶ 10, J.R.013; Ex. F ¶ 12, J.R.017; Ex. G ¶ 12, J.R.021; Ex. H ¶ 11, J.R.026; Ex. I ¶ 10, J.R.031; Ex. K, ¶ 8, J.R.043.

which includes $19,371 in expenses that ILCM has incurred as of March 13, 2025, submitted for reimbursement, but has not been reimbursed. Ex. J ¶ 12, J.R.038.

Plaintiffs each received a grant award letter from DHS memorializing the terms and conditions of the grants. Mem. at 4-5. Copies of the grants are attached hereto as **Exhibits P-X**, J.R.249-488. Each of the grants incorporates by reference the Office of Management and Budget Guidance on Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards, 2 C.F.R. § 200 *et seq.* (the "Uniform Guidance"). *See* Mem. at 5, 21; Exs. P-V, X, Section Q, J.R.267, 292, 319, 346, 373, 400, 427, 478; Ex. W, Section V, J.R.453. Accordingly, these regulations are themselves terms of the grants.[5]

The grants each provide for the following method of payment:

> The Recipient shall be paid in advance using the U.S. Department of Health and Human Services/Payment Management System, provided it maintains or demonstrates the willingness and ability to maintain procedures to minimize the time elapsing between the transfer of funds from DHS and expenditure disbursement by the Recipient. When these requirements are not met, the Recipient will be required to be on a reimbursement for costs incurred method.

Exs. P-V, X, Section E, J.R.257, 282, 309, 336, 363, 417, 468; Ex. W, Section I, J.R.448 (substantially similar language in FY2024 grant); *see also* 2 C.F.R. § 205.305(b). According to the Motion, "[m]ost Plaintiffs have outstanding requests for reimbursement, and all will need to submit additional reimbursement requests shortly." Mem. at 8.

The FY2023 grants also each include the following "Termination" provision:

> Either the Recipient or the DHS may terminate this Award by giving written notice of the other party at least thirty (30) calendar days prior to the effective date of the termination. All notices are to be transmitted to the DHS Grants Officer via the email address identified on the Notice of Award. The Recipient's authority to incur new costs will be terminated upon arrival of the date of receipt of the letter or the date set forth in the notice. Any costs incurred up to the earlier of the date of the

---

[5] *See, e.g.*, *Boaz Housing Auth. v. United States*, 994 F.3d 1359, 1367 (Fed. Cir. 2021) ("That contractual provisions either are required by or incorporate governing regulations does not make those obligations any less contractual in nature.").

receipt of the notice or the date of termination set forth in the notice will be negotiated for final payment.  Closeout of this Award will be commenced and processed pursuant to 2 C.F.R. § 200.344.

Exs. P-V, X, Section N, J.R.266, 291, 318, 345, 372, 399, 426, 477.  ILCM's FY2024 grant

contains the following Termination provision:

> 1. <u>General</u>.  The regulations at 2 C.F.R. §§ 200.340-343 set forth the administrative requirements concerning the termination of federal awards.  Termination means the ending of a federal award, in whole or in part, at any time before the planned end of the period of performance.  As required by 2 C.F.R. § 200.340(b), the purpose of this term and condition is to specify termination provisions applicable to the federal award in addition to those set forth in the regulations.
>
> 2. <u>Termination by DHS</u>.  The regulation at 2 C.F.R. § 200.340(a) provides that DHS may unilaterally terminate the federal award in whole or part if the Recipient fails to comply with the terms and conditions of the federal award and when, to the greatest extent authorized by law, the federal award no longer effectuates the program goals or agency priorities.  When terminating a federal award, the DHS will promptly notify the Recipient in writing via email of the termination that will set forth the reasons for the termination and the effective date of the termination.  A Recipient may object and provide written information and documentation challenging the termination electronically via email to DHS within 30 days of receiving the termination notice.  The termination notice may provide additional procedures for submitting an objection to the termination.

Ex. W, Section S, J.R.452.[6]  With respect to termination, the Uniform Guidance allows an agency

to terminate an award pursuant to the terms and conditions if an award no longer effectuates the

program goals or agency priorities.  2 C.F.R. § 200.340(a)(4).  The agency must provide written

notice to the recipient with the reasons for the termination, effective date, and the portion of the

award to be terminated (if applicable).  *Id*. § 200.341(a).

**C.     <u>EO 14159; the Noem Memorandum; the Freeze Letters; and the Termination Letters</u>**

On January 20, 2025, President Trump issued Executive Order 14159, 90 FR 8443, entitled

---

[6] In addition, ILCM's FY2024 grant provides:  "The Recipient and any subrecipients have no property interest in the funds made available by DHS in the Recipient's PMS account.  At any time during or after the period of performance of the Federal Award, DHS may adjust the amounts available in Recipient's PMS account due to amendments to the Federal Award, partial or full terminations, or other reasons."  Ex. W, Section I.3, J.R.449.

"Protecting the American People Against Invasion" ("EO 14159").  Section 19 provides:

> Sec. 19. Funding Review. The Attorney General and the Secretary of Homeland Security shall:
>
> (a) Immediately review and, if appropriate, audit all contracts, grants, or other agreements providing Federal funding to non-governmental organizations supporting or providing services, either directly or indirectly, to removable or illegal aliens, to ensure that such agreements conform to applicable law and are free of waste, fraud, and abuse, and that they do not promote or facilitate violations of our immigration laws;
>
> (b) Pause distribution of all further funds pursuant to such agreements pending the results of the review in subsection (a) of this section;
>
> (c) Terminate all such agreements determined to be in violation of law or to be sources of waste, fraud, or abuse and prohibit any such future agreements;
>
> (d) Coordinate with the Director of the Office of Management and Budget to ensure that no funding for agreements described in subsection (c) of this section is included in any appropriations request for the Department of Justice or the Department of Homeland Security; and
>
> (e) Initiate clawback or recoupment procedures, if appropriate, for any agreements described in subsection (c) of this section.

EO 14159 § 19.

On January 28, 2025, Kristi Noem, in her official capacity as the Secretary of DHS, issued a Memorandum regarding "Direction on Grants to Non-governmental Organizations." *See* Ex. A, J.R.001 (the "Noem Memorandum").  The Noem Memorandum instructs that:

> Effective immediately, all [DHS] grant disbursements and assessments of grant applications that:  (a) go to non-profit organizations or for which non-profit organizations are eligible, and (b) touch in any way on immigration, are on hold pending review, except to the extent required by controlling legal authority.

*Id.*  The Noem Memorandum explains that:

> The reasons for this freeze include (1) concerns that these grants may be funding illegal activities, such as encouraging or inducing illegal immigration, 8 U.S.C. § 1234(a)(1)(A)(iv), or illegal harboring of illegal aliens, 8 U.S.C. § 1234(a)(1)(A)(ii)-(iii); (2) concerns that there may be racially discriminatory language in certain grants; and (3) concerns that these grants may not be an efficient

7

use of government resources.

*Id.* The Noem Memorandum affirms that DHS "is committed to allocating grant funds in a manner that will achieve maximum effectiveness for the intended purposes and in fulfillment of [DHS's] statutory mission." *Id.* The Noem Memorandum does not reference any executive order (including EO 14159), but rather relies on DHS's own policies and priorities. *Id.*

On February 4, 2025, Plaintiffs each received a letter signed by Mary Jane Somerville, Grants Branch Chief. *See* Ex. B, J.R.002 (the "Freeze Letter"). The Freeze Letter states as follows:

> Pursuant to the [Noem Memorandum] dated January 28, 2025, and effective immediately, your grant from U.S. Citizenship & Immigration Services is frozen.
>
> In accordance with the pause in activities, payments are not available at this time.
>
> We recognize this will have an impact on your organization. We are unable to provide a timeline on this freeze.

*Id.* The Freeze Letter does not reference any executive order (including EO 14159) as a source of authority for the freeze.

On March 27, 2024, DHS informed Plaintiffs by letter (the "Termination Letter") that their grants were terminated, effective 30 days after the date of the letter. *See* ECF 31 (attaching Termination Letters at J.R.217-46). The Termination Letter advised, "DHS has determined that the scope of work performed under this award no longer effectuates the program goals and the Department's priorities," instructed the recipient to cease all federally funded work under the award, and advised that costs incurred for such work after the date of the Termination Letter would be unallowable. *See, e.g.*, ECF No. 31.2 (Termination Letter to Plaintiff SHC, J.R.220-22). The Termination Letter stated that costs resulting from proper financial obligations before the date of the termination notice would be allowable if not incurred in anticipation of termination and if they would have otherwise been allowable had the award not been terminated. *Id.*

8

The Termination Letter identified the remaining unobligated federal funding on the award and stated that DHS intended to reduce the amount of approved federal funding for the award by such amount but all other terms and conditions remain unchanged. *Id*. The Termination Letter further advised of the process for the recipient to submit an objection to the termination and closeout of the grant once the termination of the award is final. *Id*.

D.    **The Complaint and the Instant Motion**

On March 17, 2025, six weeks after the freeze went into effect, Plaintiffs commenced this action by filing their Complaint for Declaratory and Injunctive Relief and Vacatur of Final Agency Action, ECF No. 1 (the "Complaint" or "Compl."). In the Complaint, Plaintiffs challenge the funding freeze as violating the Administrative Procedure Act ("APA") – specifically, that it is arbitrary and capricious (Count I) and contrary to law (Count II) – and the Constitution – specifically, that it violates separation of powers (Count III), Fifth Amendment due process (Count IV), and is ultra vires (Count V).

On March 25, 2025, Plaintiffs filed the Motion, seeking broad relief in the form of "a nationwide injunction or § 705 stay of the Noem Memorandum and all actions by Agency Defendants to implement it, including the Freeze Letters." Mem. at 30; *see also* ECF No. 30-2 (proposed order). Plaintiffs argue that such broad, immediate relief is necessary here to prevent them "and similarly situated parties" from suffering alleged irreparable harm in the form of "losing staff, enduring reputational damage, and letter down the clients they have legal obligations to represent." Mem. at 29.

While the Termination Letters were sent two days after Plaintiffs filed the Motion, Plaintiffs stated in a Notice to the Court regarding the grant terminations, ECF No. 31, that "Plaintiffs' brief in support of their motion for preliminary relief argues that the APA prohibits

Defendants from stopping grant payments, arguments that apply regardless of whether Defendants label it as an indefinite freeze or a termination." ECF No. 31 at 2. Accordingly, Plaintiffs did not seek to adjust the briefing schedule or hearing date. *Id.*

## ARGUMENT

### I.    <u>Legal Standard for a Preliminary Injunction</u>

A preliminary injunction is "extraordinary" relief that may "only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 22, 24 (2008). Plaintiffs must satisfy four elements to show entitlement to a preliminary injunction: first, they must show that they are likely to succeed on the merits; second, that they will likely experience irreparable harm unless the court grants relief; third, that the balance of equities weighs in their favor; and fourth that an injunction is in the public interest. *Frazier v. Prince George's Cnty.*, 86 F.4th 537, 543 (4th Cir. 2023). The last two factors – balance of equities and the public interest – "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

### II.    <u>Plaintiffs Have Not Demonstrated Irreparable Harm</u>

Plaintiffs' alleged injuries in this case do not involve irreparable harm because they can be remedied through the payment of money damages. "[A] preliminary injunction usually will be denied if it appears that the applicant has an adequate alternate remedy in the form of money damages or other relief." Wright & Miller, 11A Fed. Prac. & Proc. § 2948.1 (3d ed.). "Thus, for example, the termination of business agreements or of employment typically are not found to result in irreparable injury because, if wrongful, damages will provide adequate compensation for any losses." *Id.* Injuries "in terms of money, time and energy necessarily expended in the absence of a stay" do not constitute irreparable harm. *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir.

2017) (quoting *Sampson v. Murray*, 415 U.S. 61, 90 (1974)).  While irreparable harm involving money damages can be shown "when loss 'threatens the very existence' of a plaintiffs' business," *RCM Techs., Inc. v. U.S. Dep't of Homeland Sec.*, 614 F. Supp. 2d 39, 46–47 (D.D.C. 2009), such extreme circumstances are not present here.

Plaintiffs allege that they have been (and will continue to be) irreparably harmed primarily because they have been forced (or will be forced) "to close programs, cut down on staff, and scrounge for funds."  Mem. at 24.  No Plaintiff, however, claims that its entire business will be forced to close as a result of the termination of their grants.  Rather, the terminations have required Plaintiffs to reallocate resources (*e.g.*, by subsidizing classes through other funding or moving to a pay-based model) and to lay off some staff members.  *See* Mem. at 24-26; Ex. C ¶¶ 15-16, J.R.005; Ex. D ¶ 11, J.R.009; Ex. E ¶ 11, J.R.013; Ex. F ¶¶ 13-14, J.R.017; Ex. G ¶¶ 13-15, J.R.021-22; Ex. H ¶ 12, J.R.026; Ex. I ¶ 8, J.R.030; Ex. J ¶¶ 9-11, J.R.037-38; Ex. K ¶ 7, J.R.042.  While such disruptions are no doubt burdensome (and perhaps substantially so), they are not *existential*.  *See* Ex. Y, J.R.500-01, *Corp. for Public Broadcasting v. Fed. Emergency Mgmt. Agency*, Case No. 25-cv-0740-TJK, ECF No. 17, at 12-13 (Mar. 18, 2025) (transcript of oral ruling) (denying temporary restraining order, finding plaintiff grant recipient whose grant funds were frozen did not establish irreparable harm, because plaintiff did not show that it "faces an imminent risk of shutdown absent reimbursement" and having to layoff employees "is the type of 'economic loss' that typically 'does not, in and of itself, constitute irreparable harm'").

Indeed, in the Complaint, several Plaintiffs acknowledge that the grant funding makes up a relatively small portion of their overall budgets:  SHC's grant makes up 13% of its budget (Compl. ¶ 72); CARECEN DC's grant was 8.8% of its 2024 budget (*id.* ¶ 75); CCI's grant is 28%

of its budget (*id.* ¶ 81); and ESLC's grant is 14.6% of its budget (*id.* ¶ 87).[7]  *See RCM Techs., Inc. v. U.S. Dep't of Homeland Sec.*, 614 F. Supp. 2d 39, 46–47 (D.D.C. 2009) (holding that plaintiff failed to show irreparable harm where feared losses were economic, finding plaintiff "does not claim that 70 percent of RCM's *overall* business comes from [the challenged action] . . .  Although the Court appreciates that the economic harm realized by plaintiffs like RCM on account of CIS's alleged policy could be substantial, the Court is not persuaded that the economic harm will be so great as to threaten RCMs 'very existence.'").

Furthermore, eight of the nine Plaintiffs received FY2023 grants, which will terminate by their own terms in just six months—on September 30, 2025.  Mem. at 4.  With one exception,[8] these Plaintiffs have already received a majority of the FY2023 grant funds.[9]  According to Plaintiffs' declarations, the aggregate funds remaining on the grants across all nine Plaintiffs is $1,522,997, and Plaintiffs' declarations indicate that most of this money is not currently due and owing, given the typical reimbursement method of payment.[10]  In other words, Plaintiffs' own

---

[7] The Complaint does not discuss the overall budgets of the other five Plaintiffs.

[8] According to Plaintiffs, Michigan United has $300,000 remaining on its grant due to a "processing issue," among other challenges.  *See* Ex. H ¶ 11, J.R.026.

[9] *See* Ex. C ¶¶ 6, 14, J.R.004-05 (SHC has $86,000 remaining on its $267,000 FY2023 grant); Ex. D ¶¶ 5, 8, J.R.008-09 (CARECEN DC has $169,000 remaining on its $450,000 FY2023 grant); Ex. E ¶¶ 5, 10, J.R.012-13 (CHIRLA has $100,936.16 remaining on its $450,000 FY2023 grant); Ex. F ¶¶ 6, 12, J.R.016-17 (CCI has $100,000 remaining on its $300,000 FY2023 grant); Ex. G ¶¶ 9, 12, J.R.020-21 (ESLC has $186,531.19 remaining on its $450,000 FY2023 grant); Ex. I ¶¶ 4, 10, J.R.029, J.R.031 (HIAS PA has $162,507.16 remaining on its $450,000 FY2023 grant); Ex. K ¶¶ 5, 8, J.R.042-43 (IDPL has $145,507.57 remaining on its $450,000 FY2023 grant).

[10] *See e.g.*, Ex. D ¶ 8-9, J.R.009 ("CARCEN would typically submit a voucher in April for our January-March expenses and would submit two more through the remainder of the performance period."); Ex. E ¶ 7, J.R.013 ("After noticing the payment website running into issues, CHIRLA's Managing Director withdrew funds on the morning February 4, 2025, to last till the end of the next quarterly reporting period on March 31, 2025.  This was essentially an advance payment to enable CHIRLA to provide resources for its citizenship classes, instead of the typical reimbursement process."); Ex. F ¶ 8, J.R. 017 ("CCI heard about a potential funding freeze on January 27, 2025,

statements establish that the budgetary consequences of the terminations are reasonably short-term (spread out across the next six months, and in one case 18 months) and involve easily ascertainable, fairly low dollar amounts.   Because Plaintiffs allege monetary losses that can be readily compensated through an award of money damages, there is no irreparable harm here.  *See Strauss v. Peninsula Reg'l Med. Ctr.*, 86 F.3d 1152, 1996 WL 265928, at *1 (4th Cir. 1996) (explaining that "[m]onetary loss . . . does not constitute irreparable harm unless the loss cannot 'be ascertained with any accuracy,'" and finding that "[t]he history of plaintiffs' patient volume would certainly enable a jury to compensate any business loss suffered by plaintiffs with a monetary judgment").

The cases cited by Plaintiffs in support of their irreparable harm argument are easily distinguishable based upon these facts.  In *AIDS Vaccine Advoc. Coal. v. U.S. Dep't of State*, Case No. 25-00400-AHA, 2025 WL 752378 (D.D.C. Mar. 10, 2025) (cited in Mem. at 24, 25), the district court granted a preliminary injunction against the State Department's freezing of billions of dollars in funding for foreign assistance programs administered by the plaintiffs.  *Id.* at *23. Regarding irreparable harm, the court concluded:

> the harm here goes to the very subsistence of the organizations, ***many of which are on the brink of shuttering entirely***, and poses an existential threat to the viability of their humanitarian missions.  In fact, ***Defendants have not hesitated to cite the threat of insolvency to Plaintiffs as a justification for not making payments***. . . . Defendants' actions are, in effect, the massive disruption of a whole industry or sector, and Plaintiffs have made a strong showing that the harm is "both certain and great," as well as "actual and not theoretical."

---

and proactively filed for reimbursement for its January 2025 expenses under the CINAS grant.  It filed on January 28, 2025 for $16,755.43 in expenses.  The reimbursement was paid out on February 3, 2025, a day before the funding freeze letter was received."); Ex. G ¶ 12, J.R.021 (noting $13,684.55 "we already spent and were unable to submit reimbursement for"); Ex. I ¶ 6, J.R.030 ("Generally HIAS PA has sought and continues to seek reimbursement from our award funds on a quarterly basis . . . ."); Ex. J ¶¶ 6, 12, J.R.036, 038 ("Generally, ILCM has sought and continues to seek reimbursement from our award funds on a quarterly basis . . . " and noting costs of $19,371 "that ILCM has already incurred"); Ex. K ¶¶ 8, 9, J.R.043 (IDPL "expends money on these services and submits quarterly vouchers to USCIS for reimbursement," and noting IDPL submitted a voucher for $12,416 "but has not received the funds").

*Id.* at *20 (emphasis added). Similarly, in *Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, Case No. 25-cv-239-LLA, 2025 WL 368852 (D.D.C. Feb. 3, 2025) (cited in Mem. at 24), the district court granted a preliminary injunction against the memorandum issued on January 27, 2025 by the Acting Director of the Office of Management and Budget ("OMB") directing federal agencies to freeze funding related to a series of broad executive orders, similarly implicating billions of dollars in federal grants. *Id.* at *1-2. The court specifically found that "[b]ecause the funding freeze *threatens the lifeline that keeps countless organizations operational*, Plaintiffs have met their burden of showing irreparable harm." *Id.* at *13 (emphasis added). Unlike the irreparable harm alleged in these cases, Plaintiffs here have not alleged that the funding freeze (now termination) threatens their very existence.

Plaintiffs also rely upon alleged reputational injury flowing from the funding freeze (now termination) as constituting irreparable harm. *See* Mem. at 26-27. Under certain circumstances, reputational injury can be a basis for irreparable harm. However, "the showing of reputational harm must be concrete and corroborated, not merely speculative." *Toxco Inc. v. Chu*, 724 F. Supp. 2d 16, 30 (D.D.C. 2010) (quoting *Trudeau v. Federal Trade Comm'n,* 384 F.Supp.2d 281, 297 (D.D.C. 2005), *aff'd*, 456 F.3d 178 (D.C. Cir. 2006)).

In this case, Plaintiffs' allegations regarding reputational injury are too speculative to establish irreparable harm. Plaintiffs allege, for example, that their "clients will lose trust in Plaintiffs' efficacy and reliability when their citizenship or language classes are suddenly cancelled, or they are no longer able to receive help with their naturalization applications." Mem. at 26. But Plaintiffs' allegations are uncorroborated assumptions about what the communities it serves will think about them at some undefined point in the future. Plaintiffs do not point to any concrete manifestation of the reputational injury it is purportedly suffering. Accordingly, Plaintiffs

have not established irreparable harm in the form of reputational injury. *See id.* at 30-31 (finding

no irreparable harm where plaintiff "offer[ed] nothing to substantiate his conjecture about what

the industry will assume"). *See also Strauss*, 1996 WL 265928, at *1 (alleged reputational injury

was "too speculative to merit injunctive relief"); *Advanced Resources Int'l v. Tri-Star Petroleum

Co.*, 4 F.3d 327, 331 (4th Cir. 1993) (same).

### III.    Plaintiffs Are Not Likely to Succeed on the Merits

#### A.    Plaintiffs' Claims Related to FY2023 Grants Are Contract Claims Over Which the U.S. Court of Federal Claims Has Exclusive Jurisdiction.

"The United States is immune from suit unless it unequivocally consents." *Maine

Community Health Options v. United States*, 590 U.S. 296, 322 (2020). The APA provides a

limited waiver of sovereign immunity for claims "seeking relief other than money damages." 5

U.S.C. § 702. But the APA's waiver "comes with an important carveout": it does not apply "if

any other statute that grants consent to suit expressly or impliedly forbids the relief which is

sought." *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 215

(2012) (quoting 5 U.S.C. § 702). That carve-out "prevents plaintiffs from exploiting the APA's

waiver to evade limitations on suit contained in other statutes." *Id.*

Parties that seek to access funds that the government is purportedly obligated to pay under

contracts or grants[11] must typically proceed under the Tucker Act, not the APA. The Tucker Act

provides:

> The United States Court of Federal Claims shall have jurisdiction to render
> judgment upon any claim against the United States founded either upon the
> Constitution, or any Act of Congress or any regulation of an executive department,

---

[11] Grants, such as the CIGP grants awarded to Plaintiffs, are considered contracts under the Tucker Act. *E.g.*, *Boaz Housing Auth. v. United States*, 994 F.3d 1359, 1368 (Fed. Cir. 2021) (holding that when the government implements grants by "employ[ing] contracts to set the terms of and receive commitments from recipients," the grants are properly treated as contracts for purposes of jurisdiction in the Court of Federal Claims); *Henke v. U.S. Dep't of Commerce*, 83 F.3d 1445, 1450-51 (D.C. Cir. 1996) (federal grant had the "essential elements of a contract").

or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

28 U.S.C. § 1491(a)(1). *See also* 28 U.S.C. § 1346(a)(2) ("the district courts shall not have jurisdiction of any civil action or claim against the United States founded upon any express or implied contract with the United States"). The D.C. Circuit has therefore "held that the Tucker Act 'impliedly forbids'" the bringing of "contract actions" against "the government in a federal district court" under the APA. *Albrecht v. Committee on Emp. Benefits of the Fed. Reserve Emp. Benefits Sys.*, 357 F.3d 62, 67-68 (D.C. Cir. 2004) (citations omitted). This jurisdictional barrier ensures that contract claims against the government are channeled into the court that has "unique expertise" in that area, *Ingersoll-Rand Co. v. United States*, 780 F.2d 74, 78 (D.C. Cir. 1985), and which Congress has generally not empowered to grant injunctive relief, *James v. Caldera*, 159 F.3d 573, 580 (Fed. Cir. 1998).

In determining whether a particular action is "at its essence a contract action" subject to the Tucker Act or instead a challenge properly brought under the APA, federal courts apply the standard articulated by the D.C. Circuit in *Megapulse, Inc. v. Lewis*, 672 F.2d 959 (D.C. Cir. 1982), which looks at both "the source of the rights upon which the plaintiff bases its claims" and "the type of relief sought (or appropriate)." *Id.* at 968. When a plaintiff's claim is premised on a contract with the government, depends on the government's having breached that contract, and seeks to compel the government to pay sums due under the contract, that is a Tucker Act claim, not an APA claim. *Id.* at 967-971.

Applying the *Megapulse* standard here, Plaintiffs' claims, insofar as they relate to the FY2023 grants,[12] are in essence contract claims. First, "the source of the rights upon which the

_____

[12] Importantly, Defendants do not argue that the Tucker Act applies to Plaintiff ILCM's claims arising out of its FY2024 grant. ILCM's FY2024 grant provides:

plaintiff bases its claims" are the Plaintiffs' CIGP grant awards.  Plaintiffs describe their basis for

standing to bring these claims as follows:

> each Plaintiff applied for and received a CIGP grant. . . . Plaintiffs have incurred
> expenses in reliance on and in the performance of the terms of their CIGP
> grants. . . . But Plaintiffs have not been able to obtain reimbursements for these
> costs because Defendants have frozen their grant awards. . . . And Plaintiffs' injury
> will be redressed by a favorable decision that requires Defendants to unfreeze their
> grant awards and reimburse Plaintiffs for their costs.

Mem. at 28-29.  In other words, Plaintiffs are in this Court because Plaintiffs have contracts with

the government (in the form of federal grants, *see supra* note 11), Plaintiffs allegedly performed

under those contracts, the government has allegedly not performed under the contracts, and

Plaintiffs are asking for the Court to make the government perform (*i.e.*, to pay the money that

Plaintiffs are allegedly owed under the contracts).  This is a quintessential contract claim.  Indeed,

Plaintiffs would have no claim at all without having alleged a breach of the grant agreements by

the government.

Second, "the type of relief sought (or appropriate)" also reflects the contractual nature of

this action.  Rather than challenging some regulatory action with monetary implications—the kind

of claim that does not necessarily entail any contractual breach—Plaintiffs at bottom seek what

they view as sums owed to them by the government.  *Great-West Life & Annuity Ins. Co. v.*

---

T.  Monetary Damages.  Monetary damages are not available to the Recipient in
the event of a breach of the grant or cooperative agreement by DHS, such that the
United States Court of Federal Claims does not have jurisdiction to render judgment
upon any claim against the United States arising under the grant or cooperative
agreement under 28 U.S.C. § 1491(a).

U. Standard of Review.  The scope of any judicial review for a DHS actions,
findings, and conclusions under this cooperative agreement is limited to the
standard of review under the Administrative Procedures Act, 5 U.S.C. § 706.

Ex. W, Sections T & U, J.R.452.  The FY2023 grants for the other eight Plaintiffs do not contain
this language.

*Knudson*, 534 U.S. 204, 212 (2002); *Maine Community*, 590 U.S. at 326-27; *cf. Bowen v. Massachusetts*, 487 U.S. 879 (1988). APA suits do not "claim a breach of contract" and "seek[] no money damages against the United States"; such claims instead rest on statutory or constitutional theories independent of the contract terms. *Megapulse*, 672 F.2d at 969. But here, the payment of money, far from being merely incidental to or "hint[ed] at" by Plaintiffs' request for relief, is the entire object of Plaintiffs' suit. *Crowley Gov't Servs., Inc. v. General Servs. Admin.*, 38 F.4th 1099, 1112 (D.C. Cir. 2022) (citation omitted). The appropriate vehicle for a claim seeking sums allegedly wrongfully withheld by the government is a "Tucker Act [suit] in the Claims Court," not an APA action. *Bowen*, 487 U.S. at 890 n.12 (quoting *Massachusetts v. Secretary of Health & Human Servs.*, 816 F.2d 796, 800 (1st Cir. 1987)); *see also Crowley*, 38 F.4th at 1107. Indeed, insofar as Plaintiffs receive their funding as reimbursements "for expenses already incurred," *see* Mem. at 8 ("Most Plaintiffs have outstanding requests for reimbursement, and all will need to submit additional reimbursement requests shortly"), this lawsuit presents a particularly clear case. Suits seeking "compensat[ion] for completed labors" belong in the Court of Federal Claims. *Maine Community*, 590 U.S. at 327.

Finally, just because Plaintiffs invoke statutes and regulations that "might impose procedural requirements on the government having some impact on the contract" does not mean that those provisions "create[] the substantive right to the remedy [they] seek[]." *Spectrum Leasing Corp. v. United States*, 764 F.2d 891, 894 (D.C. Cir. 1985); *see also Ingersoll-Rand*, 780 F.2d at 77-78 ("merely . . . alleging violations of regulatory or statutory provisions rather than breach of contract" does not deprive a suit of its contractual essence for jurisdictional purposes). *See also United States v. J&E Salvage Co.*, 55 F.3d 985, 988 (4th Cir. 1995) ("Neither contractors nor the government may bring a contract action in federal district court simply by recasting claims in tort

language or as some statutory or regulatory violation."). The ultimate source of Plaintiffs' asserted right to payment is the FY2023 grant awards, not the statutes or regulations that Plaintiffs claim the government violated.

Over the past two months, there has been a flood of lawsuits challenging agency decisions to freeze and/or terminate federal grants across a range of industries. Nearly all of these cases raise the issue of Tucker Act jurisdiction and are in various phases of adjudication and appeal. One district court has declined to issue injunctive relief and held that the Court of Federal Claims has jurisdiction; that ruling is now before the D.C. Circuit. *See U.S. Conf. of Catholic Bishops v. U.S. Dept. of State*, Case No. 1:25-cv-00465-TNM, 2025 WL 763738, at *2, 5-6 (D.D.C. Mar. 11, 2025) (considering suspension of grants worth $65 million total in refugee funding, and holding that it "lacks the power" to "cancel the termination, pay money due, and reinstate the contracts"), *appeal pending*, No. 25-5066 (D.C. Cir. Mar. 14, 2025).

Other district courts, however, have rejected Defendants' argument that it lacks subject matter jurisdiction in light of the Tucker Act, including this Court, Judge Rubin presiding, in *Amer. Assoc. of Colleges v. McMahon*, Case No. 25-cv-00702-JRR, 2025 WL 863319, at *2–5 (D. Md. Mar. 19, 2025), a case involving the termination of certain grants awarded by the Department of Education. An appeal of Judge Rubin's ruling is now pending before the Fourth Circuit in App. Case No. 25-1281. Defendants respectfully suggest that *Catholic Bishops*, *supra*, reflects a sounder interpretation of the law and urge this Court to adopt its reasoning here.

Because the essence of this Complaint (insofar as Plaintiffs' claims relate to FY2023 grants, *see supra* note 12) is monetary relief and enforcement of a contract, it falls under the Tucker Act and this Court lacks subject matter jurisdiction.

**B.      Funding Decisions Are Committed to Agency Discretion and Are Not Subject to Arbitrary-and-Capricious Review.**

Even if Plaintiffs' claims were not subject to the Tucker Act, Plaintiffs are unlikely to succeed on their APA claims because they challenge funding decisions by DHS that are committed to the agency's discretion by law. 5 U.S.C. § 701(a)(2). Although the APA presumes that agency action can be judicially reviewed, "under § 701(a)(2), agency action is not subject to judicial review 'to the extent that' such action 'is committed to agency discretion by law.'" *Lincoln v. Vigil*, 508 U.S. 182, 190-91 (1993).

In *Lincoln*, the Supreme Court held that the "allocation of funds from a lump-sum appropriation" is an "administrative decision traditionally regarded as committed to agency discretion," and thus such a decision is not reviewable under the APA. *Id.* at 192. The Court noted, however, that "an agency is not free simply to disregard statutory responsibilities: Congress may always circumscribe agency discretion to allocate resources by putting restrictions in the operative statutes . . . ." *Id.* at 193. But as long as the agency abides by the relevant statutes (and whatever self-imposed obligations may arise from regulations or grant instruments), the APA "gives the courts no leave to intrude" via arbitrary-and-capricious review. *Id.*

Although *Lincoln* involved lump-sum appropriations, in *Milk Train, Inc. v. Veneman*, 310 F.3d 747 (D.C. Cir. 2002), the D.C. Circuit extended its logic to more specific appropriations, holding that where Congress "left to the Secretary the decision about how the moneys" appropriated for a particular program "could best be distributed consistent with" the governing statute, such decisions were not subject to judicial review under the APA. *Id.* at 751-52. *See also Policy & Research, LLC v. U.S. Dep't of Health & Human Servs.*, 313 F. Supp. 3d 62, 75-76 (D.D.C. 2018) (Jackson, J.) ("*Milk Train* thus makes quite clear that even funding decisions related to a specific appropriation for a specific program can be properly deemed committed to agency

20

discretion."). Accordingly, DHS's decision to award, freeze, or terminate a grant is reviewable—at most—only for compliance with the terms of the governing statutes, regulations, and funding instruments. Such compliance is discussed *infra* at 21-25. Plaintiffs err in attempting to subject the decision to freeze or terminate the funding to arbitrary-and-capricious review.

C.     **Neither the Funding Freeze nor the Terminations Are Contrary to Law.**

Plaintiffs allege that the funding freeze violates (1) the Homeland Security Act; (2) the Appropriations Acts; and (3) the Uniform Guidance (*i.e.*, regulations that have been incorporated by reference into each of Plaintiffs' grants). Mem. at 19-22. In addition, Plaintiffs allege that the funding freeze violates principles of constitutional separation of powers and is ultra vires. *Id.* at 22-23. Presumably, Plaintiffs will contend that the grant terminations are similarly contrary to law. ECF No. 31. Defendants will address each argument in turn:

1.     *Neither the funding freeze nor the terminations violate the Homeland Security Act.*

Plaintiffs allege that the funding freeze (now grant terminations) violates the Homeland Security Act—specifically, 6 U.S.C. § 111(b)(1)(E) and 6 U.S.C. § 271(f)(2). This is wrong.

*First, regarding Section 111(b)(1)(E).* Congress passed the Homeland Security Act in 2002. Section 111 establishes the Department of Homeland Security and sets forth its mission. Included in that mission, following "prevent[ing] terrorist attacks," "minimiz[ing] the damage" from terrorist attacks that do occur, and other similar security-related functions, is to "ensure that the functions of the agencies and subagencies within the Department that are not related directly to securing the homeland are not diminished or neglected except by a specific explicit Act of Congress." 6 U.S.C. § 111(b)(1)(E). Plaintiffs argue that this language requires a "specific explicit Act of Congress" before USCIS could freeze (/terminate) the CIGP funds. Mem. at 20. That is a stretch. On its face, DHS's statutory mission statement appears intended to express a recognition

21

that DHS has responsibilities beyond the momentous burden of "securing the homeland," and that those important responsibilities must not be "diminished or neglected" absent Congress's express say-so.  But given that CIGP did not even begin until 2009 – seven years after Section 111(b)(1)(E) was written into law – it is implausible that Congress had this program in mind when crafting DHS's general mission statement.

*Second, regarding Section 271(f)(2).*  USCIS is one of three component agencies of DHS established under the Homeland Security Act in 2002.  *Id.* § 271(a).  Section 271(f) provides for the creation of an Office of Citizenship at USCIS.  *Id.* § 271(f).  Subsection (2) provides:

> The Chief of the Office of Citizenship for the Bureau of Citizenship and Immigration Services shall be responsible for promoting instruction and training on citizenship responsibilities for aliens interested in becoming naturalized citizens of the United States, including the development of educational materials.

*Id.* § 271(f)(2).  Plaintiffs essentially argue that USCIS cannot comply with Section 271(f)(2) without CIGP.  Mem. at 19-20.  But, once again, CIGP began in 2009 – seven years after Section 271(f)(2) was enacted.  Thus, Plaintiffs' argument implausibly suggests that USCIS failed to meet its statutory obligations for the first 7 years of its existence.  This is nonsensical and, in any event, not correct.

USCIS fulfills this statutory mandate in ways beyond its oversight of CIGP.  In particular, the USCIS Office of Citizenship maintains a "Citizenship Resource Center" on its website, https://www.uscis.gov/citizenship, which provides numerous resources to lawful permanent residents, educators, and organizations like Plaintiffs.  These resources include "information about the naturalization process, eligibility requirements, and study materials to prepare for the naturalization interview and test."  *See supra* at 3.  Accordingly, USCIS has not failed to fulfill its statutory duties under 6 U.S.C. § 271(f)(2) by freezing/terminating the CIGP funds.

2.    *Neither the funding freeze nor the terminations violate the Appropriations Acts.*

The Appropriations Acts authorizing funding for CIGP provide that the appropriated grant funding is "to remain available" until September 30, 2024 in the case of FY2023 awards, and until September 30, 2025 in the case of FY2024 awards.  *See supra* at 3-4 (quoting both Appropriations Acts in full).  Beyond that, Congress left to DHS's discretion the manner in which those appropriated funds are actually expended.  Notably, eight of the nine Plaintiffs in this case were awarded FY2023 CIGP grants.  Mem. at 4-5.  Because the 2023 Appropriations Act directs that the FY2023 funds remain available until *September 30, 2024*, the vast majority of Plaintiffs' claims that the funding freeze (now terminations) violates Congressionally mandated appropriations are simply not supported by the plain language of the 2023 Appropriations Act.[13]

In enacting the Appropriations Acts, Congress did not dictate that the funds be disbursed to these Plaintiffs, nor did Congress mandate that disbursements be made on a particular timeline.  USCIS has latitude to design the program and choose which activities to fund.  *See Milk Train*, 310 F.3d at 751 (rejecting contention that "the absence of express statutory authority for the Secretary to [act in the manner at issue] makes [that act] unlawful").  The freeze on funds and grant terminations at issue in this case are inherent in DHS's wide discretion to allocate funds generally appropriated for CIGP.  *See supra* at 20-21.

3.    *To the extent Plaintiffs rely upon alleged violations of the Uniform Guidance, Plaintiffs state a breach of contract claim over which this Court lacks subject matter jurisdiction.  Nevertheless, the terminations complied with the grant terms and conditions, including the Uniform Guidance.*

Plaintiffs also rely upon alleged violations of the Uniform Guidance in arguing that the

---

[13] Just one of the Plaintiffs – ILCM – was awarded a CIGP grant for FY2024, and ILCM states that it is currently owed just $19,371 on account of its grant.  Ex. J ¶ 12, J.R.038.

funding freeze/terminations were contrary to law.  Mem. at 21-22.  However, as Plaintiffs repeatedly acknowledge, the Uniform Guidance sets forth the terms of conditions of federal grants and is incorporated by reference into the CIGP grants awarded to Plaintiffs.  *Id.* at 5, 21. Accordingly, any claim (related to the FY2023 grants, *see supra* note 12) based upon a breach of the Uniform Guidance merely states a claim for breach of contract against the United States.  *Boaz Hous. Auth.*, 994 F.3d at 1367 ("That contractual provisions either are required by or incorporate governing regulations does not make those obligations any less contractual in nature.").  Federal district courts lack subject matter jurisdiction over contract claims asserted against the United States, which claims may only be brought in the Court of Federal Claims under the Tucker Act. *See supra* at 15-19.

Nevertheless, DHS terminated Plaintiffs' grants consistent with the terms and conditions of the grants, including the Uniform Guidance.  The "Termination" provision included in each of the grants provides that "DHS may terminate this Award by giving written notice of the other party at least thirty (30) calendar days prior to the effective date of the termination."  Exs. P-V, X, Section N, J.R.266, 291, 318, 345, 372, 399, 426, 477; *see also* Ex. W, Section S, J.R.452 (quoted in full *supra* at 6).  The recipient's "authority to incur new costs will be terminated upon . . . the date set forth in the notice."  *Id.*  In addition, pursuant to the Uniform Guidance, a federal agency may terminate contracts or grants for various reasons—*e.g.*, a change in policy priorities.  *See, e.g.*, 2 C.F.R. § 200.340(a)(4) ("The Federal award may be terminated in part or its entirety … to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities."); *Northrop Grumman v. United States*, 46 Fed. Cl. 622, 626 (2000) ("The Government's right to terminate a contract for convenience is broad.").

Here, the Termination Letters to Plaintiffs complied with the "Termination" provision of

the grants, as well as the requirements of Uniform Guidance by, *inter alia*, providing notice of termination and setting an effective date 30 days after the date of the notice; identifying the reasons for the termination; permitting allowable costs prior to issuance of the notice; and setting forth the process for challenging the termination.  *See* ECF No. 31 (attaching Termination Letters at J.R.217-246).

### 4.    The funding freeze and terminations are consistent with constitutional separation of powers and are not ultra vires.

As discussed *supra* at 23, neither the funding freeze nor the terminations violate the Appropriations Acts.  Because Plaintiffs' separation of powers and ultra vires arguments presume that the freeze/terminations contravened congressional appropriations (Mem. at 22-23), these arguments fail for those same reasons.

Furthermore, insofar as Plaintiffs base their separation of powers and ultra vires claims on the President allegedly exceeding his Article II powers, Plaintiffs' argument is unfounded.  Neither the Noem Memorandum, the Freeze Letters, nor the Termination Letters invoke, rely upon, or even reference the President or any of his executive orders.  Nevertheless, the Supreme Court has made clear that courts have "no jurisdiction … to enjoin the President in the performance of his official duties." *Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475, 501 at 501 (1867); *see also Franklin v. Massachusetts*, 505 U.S. 788, 827 (Scalia, J., concurring in part).

The President of the United States also plainly has authority to direct agencies to fully implement the President's agenda, consistent with each individual agency's underlying statutory authorities. *See Bldg. & Const. Trades Dep't v. Allbaugh*, 295 F.3d 28, 32 (D.C. Cir. 2002) ("[T]he President's power necessarily encompasses 'general administrative control of those executing the laws,' throughout the Executive Branch of government, of which he is the head." (quoting *Myers v. United States*, 272 U.S. 52, 164 (1926), citation omitted)); *see also, e.g., Sherley v. Sebelius*,

25

689 F.3d 776, 784 (D.C. Cir. 2012) ("[A]s an agency under the direction of the executive branch, it must implement the President's policy directives to the extent permitted by law."); *Sierra Club v. Costle*, 657 F.2d 298, 406 (D.C. Cir. 1981) ("The authority of the President to control and supervise executive policymaking is derived from the Constitution.").

## IV.    <u>The Balance of Equities Does Not Favor Plaintiffs</u>

The party seeking a preliminary injunction must show that the balance of equities tips in their favor and that the injunction is in the public interest. *Winter*, 555 U.S. at 20. An injunction here would effectively disable the Secretary from assessing program effectiveness and consistency with program goals and agency priorities for a program where the statutes authorizing and funding the program give her significant discretion to set those goals and priorities. *See* 2 C.F.R. ¶ 200.340(a)(4). Further, where the Government is legally entitled to make decisions about the disbursement or allocation of federal funds but is nonetheless ordered to release the funds, such funds may not be retrievable afterwards. Those harms will irreparably harm the sovereign and pecuniary interests of the United States. *See Dep't of State v. AIDS Vaccine Advoc. Coal.*, 145 U.S. 753, 757 (Mar. 5, 2025) (Alito, J., dissenting in denial of government's motion to stay preliminary injunction entered by district court and noting that "[t]he Government has represented that it would probably be unable to recover much of the money after it is paid because it would be quickly spent by the recipients or disbursed to third parties"). Thus, the balance of the equities weighs in favor of Defendants and relief should be denied.

## V.    <u>The Relief Sought by Plaintiffs Is Overbroad</u>

If the Court is inclined to grant Plaintiffs relief, it should reject their request for a sweeping nationwide injunction. Longstanding equitable principles and binding precedent prohibit such an

extraordinary order.  Any relief in this case should be tailored solely to the named Plaintiffs.

Under Fourth Circuit precedent, courts may issue nationwide injunctions only when "necessary to afford relief to the prevailing party." *Va. Soc'y for Human Life, Inc. v. FEC*, 263 F.3d 379, 393 (4th Cir. 2001).  That is because, as the Supreme Court has recognized, an injunction "must be tailored to redress the plaintiff's particular injury," *Gill v. Whitford*, 585 U.S. 48, 73 (2018), and "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs," *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (citation omitted).

That principle has deep roots.  It is well established that the scope of a court's statutory authority to enter injunctive relief is circumscribed by the type of relief that was "traditionally accorded by courts of equity." *Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 318-19 (1999).  And the tradition of equity inherited from English law was premised on "providing equitable relief only to parties" because the fundamental role of a court was to "adjudicate the rights of 'individual[s].'" *Trump v. Hawaii*, 585 U.S. 667, 718 (2018) (Thomas, J., concurring) (quoting *The Federalist No. 78*, at 466 (Alexander Hamilton) (Clinton Rossiter ed., 1961)).  As a result, "a plaintiff could not sue to vindicate the private rights of someone else." *Id*.  Yet that is exactly the relief Plaintiffs seek in this case.  They ask this Court to enjoin Defendants ability to pause and review and/or terminate CIGP grants on a nationwide basis as to an innumerable number of non-parties who are not before the Court.  But Plaintiffs have not availed themselves of any mechanism to represent the interests of non-parties: they have not sought class certification or asserted third-party standing to represent others in this suit.  Plaintiffs therefore are not entitled to injunctive relief on behalf of every other CIGP grant recipient.  Just weeks ago, the Fourth Circuit reaffirmed these principles in granting the Government's motion for

a stay pending appeal of the nationwide injunction entered by this Court in *Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*, Case No. 25-cv-0333-ABA, 2025 WL 750690 (D. Md. Mar. 10, 2025).  *See* App. Case No. 25-1189, ECF No. 29 (Mar. 14, 2025).  Judge Rushing, in a concurrence, explained that "[t]he scope of the preliminary injunction alone should raise red flags: the district court purported to enjoin *nondefendants* from taking action against *nonplaintiffs*."  App. Case No. 25-1189, ECF No. 29 at 9 (Rushing, J., concurring).

The Fourth Circuit rejected similar overbroad relief in *Virginia Society for Human Life, Inc. v. FEC*, 263 F.3d 379 (4th Cir. 2001).  There, the court vacated a permanent injunction that precluded a federal agency from enforcing, against any entity, a regulation held to have violated the First Amendment.  *Id.* at 393 ("We conclude that the district court abused its discretion by issuing a nationwide injunction, an injunction that prevents the FEC from enforcing the regulation against any party anywhere in the United States.").  The Court explained that an injunction covering the plaintiff "alone adequately protects it from the feared prosecution," and that "[p]reventing the [agency] from enforcing [the regulation] against other parties in other circuits does not provide any additional relief to [the plaintiff]."  *Id.*  The same rationale requires denial of Plaintiffs' request for a nationwide injunction here.

The problems caused by overbroad nationwide injunctions are well catalogued.  *See, e.g.*, *Labrador v. Poe*, 144 S. Ct. 921, 926-28 (2024) (mem.) (Gorsuch, J., concurring); *DHS v. New York*, 140 S. Ct. 599, 599-601 (2020) (mem.) (Gorsuch, J., concurring); *Hawaii*, 585 U.S. at 713 (Thomas, J., concurring); *Arizona v. Biden*, 40 F.4th 375, 395-98 (6th Cir. 2022) (Sutton, C.J., concurring). Nationwide injunctions "take a toll on the federal court system—preventing legal questions from percolating through the federal courts, encouraging forum shopping, and making every case a national emergency for the courts and for the Executive Branch."  *Hawaii*, 585 U.S.

at 713 (Thomas, J., concurring); *see New York*, 140 S. Ct. at 600–01 (2020) (Gorsuch, J., concurring in grant of stay) (explaining that nationwide injunctions raise serious separation of powers concerns, hamper orderly judicial resolution of issues within and across cases, and improperly disadvantage the Federal Government); *Texas*, 599 U.S. at 694 (Gorsuch, J., concurring in the judgment) (reiterating concerns with "universal injunctions" and noting that "[m]atters have not improved with time"). Indeed, "in recent years the Supreme Court has repeatedly stayed nationwide injunctions that prevented the Executive Branch from pursuing its immigration policies." *Texas v. United States*, 14 F.4th 332, 341 (5th Cir. 2021) (citing cases), *vacated on rehearing en banc*, 24 F.4th 407 (5th Cir. 2021); *see also Labrador*, 144 S. Ct. at 921 (staying statewide injunction of Idaho law and limiting injunction only to plaintiffs).

Here, a nationwide injunction is wholly unnecessary to protect the named Plaintiffs who brought this lawsuit. Plaintiffs' alleged fears about staffing, programmatic changes, and client services would be fully remedied by an injunction limited to the Plaintiffs that restores the CIGP grant funding as to them. Such relief would return Plaintiffs to the same position they were in immediately before distribution of the Freeze Letters and Termination Letters. A narrow order of this type would appropriately "maintain the status quo until after a trial and final judgment, which is the traditional function of a preliminary injunction." *Pierce v. N.C. State Bd. of Elections*, 97 F.4th 194, 209 (4th Cir. 2024).

## VI.     The Court Should Require Plaintiffs to Post Security

Federal Rule of Civil Procedure 65(c) provides: "The court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the Court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). To the extent that the Court grants relief

to Plaintiffs, Defendants respectfully request that the Court require Plaintiffs to post security for any taxpayer funds distributed during the pendency of the Court's Order.

## CONCLUSION

For the foregoing reasons, Plaintiffs' Motion should be denied.


Dated:  April 1, 2025

                                      Respectfully submitted,

                                      Kelly O. Hayes
                                      United States Attorney

                        By:    */s/  Jessica Dillon*
                                      Jessica F.W. Dillon (Bar No. 19249)
                                      Rebecca A. Koch (Bar No. 802108)
                                      Assistant United States Attorney
                                      36 South Charles Street, 4th Floor
                                      Baltimore, Maryland 21201
                                      (410) 209-4892 (direct)
                                      (410) 962-2310 (fax)
                                      jessica.dillon@usdoj.gov
                                      rebecca.koch@usdoj.gov

                                      *Counsel for Defendants*