# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

**Solutions in Hometown Connections,** *et al.*,

      Plaintiffs,

**v.**

**Kristi Noem,** *et al.*,

      Defendants.

**Civil Case No. 8:25-cv-00885-LKG**

## REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION & APA § 705 STAY

## TABLE OF CONTENTS

Table of Authorities ..................................................................................................... ii

Argument ...................................................................................................................... 1

   **I.**   This Court has jurisdiction. ..................................................................... 1

   **II.**  The Court should grant preliminary relief to Plaintiffs. ...................................... 3

     A.   Defendants' termination of Plaintiffs' grants, like their "indefinite funding freeze," violates the APA. ................................................................................................ 3

        **i.**   The freeze and termination are final agency actions. ................................. 4

        **ii.**  The freeze and terminations are arbitrary and capricious. ......................... 4

        **iii.**  The terminations are contrary to law. ..................................................... 6

        **iv.**  The freeze and terminations are contrary to the Constitution and in excess of statutory authority, claims Defendants forfeit. .......................................... 9

     B.   Defendants' actions have caused Plaintiffs irreparable harm. ....................................... 10

     C.   The balance of equities and public interest weigh in Plaintiffs' favor. ........................ 14

   **III.**  A Section 705 stay or nationwide injunction is appropriate, but bond is not. ................. 14

Conclusion .................................................................................................................... 15

# TABLE OF AUTHORITIES

**Cases**

*Aids Vaccine Advoc. Coal. v. U.S. Dep't of State*, No. 25-cv-00400, 2025 WL 752378
(D.D.C. Mar. 10, 2025)........................................................................................... 3, 8

*Am. Ass'n of Colls. for Tchr. Educ. v. McMahon*, No. 25-cv-00702, 2025 WL 863319
(D. Md. Mar. 19, 2025)............................................................................................ 2, 3

*Beacon Assocs. v. Apprio, Inc.*, 308 F. Supp. 3d 277 (D.D.C. 2018) ........................... 11

*Bennett v. Spear*, 520 U.S. 154 (1997) ....................................................................... 4

*Bowen v. Massachusetts*, 487 U.S. 879 (1988)............................................................. 2

*California v. U.S. Dep't of Educ.*, No. 25-1244, 2025 WL 878431 (1st Cir. Mar. 21, 2025) .... 2, 8

*Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402 (1971) ....................... 5

*City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225 (9th Cir. 2018) ..................... 7

City of Houston v. Dep't of Hous. & Urb. Dev., 24 F.3d 1421 (D.C. Cir. 1994)......... 13

*Climate United Fund v. Citibank, N.A.*, No. 25-cv-698, 2025 WL 842360
(D.D.C. Mar. 18, 2025)........................................................................................... 3, 13

*Coleman v. Kendall*, 74 F.4th 610 (4th Cir. 2023) ..................................................... 2

*Department of State v. AIDS Vaccine Advocacy Coalition*, 145 S. Ct. 753 (2025)..................... 14

*Edge-Works Mfg. Co. v. HSG, LLC*, 285 F. Supp. 3d 883 (E.D.N.C. 2018) .............. 13

*Farrell v. Tillerson*, 315 F. Supp. 3d 47 (D.D.C. 2018) ............................................. 9

*FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009).......................................... 8

*FEC v. Cruz*, 596 U.S. 289 (2022)............................................................................. 10

*HIAS, Inc. v. Trump*, 985 F.3d 309 (4th Cir. 2021) ............................................... 14, 15

*In re Aiken County*, 725 F.3d 255 (D.C. Cir. 2013) (Kavanaugh, J.) ......................... 10

*Inova Alexandria Hosp. v. Shalala*, 244 F.3d 342 (4th Cir. 2001) .............................. 5

*Katz v. Cisneros*, 16 F.3d 1204 (Fed. Cir. 1994) ........................................................ 3

*Lincoln v. Vigil*, 508 U.S. 182 (1993) ..................................................................... 5, 7

*Maine Cmty. Health Options v. United States*, 590 U.S. 296 (2020) ........................... 3

*Massachusetts v. Nat'l Insts. of Health*, No. 25-CV-10338, 2025 WL 702163
(D. Mass. Mar. 5, 2025)........................................................................................... 2, 3

*Megapulse, Inc. v. Lewis*, 672 F.2d 959 (D.C. Cir. 1982) ........................................ 1, 2

*Milk Train, Inc. v. Veneman*, 310 F.3d 747 (D.C. Cir. 2002).................................... 5, 8

*Morgan Stanley DW Inc. v. Rothe*, 150 F. Supp. 2d 67 (D.D.C. 2001)....................... 14

*Mountain Valley Pipeline, LLC v. 6.56 Acres of Land, Owned by Sandra Townes Powell*, 915 F.3d 197 (4th Cir. 2019) ......................................................................................... 12

*Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*, No. 25-cv-333, 2025 WL 573764 (D. Md. Feb. 21, 2025) .......................................................... 15

*Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, No. 25-cv-239, 2025 WL 597959 (D.D.C. Feb. 25, 2025) ............................................................................. 15

*Nat'l TPS All. v. Noem*, No. 25-cv-01766, 2025 WL 957677 (N.D. Cal. Mar. 31, 2025)........... 14

*Ohio v. EPA*, 603 U.S. 279 (2024) ................................................................... 4, 6

*Pacito v. Trump*, 25-cv-255, 2025 WL 655075 (W.D. Wa. Feb. 28, 2025) .................... 10, 11, 12

*Par Pharms., Inc. v. TWI Pharms., Inc.*, No. CCB-11-2466, 2014 WL 3956024 (D. Md. Aug. 12, 2014) .......................................................................... 11

*Pashby v. Delia*, 709 F.3d 307 (4th Cir. 2013) ......................................................... 15

*Pol'y & Rsch., LLC v. U.S. Dep't of Health & Hum. Servs.*, 313 F. Supp. 3d 62 (D.D.C. 2018) ................................................................................... 5, 6

*Roe v. Dep't of Def.*, 947 F.3d 207 (4th Cir. 2020) .................................................... 15

*Rueda Vidal v. Dep't of Homeland Sec.*, 536 F. Supp. 3d 604 (C.D. Cal. 2021) ....................... 10

*Salomon & Ludwin, LLC, v. Winters,* 741 F. Supp. 3d 398 (E.D. Va. 2024) ............................ 13

*Sampson v. Murray*, 415 U.S. 61 (1974) ............................................................... 11

*Stuller, Inc. v. Steak N Shake Enters.*, 695 F.3d 676 (7th Cir. 2012)................................... 12

*Variable Annuity Life. Ins. Co. v. Coreth*, 525 F. Supp. 3d 488 (E.D. Va. 2021) ...................... 14

*Williams v. Roth*, No. 21-cv-02135, 2022 WL 4134316 (D. Md. Sept. 12, 2022) ....................... 2

**Statutes**

2 U.S.C. § 683 ....................................................................................... 9

2 U.S.C. § 684 ....................................................................................... 9

5 U.S.C. § 701 ....................................................................................... 5

6 U.S.C. § 111 ....................................................................................... 6

6 U.S.C. § 271 ....................................................................................... 6

22 U.S.C. § 2348 ..................................................................................... 8

28 U.S.C. § 1491 ..................................................................................... 1

31 U.S.C. § 1301 .................................................................................... 10

Pub. L. No. 117-328, 136 Stat. 4459 (2022) ........................................................... 7

Pub. L. No. 118-47, 138 Stat. 460 (2024) ............................................................. 7

**Other Authorities**

2 C.F.R. § 200.340 ................................................................................................. 8

Wright & Miller, 11A Fed. Prac. & Proc. § 2948.1 (3d ed.) ...................................... 11

**ARGUMENT**

Two days after Plaintiffs' motion for preliminary relief challenged Defendants' indefinite freeze of grant funds, Defendants terminated the grants. Defendants do not contest that the freeze and termination are reviewable final agency action. Nor do they argue that the freeze and termination survive arbitrary-and-capricious review. Instead, they argue that the Court lacks jurisdiction because Plaintiffs' claims are *really* contract claims, that Plaintiffs are not irreparably harmed, that the freeze and termination are not contrary to law, and that the Court should grant only narrow relief (for which Plaintiffs should post bond). Defendants are wrong at each turn.

**I.  This Court has jurisdiction.[1]**

Plaintiffs challenge Defendants' unlawful freeze and now mass termination of CIGP grants as statutory, regulatory, and constitutional violations—all claims within this Court's wheelhouse and jurisdiction. Defendants insist that this is just a dressed-up contract case—despite acknowledging (at 12) that most of the relief at issue is *prospective*—so the Tucker Act divests the Court of jurisdiction. The Tucker Act vests the Court of Federal Claims with jurisdiction over, among others, "express or implied contract[s] with the United States." 28 U.S.C. § 1491(a)(1). The Tucker Act applies if the issue in a case is "at its essence" a contract claim. *Megapulse, Inc*. *v. Lewis*, 672 F.2d 959, 967 (D.C. Cir. 1982). Whether a claim "at its essence" is contractual turns on (1) "the source of the rights" underlying the claims and (2) "the type of relief sought (or appropriate)."[2] *Id.* at 968. Both make clear that the Tucker Act does not apply here and that this Court has jurisdiction.

---

[1] Plaintiffs acknowledge the stay in *Dep't of Educ. v. California,* 604 U.S. ___ (2025), issued mere hours before the filing of this brief. The stay is nonprecedential and distinguishable from this case. And it does not disturb the holding in *Bowen v. Massachusetts*, 487 U.S. 879 (1988). Plaintiffs will seek leave from this Court to file supplement briefing to address the case.

[2] Various courts apply the *Megapulse* test to Tucker Act claims. *See, e.g.*, *Atterbury v. U.S. Marshals Serv.*, 805 F.3d 398, 406 (2d Cir. 2015); *Normandy Apartments, Ltd. v. U.S. Dep't of*

**1.** Courts determine the "source of the rights" at issue by reading the complaint with "an eye toward 'the true nature of the action,'" *Am. Ass'n of Colls. for Tchr. Educ. v. McMahon*, No. 25-cv-00702, 2025 WL 863319, at *3 (D. Md. Mar. 19, 2025) (quoting *Williams v. Roth*, No. 21-cv-02135, 2022 WL 4134316, at *4 (D. Md. Sept. 12, 2022)), and examining whether the claims, "at their core," assert violations of federal law or contract provisions, *California v. U.S. Dep't of Educ.*, No. 25-1244, 2025 WL 878431, at *2 (1st Cir. Mar. 21, 2025). Here, Plaintiffs challenge Defendants' actions as insufficiently explained, insufficiently reasoned, and contrary to law. Pls.' Br. at 12, 20. Just because each grant award is also a contract does not convert Plaintiffs' APA claims, grounded in federal statutes and the Constitution, into contract claims. *See Megapulse*, 672 F.2d at 968 ("But the mere fact that a court may have to rule on a contract issue does not, by triggering some mystical metamorphosis, automatically transform an action . . . into one on the contract and deprive the court of jurisdiction it might otherwise have.").[3]

**2.** As for the relief sought, there is an important distinction between an "action at law for damages" that provides monetary compensation and "an equitable action for specific relief" which may happen to require monetary relief as part of the judicial remedy. *Bowen v. Massachusetts*, 487 U.S. 879, 893 (1988). The key difference here is "the existence of prospective relief in ongoing relationships." *Massachusetts v. Nat'l Insts. of Health*, No. 25-CV-10338, 2025 WL 702163, at *7 (D. Mass. Mar. 5, 2025). The Court of Federal Claims cannot adjudicate the lawfulness of an

---

*Hous. & Urb. Dev.*, 554 F.3d 1290, 1299-1300 (10th Cir. 2009); *North Star Alaska v. United States*, 14 F.3d 36, 37 (9th Cir. 1994). While the Fourth Circuit has not yet explicitly adopted *Megapulse*, it has adopted an analogous test in a non-contract Tucker Act case. *Coleman v. Kendall*, 74 F.4th 610, 615 (4th Cir. 2023). A judge in this district also recently applied a similar framework to a grant termination case, citing *Megapulse* as persuasive authority. *McMahon*, 2025 WL 863319, at *2-5.

[3] The government has correctly conceded that the Tucker Act does not apply to nonstatutory claims. *AIDS Vaccine Advocacy Coalition*, 2025 WL 752378, at *7 n.6.

agency's action that will affect a future, ongoing relationship between parties. *Katz v. Cisneros*, 16 F.3d 1204, 1209 (Fed. Cir. 1994). Its jurisdiction is limited to cases where plaintiffs seek specific, calculated sums "designed to compensate for completed labors." *Maine Cmty. Health Options v. United States*, 590 U.S. 296, 298-99 (2020).

Plaintiffs seek prospective, injunctive relief (or a § 705 stay) in their ongoing relationship with Defendants, not reimbursement for past work. Compl. at 40. They seek declaratory, injunctive, and administrative relief that determines Defendants' legal obligations towards them and enjoins Defendants or delays and ultimately vacates the grant terminations Defendants imposed. That relief should result in the resumption of regular disbursements of Congressionally appropriated and previously awarded funds, but such ongoing, future-facing relief that results in monetary payments is distinct from retroactive money damages. The relief Plaintiffs seek can be awarded only by a federal district court sitting in law and equity, not by the Court of Federal Claims.[4]

## II. The Court should grant preliminary relief to Plaintiffs.

### A. Defendants' termination of Plaintiffs' grants, like their "indefinite funding freeze," violates the APA.

Plaintiffs' opening brief explains why the indefinite grant freeze ordered by the Noem Memorandum—now a termination—violates the APA. Specifically, the freeze (which is a final agency action) is arbitrary and capricious and contrary to law. In response, Defendants do not argue that there is no final agency action, nor do they argue that the freeze or termination are not arbitrary and capricious. So both arguments have been forfeited. Instead, they argue that the freeze

---

[4] Defendants do not distinguish this case from the wave of decisions overwhelmingly rejecting the government's recent attempts to divest district courts of jurisdiction through the Tucker Act. *See McMahon*, 2025 WL 863319, at *2-5; *Climate United Fund v. Citibank, N.A.*, No. 25-cv-698, 2025 WL 842360, at *5-6 (D.D.C. Mar. 18, 2025); *Aids Vaccine Advoc. Coal. v. U.S. Dep't of State*, No. 25-cv-00400, 2025 WL 752378, at *7-9 (D.D.C. Mar. 10, 2025); *Massachusetts*, 2025 WL 702163, at *4-8.

and termination are unreviewable under the APA because they are committed to agency discretion, and they argue that the freeze and termination do not exceed Defendants' legal authority. Defendants are wrong on both scores.

### i. The freeze and termination are final agency actions.

As explained in Plaintiffs' opening brief, the funding freeze was a final agency action because it "immediately and conclusively" stopped grant payments for an indefinite amount of time. Pls.' Br. 13. And the freeze affected Plaintiffs' rights and obligations by, among other things, forcing them to lay off staff and cut programming. *Id.* Even though Defendants forfeited the issue, Plaintiffs have not yet had an opportunity to explain why if there were any doubt that the indefinite freeze was a final agency action, the final termination of the CIGP grants makes it clear.

The termination letters "mark[ed] the consummation of the agency's decisionmaking process," *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (quotation marks omitted), by explicitly stating that DHS "hereby terminates" the grant awards. *See* J.R. 220. And the termination determines Plaintiffs' rights and obligations, *see Bennett*, 520 U.S. at 178, by explaining the legal effects of the termination, J.R. 220, and explaining the obligations of each grantee as grants are closed out, J.R. 221. If that is not final agency action, it's hard to see what is.

### ii. The freeze and terminations are arbitrary and capricious.

Plaintiffs' brief explained (at 14-19) that the funding freeze was arbitrary and capricious because it was neither "reasonable" nor "reasonably explained." Pls.' Br. 14 (quoting *Ohio v. EPA*, 603 U.S. 279, 292 (2024)). Defendants do not even attempt to rebut any of those arguments. Nor do Defendants argue that the termination would satisfy arbitrary and capricious review. Instead, Defendants argue only that APA review is prohibited because the grant-funding decisions are committed to agency discretion. That is wrong. And the termination, like the funding freeze, is arbitrary and capricious.

4

**1.** Although the APA prohibits arbitrary and capricious review of decisions "committed to agency discretion by law," 5 U.S.C. § 701(a)(2), "this exception to judicial review is a 'very narrow one.'" *Inova Alexandria Hosp. v. Shalala*, 244 F.3d 342, 346 (4th Cir. 2001) (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 410 (1971)). Unless an agency's action is the kind "ordinarily committed exclusively to agency discretion by law," arbitrary-and-capricious review is appropriate if there is a manageable standard by which to judge an agency's action. *Id.* at 347. That standard can be provided by statute or regulation. *Id.*

Defendants argue that the funding freeze and termination are unreviewable under the APA because the Supreme Court held that allocating funds from lump-sum appropriations is committed to agency discretion. Defs.' Br. 20 (citing *Lincoln v. Vigil*, 508 U.S. 182, 190-91 (1993)). Defendants contend that *Lincoln*'s holding as to lump-sum appropriations has been extended to "more specific appropriations." *Id.* (citing *Milk Train, Inc. v. Veneman*, 310 F.3d 747, 751-52 (D.C. Cir. 2002)). But Defendants ignore that the appropriation in *Milk Train* were highly discretionary, explicitly directing that the appropriated funds "be disbursed 'in a manner determined appropriate by the Secretary.'" 310 F.3d at 749 (quoting Pub. L. No. 106–78, § 805, 113 Stat. 1135, 1179 (1999)). The Consolidated Appropriations Act of 2023 and the Further Consolidated Appropriations Act of 2024 contain no such discretionary language, and Defendants identify no other statutory source of their supposed discretion to terminate awarded grants at will.

Further, Defendants cite in passing to a decision by then-Judge Jackson reiterating the holding of *Milk Train*. Defs.' Br. at 20 (citing *Pol'y & Rsch., LLC v. U.S. Dep't of Health & Hum. Servs.*, 313 F. Supp. 3d 62, 75–76 (D.D.C. 2018)). But that decision undermines Defendants' argument. *Policy & Research* held that an agency determination to terminate funding *was* reviewable under the APA because the agency's regulations expressly addressed and limited the right to terminate

funding, giving the court a manageable standard by which to judge the agency's action. 313 F. Supp. 3d at 76-78. So too here. In fact, Defendants incorporated those very regulations into each grant, relied on them in their termination letters, and argue them here. *See* Defs.' Br. 24-25.

**2.** Even though Defendants do not argue that the termination satisfies arbitrary-and-capricious review, it fails for the same reasons as the funding freeze—it is neither reasonable nor reasonably explained. *See Ohio*, 603 U.S. at 292. The only explanation for the wholesale termination of CIGP grants is that "DHS has determined that the scope of work performed under this award no longer effectuates the program goals and the Department's priorities." *See* J.R. 220. The letter does not explain what those goals and priorities are, it does not provide any factual findings or details to support DHS's across-the-board conclusion, and it does not consider any reliance interests at stake. As explained in Plaintiffs' opening brief (at 14-19), each of those failures alone is sufficient to conclude that the decision was arbitrary and capricious.

### iii. The terminations are contrary to law.

**1.** When creating DHS, Congress forbade the department from "diminish[ing] or neglect[ing]" any of its "functions . . . not related directly to securing the homeland" without being authorized in advance by "a specific explicit Act of Congress." 6 U.S.C. § 111(b)(1)(E). At the same time, Congress tasked USCIS with "promoting instruction and training on citizenship responsibilities for [noncitizens] interested in becoming naturalized citizens of the United States, including the development of educational materials." *Id.* § 271(f)(2). But this language does not mean that DHS is forever stuck in 2003. Rather, the agency's non-homeland-security functions change and evolve over time as Congress passes legislation.

Here, Congress regularly appropriated funds for the CIGP starting in 2009, requiring DHS to carry out its citizenship-promotion duties in part through these grants. Reading sections 111(b)(1)(E) and 271(f)(2) together—not separately, as Defendants do, Defs.' Br. at 21-22—along

with appropriations acts funding the CIGP, Congress plainly mandated that DHS carry out its citizenship promotion duties in part via this grant program. Congress has sometimes "diminished" those duties by appropriating less money for the CIGP. For example, Congress appropriated $25 million in FY23 and $10 million in FY24. But less money does not mean no money or no corresponding obligation. By essentially zeroing out the CIGP despite current appropriations for the program and its citizenship-promotion obligations, DHS has violated its own enabling statute.

**2.** When Congress appropriates money to be spent on a specific program or purpose, the agency to which those funds are appropriated must spend that money. *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1235 (9th Cir. 2018) ("Absent congressional authorization, the Administration may not . . . withhold properly appropriated funds in order to effectuate its own policy goals."). Defendants attempt to duck this point by again arguing that Congress did not require them to allocate appropriated CIGP funds to these Plaintiffs or on any specific timeline.[5] Defs.' Br. at 23. But Plaintiffs are not contesting *how* or *when* Defendants allocated the funds Congress appropriated for the CIGP in FY23 or FY24. Rather, Plaintiffs argue the black letter position that Defendants may not decline to spend funds that Congress appropriated.

Congress made simple and direct appropriations of specific amounts of money to USCIS "for the Citizenship and Integration Grant Program." Pub. L. No. 117-328, 136 Stat. 4459, 4745 (2022); Pub. L. No. 118-47, 138 Stat. 460, 612 (2024). Congress did not appropriate a lump sum for USCIS to use as it sees fit for a broad purpose, *Lincoln*, 508 U.S. at 185-86, or appropriate funds to "be

---

[5] Defendants' argument that FY23 appropriations were made available only until September 30, 2024, Defs.' Br. at 23, undermines them. Congress appropriated those funds and made them available *for obligation* during that fiscal year. *See* Drew Aherne, Cong. Rsch. Serv., R48087, *Appropriations Duration of Availability: One-Year, Multi-Year, and No-Year Funds* (June 7, 2024), https://perma.cc/DNV9-ZREN. Defendants' termination of eight Plaintiffs' FY23 grants, along with dozens of other FY23 grants, simply means that those appropriated and obligated funds will never actually be spent—which violates that very appropriations act.

disbursed 'in a manner determined appropriate by the Secretary,'" *Milk Train*, 310 F.3d at 749 (quoting Pub. L. No. 106–78, § 805), or appropriate funding pursuant to an enabling statute that grants the President authority "to furnish assistance" "on such terms and conditions as he may determine," *Aids Vaccine Advoc. Coal.*, 2025 WL 752378, at *2 (quoting Foreign Assistance Act of 1961, 22 U.S.C. § 2348). Congress afforded Defendants no discretion here.

**3.** Defendants' across-the-board terminations of CIGP grants also violates binding Uniform Guidance regulations. Defendants can terminate grants "to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities." 2 C.F.R. § 200.340(a)(4). Defendants' termination letters to CIGP grantees stated only, "Pursuant to 2 C.F.R. § 200.340(a)(2) and the terms and conditions of your award, DHS has determined that the scope of work performed under this award no longer effectuates the program goals and the Department's priorities." *See, e.g.*, J.R. 220.

This tautological reasoning is insufficient. One Court of Appeals recently rejected an agency's comparable "attempts to invoke new priorities as grounds for [grant] terminations" without "show[ing] 'good reasons for the new policy' and account[ing] for 'serious reliance interests' engendered by the old one." *California*, 2025 WL 878431, at *4 (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)). Here, Defendants have not only failed to show "good reasons for the new policy," *id.*, they have failed to show that there's a new policy regarding CIGP program goals or priorities at all. In fact, the goals of the CIGP have not changed: As noted in each Notice of Funding Opportunity, "The goal of the Citizenship and Integration Grant Program is to expand the availability of high-quality citizenship preparation services for lawful permanent residents (LPRs) across the nation and to provide opportunities for immigrants to gain the knowledge and skills necessary to integrate into the fabric of American society." Ex. L, J.R. 045;

Ex. M, J.R. 098; Ex. N, J.R.161. And on the date Defendants sent out the termination email and letters, USCIS still had an active website describing the exact same goal for the program.[6] Defendants do not explain why Plaintiffs' grants "no longer effectuate" these "goals." Likewise, Defendants fail to show that DHS priorities have changed in a way that would justify terminating CIGP grants. DHS's current list of departmental "Priorities," includes nothing that can reasonably be read as justification for cancelling CIGP grants.[7] If anything, DHS's stated priority of "[b]uilding a fair, orderly, and humane immigration system" is served by CIGP grants.

### iv. The freeze and terminations are contrary to the Constitution and in excess of statutory authority, claims Defendants forfeit.

Plaintiffs moved for preliminary relief solely on their APA claims against all Defendants other than the President. Defendants fail to respond to—and thus forfeit—Plaintiffs' arguments that the DHS funding freeze, now their funding terminations, are contrary to the Constitution and in excess of statutory authority in violation of the APA. *See* Defs.' Br. at 25-26. Instead, Defendants treat Plaintiffs' Section 706(2) claims as freestanding challenges to the President's authority. Resp. at 25. But whether Defendants' grant terminations were "not in accordance with" the appropriations acts is a separate inquiry from whether Defendants acted contrary to constitutional power under § 706(2)(B) or in excess of statutory authority under § 706(2)(C). *See, e.g.*, *Farrell v. Tillerson*, 315 F. Supp. 3d 47, 65-66 (D.D.C. 2018).

Defendants' sweeping CIGP grant terminations demonstrate a clear decision "to spend less than the full amount appropriated by Congress for a particular project or program."[8] *In re Aiken*

---

[6] *Grant Program Impact*, U.S. Citizenship and Immigr. Servs., https://perma.cc/NVA5-26MJ (last visited Apr. 3, 2025).

[7] *Priorities*, Dep't of Homeland Sec., https://perma.cc/E259-57VS (last visited Apr. 3, 2025).

[8] As Plaintiffs noted in their opening brief, Pls.' Br. at 23 n.17, a decision to spend less than what Congress appropriated does, in fact, violate the Impoundment Control Act, 2 U.S.C. §§ 683-684,

*County*, 725 F.3d 255, 261 n.1 (D.C. Cir. 2013) (Kavanaugh, J.). That action violates the constitutional separation of powers and thus violates Section 706(2)(B). Pls.' Br. at 22-23. In addition, Defendants cite no statute giving them the authority to wholesale cancel awarded grant funds. *See* Defs.' Br. at 25-26. Because agencies "literally ha[ve] no power to act . . . unless and until Congress authorizes [them] to do so," *FEC v. Cruz*, 596 U.S. 289, 301 (2022) (quotation marks omitted), Defendants must identify some applicable statutory or regulatory provision authorizing their actions here. They cannot.

**B. Defendants' actions have caused Plaintiffs irreparable harm.**

Plaintiffs showed that they are irreparably harmed in at least three ways—significant reduction to internal operations, undermining of core missions, and a loss of goodwill and reputational harm. Pls.' Br. at 23-27. Put another way, Plaintiffs showed that "the combination of staff reductions, loss of institutional knowledge, damaged community partnerships, and declining service quality," *Pacito v. Trump*, 25-cv-255, 2025 WL 655075, at *23 (W.D. Wa. Feb. 28, 2025), is irreparable harm. In response, Defendants cherry-pick or misquote authorities to insist that Plaintiffs can be made whole through money damages and that Plaintiffs' reputational harm is mere speculation. Defendants are doubly wrong.

**1.** Defendants first argue that any harm to Plaintiffs' programs and functioning, including "termination of business agreements or of employment," is not irreparable harm because "damages will provide adequate compensation for any losses." Defs.' Br. at 10 (internal citation omitted). But the authorities Defendants rely on address whether terminated *employees* suffer irreparable harm—and they do not because their claims are easily remedied by money damages, including,

---

and the Anti-Deficiency Act, 31 U.S.C. § 1301(a), and is thus "not in accordance with law." In addition, compliance with the Constitution can never be "committed to agency discretion by law." *See, e.g.*, *Rueda Vidal v. Dep't of Homeland Sec.*, 536 F. Supp. 3d 604, 618 (C.D. Cal. 2021) (citation omitted).

for example, backpay. *See* Wright & Miller, 11A Fed. Prac. & Proc. § 2948.1 n.4 (3d ed.); *Sampson v. Murray*, 415 U.S. 61, 91 (1974). The "loss of . . . employees," on the other hand, often is irreparable because it can "not be remedied by money damages." *Air Evac EMS, Inc. v. McVey*, 37 F.4th 89, 103 (4th Cir. 2022).

Plaintiffs have been forced to lay off or reassign staff members, *see, e.g.*, Ex. D, J.R. 009 ¶ 11; Ex. G, J.R. 021-022 ¶¶ 13, 15. And Plaintiffs who were contemplating layoffs after the freeze will now have to let employees go. Ex. H, J.R. 026 ¶12; Ex. I, J.R. 032 ¶ 13. These harms cannot be recouped with monetary damages. After all, an award of money damages to an employer won't mean much if the now-former, prized employee, such as Plaintiff ELSC's employee with over 40 years of experience teaching citizenship classes who helped brainstorm the organization's curriculum, has already secured new employment. Ex. G, J.R. 022 ¶ 14. The deprivation of such "valuable institutional knowledge" "can be irreparable." *Beacon Assocs. v. Apprio*, *Inc.*, 308 F. Supp. 3d 277, 289 (D.D.C. 2018).

Defendants also insist that monetary harm is irreparable only if it threatens Plaintiffs' very existence. *Id.* at 11. But irreparable harm can result where a plaintiff faces a "cash-flow crisis," *Pacito,* 2025 WL 655075, at *23, or is forced to close a "division" that is only a "small portion" of their "overall business." *Par Pharms.*, *Inc. v. TWI Pharms., Inc.*, No. CCB-11-2466, 2014 WL 3956024, at *3 (D. Md. Aug. 12, 2014). Multiple Plaintiffs have designed programming and departments to carry out their responsibilities for the duration of their CIGP grants, including those providing legal representation and upcoming naturalization classes. *See, e.g.*, Ex. H, J.R. 026-27 ¶ 12; Ex. E, J.R. 013-014 ¶ 13; Ex. F, J.R. 017 ¶ 14. These departments, including those providing legal representation or entire categories of classes, will be shuttered as a result of the termination. *Id.* Plaintiffs have been forced to lay off or reassign staff members, *see e.g.*, Ex. D, J.R. 009 ¶ 11;

Ex. G, J.R. 021-022 ¶¶ 13, 15, thanks to the "cash-flow crisis" they face as result of the freeze-termination. *See Pacito,* 2025 WL 655075, at *23; Ex. I, J.R. 031 ¶ 8.

In addition, economic harms can be irreparable if Plaintiffs continue to incur costs that they will never recover because they cannot be "fully rectified" after trial. *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land, Owned by Sandra Townes Powell*, 915 F.3d 197, 216 (4th Cir. 2019) (quoting *Stuller, Inc. v. Steak N Shake Enters.*, 695 F.3d 676, 680 (7th Cir. 2012)). Here, the termination email advised that costs incurred after the "notification will be unallowable." J.R. 218. But Plaintiffs provide legal representation to LPR clients and have ongoing ethical duties to continue providing those services. Ex. I, J.R. 030-031 ¶ 8; Ex. Z, J.R. 509 ¶ 2; Ex. AA, J.R. 512 ¶ 2-3. Attorneys providing legal representation services formerly funded by CIGP grants cannot automatically withdraw because "a lawyer's primary ethical duty is owed to existing clients."[9] These are ongoing costs that will be incurred after the termination notice and cannot be recouped barring an injunction. *See* J.R. 220. And while some Plaintiffs drew from other unrestricted funds prior to the termination notice to continue providing services, even those costs are unrecoverable because Plaintiffs will not be able to replenish that unrestricted pot of funds even if their grants are reinstated. Ex. I, J.R. 030, ¶ 8.

Defendants contend (at 13) that because the amount of money owed to Plaintiffs is "easily ascertainable," they can be satisfied by an award of damages. But as Defendants themselves acknowledge, "most of this money is not currently due." Defs.' Br. at 12-13. Defendants do not explain how Plaintiffs could be awarded (and thus made whole by) damages that are "not currently due." And "[i]n cases involving government expenditures, 'once the relevant funds have been

---

[9] Am. Bar Ass'n, *Practice Advisory: Ethical Duties in Immigration Cases After Funding Loss* (Mar. 19, 2025), https://perma.cc/N37C-JD68.

obligated, a court cannot reach them in order to award relief.' Any transfer, re-allocation, or re-obligation of these funds would be an irreparable loss." *Climate United*, 2025 WL 842360, at *9 (quoting *City of Houston v. Dep't of Hous. & Urb. Dev.*, 24 F.3d 1421, 1426-27 (D.C. Cir. 1994)). Defendants' decision to terminate must be enjoined or stayed before they re-obligate or re-allocate the grants or that funding reverts to the Treasury, leaving Plaintiffs without recourse.

**2.** Plaintiffs' "loss of goodwill, [and] damage to reputation . . . are all valid grounds for finding irreparable harm." *Edge-Works Mfg. Co. v. HSG, LLC*, 285 F. Supp. 3d 883, 900 (E.D.N.C. 2018). Defendants argue that the reputational harms involve "completely uncorroborated speculation about what [the] industry might think" of Plaintiffs given Defendants' revoking their "consent to project participation." *Beacon Assocs.*, 308 F. Supp. at 288. Defendants' argument is odd considering that Plaintiffs stated that they will lose the hard-won trust from difficult-to-reach immigrant communities if grant-funded services are abruptly cut. Ex. G, J.R. 022 ¶ 16; Ex. I, J.R. 033 ¶ 14. Two days later Defendants permanently terminated Plaintiffs' grants.

Further, Plaintiffs who are investing in their current reputations with both clients and community partners, *see, e.g.* Ex. F, J.R. 017-018 ¶ 15; Ex. J, J.R. 039 ¶ 16, will suffer due to the "loss of the ability to attract new customers." *Salomon & Ludwin, LLC, v. Winters*, 741 F. Supp. 3d 398, 407 (E.D. Va. 2024); Ex. J, J.R. 037-038 ¶ 11 (Plaintiff's subgrantee was forced to stop outreach for its citizenship classes, "reducing how many eligible LPRs it can reach to enroll."). In addition to helping LPRs naturalize, many Plaintiffs have missions that include serving immigrants in their communities, *see, e.g.*, Ex. I, J.R. 029, and their reputation and reliability amongst these communities will suffer from the abrupt cancellation of services. This well-substantiated loss of "trust and goodwill" from their clients and partners constitutes irreparable harm to Plaintiffs, including in their ability to attract future funding. Ex. Z, J.R. 510-11 ¶ 2-3; Ex. AA, J.R. 513 ¶¶ 5-

6; *Morgan Stanley DW Inc. v. Rothe*, 150 F. Supp. 2d 67, 78 (D.D.C. 2001); *Variable Annuity Life.*

*Ins. Co. v. Coreth*, 535 F. Supp. 3d 488, 517 (E.D. Va. 2021).

### C. The balance of equities and public interest weigh in Plaintiffs' favor.

Plaintiffs' core services are being gutted and their organizational survival is at risk. Ex. Z, J.R.

511 ¶ 9. Granting a preliminary injunction will not only stop that harm, it will also serve the greater

public interest by ensuring that the government is abiding by federal laws, *HIAS, Inc. v. Trump*,

985 F.3d 309, 326-28 (4th Cir. 2021), an important balancing factor that Defendants do not refute.

Instead, Defendants broadly state that preliminary relief will bar the Secretary from evaluating

agency priorities. Yet Defendants fail to name, much less explain, these priorities. And Defendants

raise the specter of the "sovereign and pecuniary" harm they will suffer if funds are released and

cannot be clawed back. Defs.' Br. At 26. (quoting *Department of State v. AIDS Vaccine Advocacy*

*Coalition*, 145 S. Ct. 753, 757 (2025) (Alito, J., dissenting)). But they fail to explain why those

funds could not be clawed back and, more importantly, fail to explain how the government would

be harmed by the loss of what Defendants describe as "fairly low dollar amounts." Defs.' Br. at

13.

### III. A Section 705 stay or nationwide injunction is appropriate, but bond is not.

**1.** Plaintiffs seek either a Section 705 stay or a nationwide injunction to preserve the status

quo. "[W]here agency action is challenged as a violation of the APA, nationwide relief is

commonplace." *Nat'l TPS All. v. Noem*, No. 25-cv-01766, 2025 WL 957677, at *45 (N.D. Cal.

Mar. 31, 2025). Because "[t]he normal remedy for a successful APA challenge is vacatur of the

rule and its applicability to all who would have been subject to it," preliminary relief should also

apply to all those currently subject to Defendants' unlawful freezes. *See Massachusetts*, 2025 WL

702163, at *34. Defendants fail to address and thus forfeit the applicability of a Section 705 stay.

Defs.' Br. at 26-28.

While Defendants spend nearly three pages inveighing against nationwide injunctions, the Fourth Circuit has approved nationwide injunctions "so long as the court 'mold[s] its decree to meet the exigencies of the particular case.'" *HIAS*, 985 F.3d at 326; *see also Roe v. Dep't of Def.*, 947 F.3d 207, 231-34 (4th Cir. 2020) (discussing appropriateness of nationwide injunction). Here, Defendants have frozen and terminated grant funds based on Secretary Noem's vague and unexplained concerns. *See* Pls.' Br. at 16-19. And they did so on an across-the-board basis, without consideration or evaluation of individual recipients. *See* Ex. A, Doc. 31-1, J.R. 217-18. A nationwide injunction is appropriate because "categorical policies relied upon by the Government call for categorical relief." *Roe*, 947 F.3d at 232-33. Put simply, the government must reap what it sows.

**2.** The Court should exercise its discretion to waive or set at $0 the security requirement of Federal Rule of Civil Procedure 65(c). *Pashby v. Delia*, 709 F.3d 307, 332 (4th Cir. 2013). In similar cases, courts in this jurisdiction and others have determined bond unnecessary. *See, e.g.*, *Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*, No. 25-cv-333, 2025 WL 573764, at *30 (D. Md. Feb. 21, 2025) (setting a nominal bond of zero dollars); *Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, No. 25-cv-239, 2025 WL 597959, at *18 (D.D.C. Feb. 25, 2025) (declining to set a bond). And Defendants offer no reason that Plaintiffs should be forced to pay for relief from Defendants' illegal conduct.

## CONCLUSION

For these reasons, the Court should postpone the effective date Defendants' termination under Section 705 of the APA or temporarily and preliminarily enjoin Defendants from terminating the disbursement of grant funds until the Court can further consider the merits.

April 4, 2025

Respectfully submitted,

 _/s/ Bradley Girard_
Bradley Girard (Bar No. 31437)
Sarah M. Rich*
Adnan Perwez*
Robin F. Thurston[+]
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, DC 20043
Phone: (202) 448-9090
Fax: (202) 796-4426
bgirard@democracyforward.org
srich@democracyforward.org
aperwez@democracyforward.org
rthurston@democracyforward.org

_Counsel for Plaintiffs_

Niyati Shah (Bar No. 31526)
Shalaka Phadnis***
ASIAN AMERICANS ADVANCING
JUSTICE—AAJC
1620 L St. NW, Suite 1050
Washington, DC 20036
Phone: (202) 296-2318
nshah@advancingjustice-aajc.org
sphadnis@advancingjustice-aajc.org

Jose Perez**
LATINOJUSTICE PRLDEF,
475 Riverside Dr., Suite 1901
New York, NY 10115
Phone: (212) 219-3360
Fax: (212) 431-4276
jperez@latinojustice.org

Nickole Durbin-Felix**
LATINOJUSTICE PRLDEF
4700 Millenia Blvd., Suite 500
Orlando, FL 32839
Phone: (321) 247-6657
ndurbin-felix@latinojustice.org

[+]_Application for full admission pending_
*_Admitted_ pro hac vice
** _Motion to appear_ pro hac vice _forthcoming_
*** _Motion to appear_ pro hac vice _pending_

16