## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **Solutions in Hometown Connections**, *et al.*, and **Massachusetts Immigrant and Refugee Advocacy Coalition**, 69 Canal St., 3rd Floor, Boston, MA 02114 <br><br> Plaintiffs, <br><br> **v.** <br><br> **Kristi Noem**, in her official capacity as Secretary of the Department of Homeland Security, 2707 Martin Luther King Jr Ave. SE, Washington, DC 20528 <br><br> **U.S. Department of Homeland Security**, 2707 Martin Luther King Jr Ave. SE, Washington, DC 20528 <br><br> **Kika Scott**, in her official capacity as Senior Official Performing the Duties of the Director of the U.S. Citizenship and Immigration Services, 5900 Capital Gateway Dr., Camp Springs, Prince George's County, MD 20746 <br><br> and <br><br> **U.S. Citizenship and Immigration Services**, 5900 Capital Gateway Dr., Camp Springs, Prince George's County, MD 20746 <br><br> Defendants. | **Civil Case No. 8:25-cv-00885-LKG** <br><br> Jury Trial Demanded |

**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND VACATUR OF FINAL AGENCY ACTION**

## INTRODUCTION

1.     Since the creation of the Department of Homeland Security and its component agencies, Congress has mandated that DHS "promot[e] instruction and training on citizenship responsibilities for aliens interested in becoming naturalized citizens." 6 U.S.C. § 271(f)(2). To that end, in 2009 the Office of Citizenship in U.S. Citizenship and Immigration Services—one of DHS's component agencies—created the Citizenship and Integration Grant Program (CIGP) to "provide[] support to community-based, non-profit organizations and educational institutions actively working to remove barriers to naturalization."[1] Since 2009, the grant program has helped more than 350,000 lawful permanent residents (LPRs) prepare for citizenship.

2.     Congress has consistently funded the CIGP, appropriating $25 million and $10 million for the program for fiscal years 2023 and 2024, respectively. Congress never rescinded those appropriations or granted DHS any discretion not to spend that money.

3.     But in February—without explanation or justification—Defendants began dismantling the CIGP in its entirety. First, Defendant DHS Secretary Kristi Noem decided that all DHS grant funds that were awarded to nonprofits and "touch[ed] in any way on immigration" would be frozen indefinitely. Secretary Noem gave three speculative, unsupported reasons: the grants may be funding illegal activities such as "encouraging . . . illegal immigration," some unspecified grants may contain racially discriminatory language, and the grants may not be an efficient use of government resources.

4.     When Plaintiffs—CIGP funding recipients—sought preliminary relief to enjoin the illegal, across-the-board freeze, Defendants did not even bother to explain it. Instead, a mere two days after Plaintiffs' motion, Defendants shut down the entire CIGP. Defendants sent a mass email

---

[1] *Grant Program Impact*, U.S. Citizenship and Immigration Services, https://perma.cc/9F4L-SVLG.

and boilerplate letters to all Plaintiffs (and most, if not all, CIGP grant recipients) informing them that their grants were terminated because they "no longer effectuate[] the program goals and the Department's priorities." The form termination letter, like the freeze, did not explain why any *individual* grant failed to effectuate the program's goals or policies. Nor did the letter offer any further explanation or factual findings. And Defendants have offered no explanation for their decision to dismantle the entire program and refuse to spend Congressionally appropriated funds.

5.     At Defendants' urging, Plaintiffs built programs to provide critical services including "English language and civics instruction, legal assistance with naturalization applications, and … community space for immigrant [integration]."[2] Plaintiffs hired and trained staff specifically for these programs, contracted with partner organizations to provide specific services mandated by the grant awards, signed retainers with clients seeking to naturalize, and built reputations within their communities for providing effective, reliable assistance. In short, Plaintiffs have fulfilled the goals of the CIGP and, understandably, have relied on the grant program continuing through the entire term of their grants.

6.     The sudden and unexplained dismantling of the entire CIGP has thrown Plaintiffs' operations into disarray. Some have been forced to cut programming. Some have already been forced to lay off staff or will soon be. Some have been forced to end relationships with partner organizations. Nearly all have on-going attorney-client relationships with naturalization clients whom they have ethical obligations to continue representing. And all are losing the trust of the communities they serve, which is an irreplaceable resource. Plaintiffs have been and continue to be irreparably harmed by the inability to carry out programs built for, and funded by, CIGP grants.

---

[2] *See id.*

7.     Defendants' unexplained and unreasonable shuttering of a congressionally funded program violates the Administrative Procedure Act because it is contrary to law and the Constitution, in excess of their statutory authority, and arbitrary and capricious. By refusing to spend appropriated funds for the purposes Congress specified, Defendants have violated the separation of powers and acted *ultra vires*. By terminating Plaintiffs' grants without providing any meaningful opportunity to challenge the termination, Defendants have violated Plaintiffs' due-process rights. And by dismantling the entire CIGP a mere two days after Plaintiffs filed their motion for preliminary relief, Defendants retaliated against Plaintiffs in violation of the First Amendment. Defendants' actions should be declared unconstitutional and unlawful; should be preliminarily and permanently enjoined; and should be stayed and ultimately vacated and set aside.

## JURISDICTION AND VENUE

8.     This Court has subject-matter jurisdiction over this action under 28 U.S.C. § 1331. This action arises under the U.S. Constitution and the APA, 5 U.S.C. §§ 551 *et seq.* An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a), and this Court may grant declaratory relief, injunctive relief, and other appropriate relief under 28 U.S.C. §§ 2201-02 and 5 U.S.C. §§ 705-06.

9.     Venue is proper under 28 U.S.C. § 1391(e)(1) because this action seeks relief against a federal agency and officials acting in their official capacity; at least one defendant resides in this district; at least one plaintiff resides in this district; and a substantial part of the events or omissions giving rise to the claims occurred in this district.

## THE PARTIES

10.     Plaintiff Solutions in Hometown Connections (SHC) is a nonprofit located in Greenbelt, MD that engages with refugees, asylees, and other newly arrived immigrants—especially women with small children—to build better communities. SHC provides services including

3

multigenerational English classes and tutoring; early-childhood education; citizenship preparation, such as classes, tutoring, field trips, and connections to naturalization assistance; and assistance identifying and obtaining social and community services.

11.    Plaintiff Central American Resource Center (CARECEN) is a Washington, D.C.-based nonprofit founded in 1981 to help immigrants in the D.C. region transition to an integrated life in their new home and equip them to play an essential role in the advancement of the community. Among other services, CARECEN offers low-cost citizenship classes, which include English-language learning and mock interviews; citizenship information sessions and workshops; citizenship tutoring and interview preparation; and assistance with naturalization applications.

12.    Plaintiff Coalition for Humane Immigrant Rights (CHIRLA) is a Los Angeles-based nonprofit that has been providing immigration advocacy and services throughout Southern California since 1986. Among other services, CHIRLA provides citizenship instruction, screenings for naturalization eligibility, and legal assistance with the citizenship process.

13.    Plaintiff Community Center for Immigrants Incorporated (CCI) is a Milwaukee-based nonprofit providing immigration-related legal services and educational programming to predominantly low-income immigrant individuals and families. CCI guides students through the naturalization process while helping them develop the language, digital, health, and financial literacies necessary to successfully integrate into the community. It provides free citizenship classes, English classes, voter registration and education, and affordable legal services.

14.    Plaintiff English Skills Learning Center (ESLC) is a nonprofit located in West Valley City, UT that helps integrate and strengthen communities by breaking language and cultural barriers. ESLC offers English-language classes to about 800 students a year, from more than 86 different countries, with 120 trained and mentored community volunteers.

15.    Plaintiff Michigan Organizing Project, doing business as Michigan United, is a statewide organization of churches, labor, and community groups working to ensure that the Michigan economy works for everyone and to protect the democratic and civil rights of Michigan residents. As part of this mission, Michigan United provides low-cost immigration-related legal services throughout the state of Michigan. These services include free citizenship classes, English-as-a-Second Language classes, and assistance applying for citizenship.

16.    Plaintiff Hebrew Immigrant Aid Society and Council Migration Service of Philadelphia (HIAS PA), doing business as "HIAS Pennsylvania," is a nonprofit organization headquartered in Philadelphia. Among other activities, HIAS PA serves low-income LPRs by providing legal representation for LPRs seeking to naturalize and working with partner organizations to provide civics classes and English language education.

17.    Plaintiff Immigrant Law Center of Minnesota (ILCM) is a nonprofit organization headquartered in St. Paul. ILCM provides free immigration legal representation to low-income immigrants and refugees in Minnesota and to refugees in North Dakota. ILCM provides services such as applications for citizenship, DACA renewals, and support for non-US citizen survivors, refugees, and children.

18.    Plaintiff Instituto del Progreso Latino (IDPL) is a nonprofit organization headquartered in Chicago that helps immigrant families through education, training, and employment, and is the largest processor of citizenship applications in the state of Illinois. IDPL's services include free citizenship, English, and adult education classes, as well as helping residents navigate the application process to become U.S. citizens.

19.    Plaintiff Massachusetts Immigrant and Refugee Advocacy Coalition (MIRA Coalition) is a nonprofit organization headquartered in Boston that organizes and serves a broad community

of members and allies for the advancement of immigrants across Massachusetts. As part of this work, MIRA Coalition offers classes, legal representation, and free educational information to LPRs looking to naturalize as U.S. Citizens.

20.    Defendant Kristi Noem is the Secretary of Defendant DHS. Plaintiffs are suing Secretary Noem in her official capacity. Secretary Noem administers the CIGP through U.S. Citizenship and Immigration Services (USCIS), which is a component agency of DHS.

21.    DHS is headquartered in Washington, D.C.

22.    Defendant Kika Scott is, per the USCIS website as of the time this complaint was filed, the "Senior Official Performing the Duties of the Director" of Defendant USCIS. Plaintiffs are suing Interim Director Scott in her official capacity. As part of her official duties as Interim Director, Scott administers the CIGP.

23.    USCIS is headquartered in Camp Springs, Maryland.

## LEGAL BACKGROUND

### The Administrative Procedure Act

24.    The APA requires courts to "hold unlawful and set aside" any agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"; "contrary to constitutional right, power, privilege, or immunity"; or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A)-(C).

25.    The APA requires an agency to "examine the relevant data and articulate a satisfactory explanation for its action including 'a rational connection between the facts found and the choice made.'" *Mayor of Balt. v. Azar*, 973 F.3d 258, 275 (4th Cir. 2020) (quoting *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). Agency action is arbitrary and capricious if the agency has "[r]elied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation

for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.* (quoting *State Farm*, 463 U.S. at 43). Agency action must be "upheld, if at all, on the same basis articulated in the order by the agency itself." *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 169 (1962).

26.    An agency that fails to follow the Constitution, statutes, or regulations acts contrary to law. In APA cases, "the reviewing court shall decide all relevant questions of law" and "interpret constitutional and statutory provisions" at issue. 5 U.S.C. § 706. Courts do not defer to an agency's interpretation of its governing statute or other statutes it is implementing. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 393, 400-01 (2024).

27.    Agencies "are creatures of statute" and are therefore subject to the limits prescribed by Congress. *Nat'l Fed'n of Indep. Bus. v. Occupational Safety & Health Admin.*, 595 U.S. 109, 117 (2022) (per curiam). Agencies "'literally ha[ve] no power to act' except to the extent Congress [has] authorized." *Marin Audubon Soc'y v. Fed. Aviation Admin.*, 121 F.4th 902, 912 (D.C. Cir. 2024) (first alteration in original) (quoting *Fed. Election Comm'n v. Ted Cruz for Senate*, 596 U.S. 289, 301 (2022)). If an agency exceeds that power, the court must vacate and set aside its action under the APA. *See* 5 U.S.C. § 706(2)(C).

**The constitutional and statutory requirements that the Executive Branch spend funds appropriated by Congress**

28.    The Constitution vests Congress, not the executive branch, with "exclusive power" over federal spending. *U.S. Dep't of Navy v. Fed. Labor Rels. Auth.*, 665 F.3d 1339, 1346 (D.C. Cir. 2012) (quoting *Rochester Pure Waters Dist. v. EPA*, 960 F.2d 180, 185 (D.C. Cir. 1992)). The spending power is the first listed among Congress's enumerated powers in Article 1, Section 8. The founders understood Congress's power of the purse as "the most complete and effectual

weapon" of a representative body, *id.* at 1347 (quoting The Federalist No. 58, at 359 (James Madison) (Clinton Rossiter ed., 1961)), and "a bulwark of the Constitution's separation of powers among the three branches of the National Government," *id.* at 1347. To ensure that Congress alone would control public spending, the Constitution explicitly denies that power to the other branches via the Appropriations Clause, which forbids the expenditure of federal funds except "in Consequence of Appropriations made by Law." U.S. Const. art. I, § 9, cl. 7.

29.    Consistent with this division of powers, the President must "faithfully execute[]" the laws as Congress enacts them. *Id.*, art. II, § 3. Like other statutes, an appropriations act is "Law." *Id.*, art. I, § 9, cl. 7. The separation of powers forbids the executive branch from amending or ignoring such a law once duly enacted. *See Clinton v. City of New York*, 524 U.S. 417, 438 (1998).

30.    Nor does the executive branch have inherent constitutional power to withhold funds that Congress has lawfully appropriated. Absent statutory authorization, the Executive has only the powers conferred on it by the Constitution minus those constitutional powers explicitly conferred on Congress. *See* U.S. Const. art. II, § 1, cl. 1; *see also Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring). The power to control federal spending policies is not among the Executive's powers. While the executive branch may have "policy reasons . . . for wanting to spend less than the full amount appropriated by Congress for a particular project or program[,]" it "does not have unilateral authority to refuse to spend the funds." *In re Aiken Cnty.*, 725 F.3d 255, 261 n.1 (D.C. Cir. 2013) (Kavanaugh, J.). To spend less than Congress appropriated, the executive branch must "propose the rescission of funds, and Congress then may decide whether to approve a rescission bill." *Id.*

31.    Congress has enacted two federal statutes that make this prohibition on withholding appropriated funds explicit. First, in the Impoundment Control Act of 1974, Congress expressly

prohibited the President from declining to obligate appropriated funds. Pub. L. No. 93-344, 88 Stat. 333 (codified as amended at 2 U.S.C. §§ 681 *et seq.*). Under the Impoundment Control Act, appropriated funds "shall be made available for obligation" unless the President transmits a special message to Congress and Congress rescinds the appropriation. 2 U.S.C. § 683(b); *see id.* § 684(a). This aligns with the constitutional mandate that changes to enacted legislation require bicameralism and presentment. *See INS v. Chadha*, 462 U.S. 919, 956 (1983).

32.    The Impoundment Control Act also permits the President to "defer[]" budget authority—that is, to withhold or delay the obligation or expenditure of appropriated funds—but only for limited purposes, for a limited time, and after transmitting a special message to Congress setting forth the reasons for the proposed deferral. 2 U.S.C. § 684(a); *see id.* § 682(1). Deferral is permissible only "(1) to provide for contingencies; (2) to achieve savings made possible by or through changes in requirements or greater efficiency of operations; or (3) as specifically provided by law." *Id.* § 684(b). "No officer or employee of the United States may defer any budget authority for any other purpose." *Id.*

33.    Second, the Anti-Deficiency Act Amendments of 1982 likewise forbid the Executive from declining to spend (and thus holding in reserve) appropriated funds for policy reasons, and from redirecting funds to purposes other than those prescribed by Congress. Pub. L. No. 97-258, 96 Stat. 929 (codified as amended throughout Title 31). The Anti-Deficiency Act provides that "[a]ppropriations shall be applied only to the objects for which the appropriations were made except as otherwise provided by law." 31 U.S.C. § 1301(a). "In apportioning or reapportioning an appropriation, a reserve may be established only—(A) to provide for contingencies; (B) to achieve savings made possible by or through changes in requirements or greater efficiency of operations; or (C) as specifically provided by law." *Id.* § 1512(c)(1).

34.    Because Congress has repeatedly forbidden the President to withhold or redirect duly appropriated funds based on his own policy priorities, the President's "power is at its lowest ebb" when he attempts to do so. *Youngstown*, 343 U.S. at 637 (Jackson, J., concurring).

### The Department of Homeland Security and its component agencies

35.    Congress created DHS in 2002, as part of a wholesale restructuring of immigration, disaster response, and national security agencies in the wake of the attacks of September 11, 2001. Homeland Security Act of 2002, Pub. L. No. 107-296 (codified at 6 U.S.C. § 101 *et seq.*). Congress abolished the Immigration and Naturalization Service, redistributing its functions to DHS and its newly created component agencies—including USCIS.

36.    By statute, DHS's "primary mission" is to "ensure that the functions of the agencies and subdivisions within the Department that are not related directly to securing the homeland are not diminished or neglected except by a specific explicit Act of Congress." 6 U.S.C. § 111(b)(1)(E).

37.    DHS has established twelve cross-functional agency priorities, including "[b]uild[ing] a fair, orderly, and humane immigration system."[3]

38.    The Homeland Security Act further mandates that USCIS "promot[e] instruction and training on citizenship responsibilities for aliens interested in becoming naturalized citizens of the United States, including the development of educational materials." 6 U.S.C. § 271(f)(2). This is a function not related directly to securing the homeland.

39.    USCIS was also tasked with adjudicating immigration-related applications and petitions, including asylum applications, naturalization petitions, and some immigrant visa petitions, and establishing "national immigration services policies and priorities." 6 U.S.C. §§ 271(a)(3)(D), (b).

---

[3] *Priorities*, Dep't of Homeland Sec., https://perma.cc/E259-57VS (last updated Feb. 27, 2025).

40.    The Homeland Security Act also created the Office of Citizenship within USCIS. *Id.* § 271(f)(1). The Office of Citizenship, like USCIS, is headquartered in Camp Springs, Maryland. The USCIS website describes its mission as "to provide federal leadership, tools, and resources to proactively foster civic [integration]. To facilitate this process, the Office of Citizenship engages and supports partners to welcome immigrants; promote English language learning and education on the rights and responsibilities of citizenship; and encourage U.S. citizenship."[4]

**DHS and its agencies carry out their statutory functions through grant programs**

41.    In 2009, the Office of Citizenship created the Citizenship and Integration Grant Program (CIGP) to "provide[] support to community-based, non-profit organizations and educational institutions actively working to remove barriers to naturalization."[5] Grant recipients, which include "community and faith-based groups, public libraries, and adult education and literacy organizations," provide "English language and civics instruction, legal assistance with naturalization applications, and … community space for immigrant [integration]."[6]

42.    The "goal of the [CIGP] is to expand the availability of high-quality citizenship preparation services for [LPRs] across the nation and to provide opportunities for immigrants to gain the knowledge and skills necessary to integrate into the fabric of American society."[7]

43.    On information and belief, CIGP funding is the primary means by which USCIS performs its statutory mandate to "promot[e] instruction and training on citizenship responsibilities for aliens interested in becoming naturalized citizens of the United States." 6 U.S.C. § 271(f)(2).

---

[4] *Office of Citizenship,* U.S. Citizenship and Immigr. Servs., https://perma.cc/6U94-L5R6.
[5] *Grant Program Impact,* U.S. Citizenship and Immigr. Servs, https://perma.cc/WZM4-EGLF.
[6] *Id.*
[7] *Id.*

44.    Since 2009, USCIS has awarded more than $155 million through 644 competitive CIGP grants to organizations in 41 states and the District of Columbia. This program has helped more than 350,000 LPRs prepare for citizenship.

45.    The CIGP is funded largely through Congressional appropriations. For Fiscal Year 2023, Congress appropriated $25 million "for the Citizenship and Integration Grant Program, … to remain available until September 30, 2024." Consolidated Appropriations Act of 2023, Pub. L. No. 117-328, 136 Stat. 4745. For Fiscal Year 2024, Congress appropriated $10 million "for the Citizenship and Integration Grant Program, … to remain available until September 30, 2025." Further Consolidated Appropriations Act of 2024, Pub. L. No. 118-47, 138 Stat. 612.

46.    No provision of the Consolidated Appropriations Act of 2023, the Further Consolidated Appropriations Act of 2024, or any other statute authorizes Defendants to dismantle the CIGP program unilaterally or refuse to spend appropriated CIGP funding.

47.    In 2013, the Office of Management and Budget adopted guidance on Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards (Uniform Guidance). 2 C.F.R. § 200 *et seq.*; 79 Fed. Reg. 78589 (Dec. 26, 2013). Federal award-making agencies, including DHS and USCIS, implemented the Uniform Guidance through an Interim Rule, which became effective on December 26, 2014. 76 Fed. Reg. 75867; *see also* 2 C.F.R. § 3002.10. OMB revised the Uniform Guidance in 2024, and those revisions went into effect on October 1, 2024. 89 Fed. Reg. 30046.

48.    The Uniform Guidance binds Defendants and is incorporated by reference into all DHS grants and awards. The Uniform Guidance requires an award-making agency to "manage and administer the Federal award in a manner so as to ensure that Federal funding is expended and

associated programs are implemented in full accordance with the U.S. Constitution, applicable Federal statutes and regulations." 2 C.F.R. § 200.300(a).

## FACTUAL ALLEGATIONS

49.    The most common CIGP grants are Citizenship Instruction and Naturalization Application Services (CINAS) grants. CINAS recipients receive funds over the course of a two-year performance period. CINAS grant recipients must provide two services: citizenship instruction and assistance filing naturalization applications. Citizenship instruction includes, for example, English and civics classes. Assistance filing naturalization applications includes legal representation of clients, either through an attorney or a DOJ Accredited Representative.

50.    The CIGP also awards Community and Regional Integration Network (CARING) Grants, which help public or nonprofit organizations provide extended civic integration services, citizenship instruction, and naturalization-application services to the most vulnerable immigrants, including refugees, asylees, Cubans, Haitians, and trafficking victims. Like CINAS recipients, CARING recipients receive funding over the course of a two-year performance period. And like CINAS recipients, CARING recipients provide citizenship classes and naturalization application services. CARING program participants may qualify for services with a lower level of English-language proficiency, in recognition of the fact that many refugees and asylees have not had access to the same educational opportunities as other noncitizens due to their experiences of displacement. For the same reason, CARING grantees also develop individualized integration plans for each immigrant who participates in the program. CARING grantees are evaluated on the same performance metrics as CINAS grantees, with an additional metric—the number of integration plans developed.

51.    All Plaintiffs applied for and were awarded CIGP grants.

52.    With Fiscal Year 2023 appropriations, USCIS awarded more than $22 million in CIGP funding to 65 organizations, with a performance period of October 1, 2023 through September 30, 2025. The majority were CINAS grants, which were awarded to 51 organizations around the country, including Plaintiffs CHIRLA, Michigan United, CARECEN, CCI, the English Skills Learning Center, Instituto del Progreso Latino, and HIAS PA. USCIS also awarded one CARING grant, to Plaintiff Solutions in Hometown Connections.

53.    With Fiscal Year 2024 appropriations, USCIS awarded nearly $10 million in CIGP funding to 36 organizations all over the country, including Plaintiffs ILCM and MIRA. These grants have a performance period of November 22, 2024, through September 30, 2026.

54.    All grant recipients must submit a financial report and their performance metrics to USCIS on a quarterly basis throughout the entirety of the grant term. FY2023 grantees have two quarterly reports remaining due and FY2024 grantees have six.

55.    All CIGP funding recipients may use CIGP funds only for approved purposes. Funding recipients may be paid in advance if they are able to demonstrably minimize the time elapsing between the transfer of the funds and the expenditure disbursement. And for FY2024 grantees, advance payments may not be held for more than three business days before disbursements. If grant recipients cannot disburse advance payments within such time constraints, they must seek reimbursement after costs are incurred.

**Defendants begin dismantling the CIGP: Secretary Noem freezes grant funds.**

56.    On January 28, Secretary Noem issued a Memorandum to DHS component agency and office heads placing "on hold pending review" "all Department grant disbursements and assessments of grant applications that: (a) go to non-profit organizations or for which non-profit organizations are eligible, and (b) touch in any way on immigration, . . . except to the extent required by controlling legal authority."

57.    Secretary Noem gave three reasons for "this freeze": "(1) concerns that these grants may be funding illegal activities, such as encouraging or inducing illegal immigration, 8 U.S.C. § 1324(a)(1)(A)(iv), or illegal harboring of illegal aliens, 8 U.S.C. § 1324(a)(1)(A)(ii)-(iii); (2) concerns that there may be racially discriminatory language in certain grants; and (3) concerns that these grants may not be an efficient use of government resources."

58.    The Noem Memorandum's freeze was "[e]ffective immediately." Any DHS component that sought to keep grant funds flowing "to the extent required by controlling legal authority" was required to "obtain the express written consent of the General Counsel or his delegee" within seven days. Plaintiffs are unaware of any funding that remained unfrozen under that exception.

59.    The day after issuing the Memorandum, in an interview with Fox News about the funding freeze, Secretary Noem explained that she used to think of NGOs as "nonprofit[s] telling somebody about Jesus or spreading faith and salvation," but she "realized over the years, it's been perverted into this shadow government."[8]

**After Plaintiffs challenge the freeze, Defendants terminate the entirety of the CIGP.**

60.    On February 4, seven days after the Noem Memorandum was issued (and the day the period for internal review ended), Defendants sent all Plaintiffs emails informing them that their CIGP funding had been frozen pursuant to the Memorandum. Attached to each of these emails was an identical form letter from the Office of Citizenship that noted that DHS "recognize[d] this will have an impact on your organization" but was "unable to provide a timeline on this freeze."

61.    The funding freeze immediately impacted Plaintiffs' ability to provide their citizenship instruction and naturalization services. So Plaintiffs filed suit, arguing that the freeze of grant funds violated the APA and the constitution and was ultra vires.

---

[8] *Kristi Noem announces freeze of grants to NGO groups*, Fox News (Jan. 29, 2025), https://perma.cc/ADF3-8TCV.

62.    Because Defendants' funding freeze immediately and irreparably harmed Plaintiffs, they filed a motion for a temporary restraining order, preliminary injunction, or administrative stay under Section 705 of the APA. That motion explained that Secretary Noem's blanket freeze of grant funds violated the APA.

**After Plaintiffs challenge the freeze, Defendants entirely shut down the CIGP.**

63.    On March 27, two days after Plaintiffs filed their motion, Defendants sent a mass email to all or nearly all current CIGP funding recipients—Plaintiffs included—informing them that, effective immediately, their grants had been fully terminated.

64.    The termination email stated that "DHS has determined that the scope of work performed under this award no longer effectuates the program goals and the Department's priorities."

65.    Later that day, Defendants posted generic termination letters with further instructions to each CIGP funding recipient's account in Defendants' online grants portal.

66.    Like the earlier email, the termination letters informed grantees that "[p]ursuant to 2 C.F.R. § 200.340(a)(2) and the terms and conditions of your award, DHS has determined that the scope of work performed under this award no longer effectuates the program goals and the Department's priorities." The email and letter provide no other basis or explanation for any individual grant termination or for the wholesale dismantling of the entire CIGP.

67.    The regulation Defendants cite, 2 C.F.R. § 200.340(a)(2), provides that a grant may be terminated "[b]y the Federal agency . . . with the consent of the recipient or subrecipient, in which case the two parties must agree upon the termination conditions." Defendants have not sought consent from Plaintiffs to terminate CIGP grants nor come to any agreements with Plaintiffs for termination conditions.

68.    The termination letter does not explain why "the scope of work performed under this award no longer effectuates the program goals and the Department's priorities." Neither does the

letter identify the applicable program goals or agency priorities, indicate that the program goals or agency priorities have changed, or explain how they have changed.

69.    The termination letter informed CIGP funding recipients that they "must cease all federally funded work" under their grants and that "any costs incurred for such work on or after the date of this letter will be unallowable." But "[c]osts resulting from financial obligations which were properly incurred … before the date of this termination notice, and that were not incurred in anticipation of termination, remain allowable if they would have otherwise been allowable had the award not been terminated."

70.    The termination letter states that if CIGP funding recipients wish to object to the termination of their award, they must do so "in writing and provide any information or documentation relevant to your challenge" by April 26 at 5 pm Eastern time. The letter does not explain what form the objection should take, what kind of "information or documentation" is considered relevant, or where or how to submit written objections. Nor does the letter explain the government's timeline for considering objections, what the government takes into account, and whether an objection to the full-scale dismantling of the CIGP would even be considered. Despite this lack of information, the letter stated that "[t]here will no other opportunity to appeal this action to DHS."

71.    Counsel for Plaintiffs asked Defendants' counsel for clarification about the objection process. Defendants' counsel did not provide guidance. Plaintiffs' counsel (cc'ing Defendants' counsel) twice emailed Jacqueline Greely—the DHS officer who signed the termination letter—seeking guidance on the process for objections. Greely never responded.

72.    Upon information and belief, all current CIGP grantees—including Plaintiffs—received virtually identical termination letters regardless of their grant type or term. The only differences in

the letters included the grantees' name and contact information, award number, and the amount of unobligated funds of their grant.

73.    Upon information and belief, Defendants have shuttered the CIGP program in its entirety.[9]

### The CIGP dismantling's harm to Plaintiffs

74.    The dismantling of the CIGP is harming, and will continue to harm, each Plaintiff.

75.    Plaintiffs accepted CIGP grants with the expectation that they would build and carry out multi-year programs to provide services to LPRs seeking to naturalize.

76.    Among other things, Plaintiffs hired staff, designed curricula, entered into relationships with subgrantees and attorney-client relationships with naturalization clients, and promoted their grant-funded programs to relevant populations—all with the expectation that the CIGP would continue to exist at least until the end of their grant terms.

77.    Because CIGP funding is distributed in tranches over time (either via advance payments or, more commonly for Plaintiffs, through reimbursements), Plaintiffs built their programs with the expectation that they would be reimbursed through an iterative process for the entire length of their grant performance periods as they completed grant-funded work.

78.    When Defendants dismantled the CIGP, they ordered Plaintiffs to cease their grant-funded work. Defendants informed Plaintiffs that future work would not be reimbursed. In short, Defendants removed Plaintiffs' ability to be compensated in the future for their ongoing work implementing the programs that Plaintiffs planned to carry out (and be funded) over the entire term of the CIGP grants.

---

[9] Defendants have never denied that they terminated the program. Indeed, Defendants' response to Plaintiffs' motion for preliminary relief describes their actions as a "funding freeze (now termination)." ECF No. 32, at 17.

79.    Nearly all Plaintiffs have sought or will soon seek reimbursement for grant work completed until the date of the grant termination letters. Each plaintiff still has outstanding grant funds obligated to them for future grant work. If the CIGP had not been dismantled, Plaintiffs would perform approved grant work, then seek reimbursement from Defendants for that work.

80.    Defendants stated that each Plaintiff's grant was terminated because "the scope of work performed under this award no longer effectuates the program goals and the Department's priorities." This will, at minimum, impede each Plaintiff's competitiveness for future grants pursuant to 2 C.F.R. § 200.206, which requires federal agencies to conduct risk assessments based on criteria that include an applicant's history of managing previous federal awards and their ability to effectively implement statutory, regulatory, or other requirements.

81.    Plaintiffs have already made difficult choices to account for the dismantling of the CIGP and are actively engaged in contingency planning for even harder ones ahead.

82.    Some Plaintiffs have already laid off or reassigned CIGP-funded staff, and others will need to do so soon. They may not be able to rehire or reassign these staffers should CIGP funding resume or new funding be secured.

83.    Some Plaintiffs have also been forced or may soon be forced to terminate relationships with other organizations who have been helping them perform their obligations under their grants. These organizations may not be willing or able to resume their partnerships with Plaintiffs should Plaintiffs attempt to restart their affected programming.

84.    Most Plaintiffs have ongoing attorney-client relationships with clients they agreed to represent in reliance on CIGP funding and the continued existence of the program itself. These Plaintiffs have ethical obligations to continue representing these clients, whether or not CIGP

funding resumes. These Plaintiffs are scrambling to reallocate other funding if possible and to seek additional funding from other sources to meet these obligations.

85.    For some Plaintiffs, donors and funders have responded negatively to their recent cuts in service, further imperiling their ability to secure new funds.

86.    Plaintiffs' credibility within the immigrant communities they serve will suffer unless Plaintiffs can continue to carry out their CIGP-funded services. Many of Plaintiffs' students and clients have paid USCIS a naturalization application fee. These students and clients have lost and will continue to lose trust in Plaintiffs' efficacy and reliability when, because of the CIGP dismantling, their citizenship or language classes are suddenly canceled or they are no longer able to receive help with the remainder of the naturalization process. This is also true for Plaintiffs who employ members of the immigrant and refugee communities they serve, some of whom have been laid off or may be laid off soon as a result of the CIGP dismantling.

***Solutions in Hometown Connections***

87.    Plaintiff SHC applied for and received a FY2023 CARING grant for $276,575 to provide citizenship instruction, English-language learning, and digital-literacy assistance to 180 immigrants. SHC works with LPR women who are mothers of small children. These women have not previously had formal educational opportunities, and many lack English-language literacy and have never had formal employment. The grant funded 75 percent of SHC's naturalization program.

88.    After submitting its most recent allowable reimbursement request, SHC has approximately $92,311 remaining on its grant for services it planned through September 30, 2025. As a direct result of the CIGP dismantling, SHC has eliminated all paid legal services, rolled back integration case management services to be on-request only, increased student-to-teacher ratios in its classes, cancelled planned classes and field trips, and halted childcare for students. SHC provided legal representation services to its students via a subgrantee. The CIGP dismantling has

forced SHC to stop paying the subgrantee, which has resulted in the subgrantee closing multiple women's cases who had not yet filed N-400 naturalization applications. SHC contacted each of its students individually to explain that legal services for their naturalization applications would no longer be available through the subgrantee. Since then, SHC has heard from many students who are disappointed in SHC, damaging the organization's reputation in the community. In addition, SHC's subgrantee is no longer taking case referrals from SHC, given that SHC can no longer pay them.

89.    SHC's forced service cuts have damaged its ability to carry out its mission and its standing in the community, undermining its ability to secure future funding.

90.    Due to the loss of CIGP funds, SHC has been forced to subsidize the current class through its own scarce unrestricted funds to avoid disruption, but this funding will run out, and SHC has been unable to cover the cost of  the program via other programmatic funding requests.

*Central American Resource Center*

91.    Plaintiff CARECEN applied for and received a FY2023 CINAS grant of $450,000 to provide citizenship instruction to more than 300 LPRs, administer naturalization eligibility screenings to 300 LPRs, and file 300 naturalization applications. The CINAS grant alone funded 66% of the naturalization program, its largest single funding source.

92.    After submitting its final reimbursement request, which it is in the process of doing, CARECEN will have approximately $141,062.72 remaining on its grant for services it planned through September 30, 2025. It has 140 open naturalization cases for clients to whom it owes an ethical obligation, but with no dedicated funding to pay for those representation services any longer. As a direct result of the CIGP dismantling, CARECEN has had to lay off its part-time instructors, scale its program back by 80%, and shift to a volunteer model.  This is a drastic change from its previous model, causing ripple effects in both its relationship with clients and funders.

93.    CARECEN's forced service cuts have damaged its ability and reputation in the community. Funders are confused at the sudden changes in their offerings. This is damaging its credibility and relationships with both clients and funders at large. It has injected insecurity about the organization's financial future.

94.    Due to the loss of CIGP funds, CARECEN has been forced to reallocate its limited resources to emergency fundraising or gap-filling just to keep its client services afloat. The sudden freeze and termination have prevented CARECEN from doing the typical fundraising events and calls the organization normally engages in.

***Coalition for Humane Immigrant Rights***

95.    Plaintiff CHIRLA applied for and received a FY2023 CINAS grant of $450,000 to provide citizenship instruction and naturalization-eligibility screenings to 200 LPRs, and to file 200 naturalization applications. The CINAS grant alone funded 50% of the naturalization program, serving as its largest single funding source.

96.    After submitting its most recent allowable reimbursement request, CHIRLA has approximately $94,266.58 still remaining on its grant for services it planned through September 30, 2025. It has 150 open naturalization cases for clients to whom it owes an ethical obligation, 75 of which were funded solely by the CIGP grant and are with no dedicated funding to pay for those representation services any longer. As a direct result of the CIGP dismantling, CHIRLA has been severely hampered in its ability to provide English as a Second Language (ESL) classes in partnership with a subgrantee to students who need to pass their citizenship test. This has had a ripple effect across the organization, including recruitment and civic engagement efforts, to which the naturalization services typically serve as a pipeline.

97.    CHIRLA's forced service cuts damage its ability to share key data points on its naturalization services with its funders, who value having hard numbers on program outcomes and

deliverables completed each year. These help highlight the organization's capacity and impact, and play a large role in determining how much funders are willing to donate to the organization.

98.    Due to the loss of CIGP funds, CHIRLA's fundraising team now needs to fundraise a significant amount of money to try to cover the gap from other sources. This requires increased resources, taking away from its ability to fundraise for other important programs.

***Community Center for Immigrants***

99.    Plaintiff CCI received a FY2023 CINAS grant of $300,000 to provide citizenship-preparation and naturalization-application services to 200 LPRs in the Milwaukee metropolitan region. CCI's CINAS grant funded 47% of the naturalization program, serving as its largest single funding source.

100.    After submitting its most recent allowable reimbursement request, CCI has approximately $63,259.47 remaining on its grant for services it planned through September 30, 2025. It has 61 open naturalization cases for clients to whom it owes an ethical obligation, but with no dedicated funding to pay for those representation services any longer. As a direct result of the CIGP dismantling, CCI has had to lay off a full-time staff member, significantly increase its prices for naturalization services, and reduce the number of new clients for all of its immigration legal services despite a three-month backlog.

101.    CCI's forced service cuts have caused doubt and concern to spread among its fundraising base. The CIGP dismantling robbed CCI of the largest single source of revenue for its naturalization program. Funders are worried about donating to CCI generally following the loss of CIGP funding, with concerns about its fiscal and organizational stability as a young organization. The dismantling and its effects on CCI have threatened to damage its long-term organizational survival by harming the crucial relationship with its funders.

102.  Due to the loss of CIGP funds, CCI has not even been able to start up the small network of volunteers, private foundations, and donors it typically relies on before the end of a grant period. The organization simply cannot afford to reallocate staff time to fundraise while navigating the dismantling and has not been able to raise anywhere near the amount of money required.

***Michigan United***

103.  Plaintiff Michigan United received a FY2023 CINAS grant of $300,000 to provide citizenship instruction and naturalization-application services to 200 LPRs. This grant provides the majority of the funding for Michigan United's legal department and funds 100 percent of the naturalization program.

104.  Throughout the course of its grant period up to the date of the termination letter, Michigan United had not been reimbursed for any of its CIGP expenses, due initially to an issue on Defendants' end and later due to staff turnover and delays caused by onboarding and training new personnel. Michigan United submitted two recent requests for reimbursement, and has $300,000 minus those two reimbursement amounts remaining on its grant for services it has planned through September 30, 2025. Michigan United has at least 35 open naturalization cases for clients to whom it owes an ethical obligation. As a direct result of the CIGP dismantling, Michigan United will have to terminate some or all of its three full-time staff and two part-time instructors and potentially shut down its legal services program entirely.

105.  Michigan United's forced service cuts have damaged its ability to carry out its mission and its standing in the community, undermining its ability to secure future funding and threatening the future of the naturalization program.

106.  Due to the loss of CIGP funds, Michigan United's fundraising team must now fundraise a significantly higher amount, as the organization has been subsidizing its CIGP out-of-pocket with the expectation that it would finally draw the full reimbursement amount.

*English Skills Learning Center*

107. Plaintiff ESLC received a FY2023 CINAS grant of $450,000 to provide citizenship instruction to at least 200 LPRs, administer eligibility screening to 440 LPRs, and to file 400 naturalization applications. The grant alone funds 76% of its naturalization program, by far the biggest funding source for the program.

108. After submitting its most recent allowable reimbursement request, ESLC has approximately $166,546.13 remaining on its grant for services it planned through September 30, 2025. It has 127 open naturalization cases for clients to whom it owes an ethical obligation, but with no dedicated funding to pay for those representation services any longer. As a direct result of the dismantling, ESLC has had to eliminate two full-time positions, may have to terminate a director-level position soon, and will terminate the program as a whole by June 2025.

109. ESLC's forced service cuts have caused significant damage to funders' confidence in the organization, as they are confused about what ESLC "did" to lose its CIGP funding. The government's explanation that ESLC's work did not "effectuate" the "Department's priorities" has only caused further confusion, causing serious harm to ESLC's general reputation and ability to fundraise as an organization.

110. Due to the loss of CIGP funds, ESLC has been scrambling for alternative sources of funding. It has put a pause on addressing the community need for more English language classes in order to spend time fundraising, where it is facing considerable headwinds.

*HIAS Pennsylvania*

111. Plaintiff HIAS PA applied for and received a FY2023 CINAS grant of $450,000 to provide citizenship instruction to a minimum of 200 LPRs, administer naturalization eligibility screenings to 200 LPRs (with a stated goal of 350), and to file 200 naturalization applications. This grant makes up 76% of HIAS PA's naturalization funding and continues an administrative and

programmatic relationship with USCIS that goes back more than a decade. Without the grant, HIAS PA will incur an estimated budget deficit of $123,505.

112.  After submitting its final allowable reimbursement request, HIAS PA has approximately $107,437.40 remaining on its grant for services it planned through September 30, 2025. HIAS PA currently has 63 open naturalization cases for clients to whom it owes an ethical obligation, but with no dedicated funding to pay for those representation services any longer. As a direct result of the CIGP dismantling, HIAS PA has had to reallocate funds from other programs to cover the expenses of the dedicated attorney representing LPRs in their naturalization application process. As result, HIAS PA is currently operating on only 60 remaining days of payroll and will have to lay off 17 staff on June 30, 2025 and effectively shutter its naturalization program unless funding is restored or new funding is secured. While HIAS PA's subgrantee organizations were still providing civics and citizenship education classes after the initial freeze, despite not being paid, they have now canceled citizenship classes, including one which already had students on the waitlist.

113.  HIAS PA's forced service cuts have damaged its ability to carry out its mission and its standing in the community, undermining its ability to secure future funding because it is losing clients' trust and donors are questioning its viability as an organization. As a result of the cuts caused by the CIGP dismantling, funders assume that HIAS PA's inability to provide services reflects its lack of capacity, and one private donor has already decided not to award funding to HIAS PA based on concerns over its future as an organization.

114.  Due to the loss of CIGP funds, HIAS PA has been forced to prematurely reallocate resources and staff time to emergency fundraising activities in order to make up the gap. HIAS PA

has been unable to carry out normal fundraising activities because its resources are strained to continue providing its client services.

***Immigrant Law Center of Minnesota***

115.  Plaintiff ILCM applied for and received a FY2024 CINAS grant of $283,018 to provide citizenship instruction to 200 LPRs, administer naturalization eligibility screenings to 224 LPRs, and file 200 naturalization applications. The grant funds part of the work of fourteen staff members. Without the grant, ILCM is estimated to be operating on a $49,000 budget deficit for naturalization services in the 2025 fiscal year.

116.  After submitting the final allowable reimbursement request, ILCM has approximately $240,324 remaining on its grant for services it planned through September 30, 2026. ILCM currently has 131 open naturalization cases for clients to whom it owes an ethical obligation, but with no dedicated funding to pay for all those representation services any longer. As a direct result of the CIGP dismantling, ILCM had been forced to rely on unsustainable pro bono services for its current open naturalization cases. ILCM has stopped sub-granting to the organization that provides civics classes in furtherance of its grant, leading the subgrantee to first reduce, and then permanently cut its citizenship classes down from four to one, abandon its instructional support to its citizenship class teachers, and terminate its own relationships with two other partner organizations, harming the students who relied on its services for their English and civics education.

117.  ILCM's forced service cuts have damaged its ability to carry out its mission and its standing in the community, undermining its ability to secure future funding because it is losing both donors' and clients' trust. Donors have already given ILCM's subgrantee negative feedback over the cuts, jeopardizing both the subgrantee and ILCM's ability to fundraise going forward.

*Instituto del Progreso Latino*

118.  Plaintiff IDPL received a FY2023 CINAS grant of $450,000 to provide legal screening eligibility for 600 LPRs, citizenship instruction to 420 LPRs, and naturalization-application services to 325 LPRs. This grant continued a long-standing, fifteen-year administrative and programmatic relationship with USCIS, and funds 25% of the naturalization program.

119.  After submitting its final reimbursement request, IDPL has approximately $129,591.57 remaining on its grant for services planned through September 30, 2025. IDPL has 98 open naturalization cases for clients to whom it owes an ethical obligation, and while all cases remain open and the attorneys continue to uphold their ethical obligation and serve their clients, these cases are not fully staffed. As a direct result of the CIGP dismantling, IDPL will lose up to three full-time employees or the equivalent after June 30, will cancel future appointments, and may move to a fee-structured program.

120.  IDPL's forced service cuts have damaged its ability to take on new clients and capacity to carry out its mission and its strong standing in the community as the largest processor of citizenship applications in the state of Illinois.

121.  Due to the loss of CIGP funds, IDPL has been forced to reallocate other independent agency funding to cover the costs of its naturalization program. This reallocation requires depleting other organizational funds. IDPL's inability to take on new clients undermines its mission and hinders its ability to make a case for funding.

*Massachusetts Immigrant & Refugee Advocacy Coalition*

122.  Plaintiff MIRA received a FY2024 CINAS grant of $300,000 to provide citizenship instruction to 200 LPRs, administer naturalization eligibility screenings to 200 LPRs, and file 200 naturalization applications. This grant funds 56% of its naturalization program and furthers a

longstanding relationship between USCIS and MIRA, which has been receiving CIGP funds since 2013.

123.  After submitting its final reimbursement request, MIRA has approximately $221,179.47 remaining on its grant for services planned through September 30, 2026. MIRA currently has 174 open naturalization cases for clients to whom it owes an ethical obligation, and insufficient funding to pay for those representation services.

124.  MIRA itself has canceled its citizenship clinics, turned away new clients, and canceled plans to expand its naturalization services into New Hampshire. It has also been forced to stop funding its subgrantee, which has since cancelled its English as a Second Language classes.

125.  The forced cuts have caused confusion in the community MIRA serves, damaging its credibility and reputation with clients, who have already expressed disappointment with the organization's new inability to assist them.

126.  Due to the loss of CIGP funds, MIRA has been forced to prematurely reallocate resources to new fundraising activities to make up the gap, further straining its own resources.

## CLAIMS FOR RELIEF

## COUNT I

### Violation of the Administrative Procedure Act, arbitrary and capricious,
### 5 U.S.C. § 706(2)(A)

127.  Plaintiffs restate and reallege all paragraphs above as if fully set forth here.

128.  Under the APA, the Court shall "hold unlawful and set aside agency action" that is "arbitrary [and] capricious." 5 U.S.C. § 706(2)(A).

129.  Defendants' steps to dismantle the CIGP—including the Noem Memorandum, freezing DHS grant disbursements, and the termination email and letter—are final agency action reviewable under 5 U.S.C. §§ 702 and 706.

130.  Defendants' actions are arbitrary and capricious because they have failed to adequately justify their actions; consider reasonable alternatives; consider key aspects of the problem, including substantial reliance interests at stake; and acknowledge or justify their change of position. Defendants have also relied on factors Congress did not authorize them to consider.

131.  Defendants have not "examine[d] the relevant data and articulate[d] a satisfactory explanation" for entirely dismantling the CGIP. *Mayor of Balt.*, 973 F.3d at 275 (quoting *State Farm*, 463 U.S. at 43). Instead, they have offered implausible, pretextual justifications for their actions and ignored the significant reliance interests at issue.

132.  The Noem Memorandum justifies an across-the-board funding freeze with three unsubstantiated and speculative "concerns": that grants "may be funding illegal activities, such as encouraging or inducing illegal immigration," "that there may be racially discriminatory language in certain grants," and "that these grants may not be an efficient use of government resources." The Noem Memorandum evinces zero fact-finding by Defendants as to any of these "concerns." In addition, Congress has not authorized the Secretary or other Defendants to consider any of these factors when disbursing appropriated funds.

133.  Likewise, the termination email and letter state only that CIGP grants "no longer effectuate[] the program goals and the Department priorities." Defendants do not explain how Plaintiffs' programs fail to "effectuate" the CIGP's "goals" or DHS's "priorities," or when and why they stopped doing so. Nor do Defendants explain that the CIGP's goals or Department's priorities have changed, or when and how they did. In fact, Defendants still state publicly that "[t]he goal of the CIGP is to expand the availability of high-quality citizenship preparation services

for LPRs across the nation and to provide opportunities for immigrants to gain the knowledge and skills necessary to assimilate into the fabric of American society."[10]

134.  Defendants have failed to provide a reasonable explanation for why dismantling the CIGP is necessary, despite the practical and logical consequences that will result for affected grantees. Defendants have also failed to consider any reasonable alternatives to dismantling the CIGP. *See Allied Loc. & Reg'l Mfrs. Caucus v. EPA.*, 215 F.3d 61, 80 (D.C. Cir. 2000) ("To be regarded as rational, an agency must also consider significant alternatives to the course it ultimately chooses."). Defendants did not "examine the relevant data," including whether any CIGP grants actually implicated the Secretary's stated concerns or no longer effectuated the CIGP's goals or DHS priorities, before selecting a course of action. *State Farm*, 463 U.S. at 43. By giving zero thought to the serious reliance interests at stake, Defendants "entirely failed to consider an important aspect of the problem." *Id*. By dismantling the CIGP, which funds entire programs and multiple staff positions for Plaintiffs and dozens of other organizations, Defendants' actions are causing irreparable harm to these organizations.

135.  The specifics of the CIGP funding awarded to Plaintiffs illustrate the mismatch between Defendants' unsupported justifications for dismantling the entire program and the extreme results of their actions. CIGP grants serve to help *lawful* permanent residents study for the citizenship test and complete the naturalization process to become American citizens. It is illogical to conclude that providing citizenship-education classes and assistance filing naturalization applications will encourage *illegal* immigration (a term without definition in either the Memorandum or federal statute) or that CIGP grants fail to effectuate the very goals and policies Defendants still publicly

---

[10] *Grant Program Impact*, U.S. Citizenship and Immigration Services, https://perma.cc/9F4L-SVLG.

tout—the same goals and policies that were in place when Defendants awarded Plaintiffs the funding. Such an explanation is "so implausible that it does not represent reasonable administration of the" CIGP. *Bedford Cnty. Mem'l Hosp. v. Health & Hum. Servs.*, 769 F.2d 1017, 1022 (4th Cir. 1985).

## COUNT II

### Violation of the Administrative Procedure Act, contrary to law, 5 U.S.C. § 706(2)(A)-(C)

136.  Plaintiffs restate and reallege all paragraphs above as if fully set forth here.

137.  Under the APA, the Court shall "hold unlawful and set aside agency action" that is an "abuse of discretion, or otherwise not in accordance with law"; "contrary to constitutional right, power, privilege, or immunity"; or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. §§ 706(2)(A)–(C).

138.  Defendants' steps to dismantle the CIGP—including the Noem Memorandum, freezing DHS grant disbursements, and the termination email and letter—are final agency action reviewable under 5 U.S.C. §§ 702 and 706.

139.  Dismantling the CIGP is contrary to law because it violates two appropriations acts, the Homeland Security Act, and agency regulations.

140.  The Consolidated Appropriations Act of 2023 mandates that $25 million of appropriated funds be obligated and disbursed "for the Citizenship and Integration Grant Program." The Further Consolidated Appropriations Act of 2024 similarly mandates that $10 million of appropriated funds be obligated and disbursed on CIGP grants. Defendants obligated those funds by awarding grants to numerous organizations around the country including Plaintiffs. By dismantling the CIGP by refusing to disburse and then terminating these grants—without asking Congress first or complying with the procedures laid out in the Impoundment Control and Anti-Deficiency Acts—

Defendants have violated both statutes as well as the Consolidated Appropriations Act of 2023 and the Further Consolidated Appropriations Act of 2024.

141. The Homeland Security Act sets as the "primary mission" of DHS to "ensure that the functions of the agencies and subdivisions within the Department that are not related directly to securing the homeland are not diminished or neglected except by a specific explicit Act of Congress." 6 U.S.C. § 111(b)(1)(E). That Act further mandates that USCIS "promot[e] instruction and training on citizenship responsibilities for aliens interested in becoming naturalized citizens of the United States, including the development of educational materials." 6 U.S.C. § 271(f)(2). By dismantling the CIGP, which is a primary means by which USCIS complies with this statutory mandate, Defendants have thus diminished and neglected this function of the Department absent any specific explicit Act of Congress authorizing them to do so and have violated these provisions of the Homeland Security Act.

142. The Uniform Guidance sets the rules for awarding and administering Federal grants to non-Federal actors, including nonprofits. *See* 2 C.F.R. § 200.01 *et seq.* The regulations allow Defendants to terminate grants only in specific circumstances, including "to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities." *Id.* § 200.340(a)(4). The CIGP dismantling is not authorized by law, as it violates the Constitution and numerous statutes. In addition, there were no changes in the CIGP grant awards, the goals of the CIGP, or the Department's priorities, that would allow Defendants to terminate all CIGP grants en masse pursuant to this regulation. The regulations also mandate that award-making agencies reimburse award recipients for covered expenses "within 30 calendar days after receipt of the payment request unless [the agency] reasonably believes the request to be improper." *Id.* § 200.305(b)(3). In addition, "[p]ayments for allowable costs must not be withheld at any time

during the period of performance" of the award "unless required by Federal statute[ or] regulations," or if the award recipient—*i.e.*, a grantee—has failed to comply with the award terms or is delinquent on a debt to the federal government. *Id.* § 200.305(b)(6). Defendants violated these regulations by freezing and later terminating Plaintiffs' funding and dismantling the entire program.

143.   Defendants have also violated the constitutional separation of powers, which vests exclusive power over federal spending with Congress, and the Appropriations Clause, which obligates the Executive branch to spend funds that have been appropriated by Congress. U.S. Const. art. I, § 9, cl. 7. By refusing to spend funds that Congress has duly appropriated on the purposes Congress has specified, Defendants have violated the Constitution.

144.   Finally, Defendants have acted "in excess of statutory authority" by taking actions not authorized by Congress. Agencies cannot act without statutory authorization. *Nat'l Fed'n of Indep. Bus.*, 595 U.S. at 117. No statute authorizes Defendants to unilaterally dismantle a program for which Congress appropriated and allocated funds for any reason, much less the pretextual, implausible reasons cited.

## COUNT III

### Violation of the Separation of Powers

145.   Plaintiffs restate and reallege all paragraphs above as if fully set forth here.

146.   Plaintiffs have a non-statutory right of action to declare unlawful and enjoin Defendants' unconstitutional actions.

147.   The Constitution vests exclusive power over federal spending with Congress. U.S. Const. art. I, § 8, cl. 1. The Constitution explicitly denies that power to the other branches via the Appropriations Clause, which forbids the expenditure of federal funds except "in Consequence of Appropriations made by Law." *Id.*, art. I, § 9, cl. 7.

148.  Under Article II, the President must take care to faithfully execute the laws, including appropriations acts. *Id.*, art. II, § 3. Consistent with the constitutional division of legislative and executive powers and the requirements of bicameralism and presentment, the executive branch has no unilateral authority to amend or ignore congressional appropriations. Nor may the Executive direct federal officers or agencies to act contrary to a federal statute.

149.  The executive branch also lacks inherent constitutional power to decline to spend funds that Congress has appropriated. Although the Executive would lack that power even in the absence of any statutory prohibition, the Impoundment Control Act and Anti-Deficiency Act forbid the executive branch from declining to spend appropriated funds based on policy priorities, foreclosing any claim of concurrent executive power.

150.  By dismantling the CIGP—thus refusing to spend funding that Congress has appropriated for that purpose—Defendants have violated the separation of powers.

## COUNT IV

### Fifth Amendment Due Process

151.  Plaintiffs restate and reallege all paragraphs above as if fully set forth here.

152.  Under the Fifth Amendment, the federal government may not deprive a person or entity of property "without due process of law." U.S. Const. amend. V.

153.  Plaintiffs have a constitutionally protected property interest in the CIGP funding they applied for, were awarded, and relied on. Plaintiffs have expended significant resources to set up their naturalization programs in reliance on their grant awards. Plaintiffs' interest in their grant awards is established and governed by the acceptance of their application by the federal government. *See, e.g.*, *Cnty. of Santa Clara v. Trump*, 275 F. Supp. 3d 1196, 1218 (N.D. Cal. 2017), *aff'd in part, vacated in part, remanded sub nom. City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225 (9th Cir. 2018).

154.  The dismantling of the CIGP, including the Noem Memorandum, the freeze letter, and the mass termination email and letters, deprive Plaintiffs of their due-process rights because they cut off obligated CIGP funding without any further explanation as to why it "no longer effectuates the program goals and the Department's priorities." Neither did the letter identify the applicable program goals or agency priorities, indicate that the program goals or agency priorities had changed, or explain how they had changed.

155.  Plaintiffs' CIGP funding was terminated pursuant to 2 C.F.R. § 200.340(a)(2) which requires consent from the funding recipient.  Plaintiffs neither asked nor provided their consent.

156.  Plaintiffs were told their only recourse was to file written objections documenting their challenge. But no other information was provided, including what form the objection should take, what kind of "information or documentation" is relevant, or where or how to submit written objections.

157.  The CIGP dismantling deprives Plaintiffs of their property interest in their funding. Plaintiffs have had their operations disrupted as a result, including reduction in services provided, loss of key staff, and financial losses due to continuing to provide naturalization services in adherence to their missions and ethical obligations. Plaintiffs had no notice of the CIGP dismantling to plan for the concomitant hardships nor do they have any way to review or challenge the government's decision to terminate their funding.

**COUNT V**

**Ultra vires**

158.   Plaintiffs restate and reallege all paragraphs above as if fully set forth here.

159.  Plaintiffs have a nonstatutory right of action to declare unlawful and enjoin Defendants' unconstitutional actions.

160. No statute, constitutional provision, or other source of law authorizes Defendants to withhold appropriated DHS funds or dismantle an entire program for which Congress appropriated funding. Defendants' actions in doing so exceed their lawful authority.

## COUNT VI

### First Amendment Retaliation

161. Plaintiffs restate and reallege all paragraphs above as if fully set forth here.

162. The First Amendment guarantees a right to "freedom of speech" and "to petition the Government for a redress of grievances." U.S. Const. amend. I. The right to petition includes the right "to appeal to courts and other forums established by the government." *Borough of Duryea v. Guarnieri*, 564 U.S. 379, 387 (2011). The government violates the First Amendment when it retaliates against someone for exercising their First Amendment rights. *See, e.g.*, *Lozman v. City of Riviera Beach*, 585 U.S. 87, 90 (2018).

163. Just two days after Plaintiffs filed their motion challenging Defendants' grant-funding freeze, Defendants terminated Plaintiffs' CIGP grants. The termination of governmental funds is an adverse action that would objectively "chill" the activity of "a person of ordinary firmness." *Constantine v. Rectors and Visitors of George Mason Univ.*, 411 F.3d 474, 499 (4th Cir. 2003).

164. There was a causal relationship between Plaintiffs' protected activity and Defendants' conduct. *See Shaw v. Foreman*, 59 F.4th 121, 130-31 (4th Cir. 2023). Defendants had knowledge of this litigation. *See id.* And two days between Plaintiffs' motion and Defendants' conduct is sufficient "temporal proximity to suggest a causal connection." *Id.* at 130-31 (quoting *Constantine*, 411 F.3d at 501).

## PRAYER FOR RELIEF

The principal relief Plaintiffs seek is prospective, *not* grant funds that are owed for work already completed.[11] Plaintiffs respectfully request that this Court:

a.      Declare the dismantling of the Citizenship and Integration Grant Program unconstitutional and unlawful;

b.      Vacate and set aside the CIGP dismantling, including the January 28, 2025 Noem Memorandum, the February 4 Freeze Letter, the March 27 mass termination email and letters, and Defendants' other actions to implement the dismantling, pursuant to 5 U.S.C. § 706(2), and declare that these actions are arbitrary and capricious and contrary to law;

c.      Preliminarily and permanently enjoin Defendants from dismantling the CIGP, including enjoining them from implementing or giving effect to the Noem Memorandum, the Freeze Letter, or the termination email and letters;

d.      Postpone the effective date of the CIGP dismantling and any actions by Defendants to implement it or to otherwise freeze or terminate the disbursement of appropriated and obligated CIGP funds, pursuant to 5 U.S.C. § 705;

e.      Order Defendants to file a status report within 48 hours of the entry of a preliminary injunction or 5 U.S.C. § 705 stay, and at regular intervals thereafter, confirming compliance with the order;

f.      Enjoin Defendants from imposing any negative consequences on Plaintiffs for noncompliance with the terms of their respective CIGP grants if such

---

[11] Defendants' termination letters explained that Plaintiffs will be reimbursed for work up until the date of the termination. If Defendants carry through with that reimbursement, Plaintiffs will be seeking *only* prospective relief.

noncompliance is due directly or indirectly to any aspect of Defendants'

dismantling of the CIGP;

g.      Award Plaintiffs reasonable attorneys' fees and costs; and

h.      Grant such other and further relief as the Court may deem appropriate.

## JURY DEMAND

Plaintiffs demand a jury trial of all issues so triable under Rule 38 of the Federal Rules of

Civil Procedure.

April 25, 2025

Respectfully submitted,

Niyati Shah (Bar No. 31526)
Shalaka Phadnis***
ASIAN AMERICANS ADVANCING
JUSTICE—AAJC
1620 L St. NW, Suite 1050
Washington, DC 20036
Phone: (202) 296-2318
nshah@advancingjustice-aajc.org
sphadnis@advancingjustice-aajc.org

Jose Perez**
LATINOJUSTICE PRLDEF,
475 Riverside Dr., Suite 1901
New York, NY 10115
Phone: (212) 219-3360
Fax: (212) 431-4276
jperez@latinojustice.org

Nickole Durbin-Felix**
LATINOJUSTICE PRLDEF
4700 Millenia Blvd., Suite 500
Orlando, FL 32839
Phone: (321) 247-6657
ndurbin-felix@latinojustice.org

 _/s/ Bradley Girard_
Bradley Girard (Bar No. 31437)
Sarah M. Rich*
Adnan Perwez*
Robin F. Thurston[+]
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, DC 20043
Phone: (202) 448-9090
Fax: (202) 796-4426
bgirard@democracyforward.org
srich@democracyforward.org
aperwez@democracyforward.org
rthurston@democracyforward.org

_Counsel for Plaintiffs_

[+]_Application for full admission pending_
*_Admitted_ pro hac vice
** _Motion to appear_ pro hac vice _forthcoming_
*** _Motion to appear_ pro hac vice _pending_