## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

**Solutions in Hometown Connections,** *et al.*,

        Plaintiffs,

**v.**

**Kristi Noem,** *et al.*,

        Defendants.

**Civil Case No. 8:25-cv-00885-LKG**

## MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR
## PRELIMINARY INJUNCTION & APA § 705 STAY

# TABLE OF CONTENTS

Table of Authorities ............................................................................................................ ii

Introduction ........................................................................................................................ 1

Factual Background ........................................................................................................... 2

   **I.**   To fulfill its statutory mission, DHS creates the Citizenship and Integration Grant Program to promote citizenship education and naturalization. ................................... 2

   **II.**   Defendants allocate CIGP funding to Plaintiffs to help noncitizens prepare for naturalization. ................................................................................................................ 3

   **III.**   Defendants illegally freeze support for the CIGP and then shut it down entirely. ............. 5

   **IV.**   The dismantling of CIGP irreparably injures Plaintiffs. ................................................ 6

Argument ............................................................................................................................ 9

   **I.**   This Court has jurisdiction. ........................................................................................... 10

   **II.**   Plaintiffs are likely to succeed on the merits of their claims. ........................................ 14

      A.   The CIGP dismantling violates the Administrative Procedure Act. ........................... 14

      B.   The CIGP dismantling violates the separation of powers and is ultra vires. ................ 24

   **III.**   Plaintiffs are suffering irreparable harm. ....................................................................... 25

   **IV.**   The balance of equities and public interest favor Plaintiffs. ............................................ 29

   **V.**   Relief ............................................................................................................................... 30

Conclusion .......................................................................................................................... 30

## TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Air Evac EMS, Inc. v. McVey*,
    37 F.4th 89 (4th Cir. 2022) .................................................................... 27

*Al Otro Lado v. Mayorkas*,
    No. 17-cv-02366, 2021 WL 3931890 (S.D. Cal. Sept. 2, 2021)............................... 17

*Am. Ass'n of Colleges for Tchr. Educ. v. McMahon*,
    No. 1:25-CV-00702-JRR, 2025 WL 833917 (D. Md. Mar. 17, 2025) ...................... 21

*Am. Ass'n of Colls. for Tchr. Educ. v. McMahon*,
    No. 25-1281 (4th Cir. April 10, 2025) ...................................................... 13

*Am. Ass'n of Colls. for Tchr. Educ. v. McMahon*,
    No. 25-cv-00702, 2025 WL 863319 (D. Md. Mar. 19, 2025) ........................... 10, 11

*Atterbury v. U.S. Marshals Serv.*,
    805 F.3d 398 (2d Cir. 2015)................................................................. 10

*Beacon Assocs v. Apprio, Inc.*,
    308 F. Supp. 3d 277 (D.D.C 2018) ........................................................ 27

*Bedford Cnty. Mem. Hosp. v. Health & Human Servs.*,
    769 F.2d 1017 (4th Cir. 1985) .......................................................... 22, 23

*Bennett v. Spear*,
    520 U.S. 154 (1997)......................................................................... 15

*Bowen v. Massachusetts*,
    487 U.S. 879 (1988).......................................................................... 12

*California v. Dep't of Ed.*,
    No. 25-1244, 2025 WL 878431 (1st Cir. Mar. 21, 2025) ................................. 13

*California v. Dep't of Ed.*,
    No. 25-cv-10548, 2025 WL 725103 (D. Mass. Mar. 6, 2025), ............................. 13

*Casa de Maryland, Inc. v. Wolf*,
    486 F. Supp. 3d 928 (D. Md. 2020) ..................................................... 9, 30

*Chi. Women in Trades v. Trump*,
    No. 25-cv-2005, 2025 WL 1114466 (N.D. Ill. Apr. 14, 2025)............................ 14

*Climate United Fund v. Citibank, N.A.*,
    No. 25-cv-698, 2025 WL 1131412 (D.D.C. Apr. 16, 2025)............................ 11, 12, 13, 20, 29

*Clinton v. City of New York*,
    524 U.S. 417 (1998).............................................................................19

*Coleman v. Kendall*,
    74 F.4th 610 (4th Cir. 2023) ...........................................................10

*Deese v. Esper*,
    483 F. Supp. 3d 290 (D. Md. 2020).................................................17

*Dep't of Educ. v. California*,
    145 S. Ct. 966 (2025)........................................................................13

*Dep't of Homeland Security v. Regents of the Univ. of Cal.*,
    591 U.S. 1 (2020)..............................................................................24

*Edge-Works Mfg. Co. v. HSG, LLC*,
    285 F. Supp. 3d 883 (E.D.N.C. 2018).............................................28

*F.C.C. v. Fox Television Stations, Inc.*,
    556 U.S. 502 (2009)..........................................................................22

*Fed. Election Comm'n v. Ted Cruz for Senate*,
    596 U.S. 289 (2022)..........................................................................20

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
    528 U.S. 167 (2000)............................................................................9

*Griffith v. Fed. Lab. Relations Auth.*,
    842 F.2d 487 (D.C. Cir. 1988).........................................................25

*Handsome Brook Farm, LLC v. Humane Farm Animal Care, Inc.*,
    700 Fed. App'x 251 (4th Cir. 2017) ................................................28

*HIAS, Inc. v. Trump*,
    415 F. Supp. 3d 669 (D. Md. 2020) ...........................................25, 29

*HIAS, Inc. v. Trump*,
    985 F.3d 309 (4th Cir. 2021) ...........................................................30

*In re Aiken County*,
    725 F.3d 255 (D.C. Cir. 2013)..........................................................19

*In re Microsoft Corp. Antitrust Litig.*,
    333 F.3d 517 (4th Cir. 2003) .............................................................9

*Int'l Refugee Assistance Project v. Trump*,
    883 F.3d 233 (4th Cir. 2018) ...........................................................25

*Judulang v. Holder*,
  565 U.S. 42 (2011) ............................................................................................ 22

*Katz v. Cisneros*,
  16 F.3d 1204 (Fed. Cir. 1994) ......................................................................... 14

*Lummi Tribe of the Lummi Rsrv. v. United States*,
  870 F.3d 1313 (Fed. Cir. 2017) ....................................................................... 12

*Maine Cmty. Health Options v. United States*,
  590 U.S. 296 (2020) ......................................................................................... 12

*Maine v. U.S. Dep't of Agric.*,
  No. 25-cv-00131, 2025 WL 1088946 (D. Me. Apr. 11, 2025) ......................... 14

*Marin Audubon Soc'y v. Fed. Aviation Admin.*,
  121 F.4th 902 (D.C. Cir. 2024) ........................................................................ 20

*Mayor of Balt. v. Azar*,
  973 F.3d 258 (4th Cir. 2020) .......................................................... 20, 21, 22, 23, 24

*Md. Dep't of Hum. Res. v. U.S. Dep't of Health & Hum. Servs.*,
  763 F.2d 1441 (D.C. Cir. 1985) ....................................................................... 11

*Megapulse, Inc. v. Lewis*,
  672 F.2d 959 (D.C. Cir. 1982) ......................................................................... 10

*Michigan v. E.P.A.*,
  576 U.S. 743 (2015) ......................................................................................... 21

*Morales-Izquierdo v. Gonzales*,
  486 F.3d 484 (9th Cir. 2007) ........................................................................... 22

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) ....................................................................... 20, 21, 22, 23, 24

*Mountain Valley Pipeline, LLC v. 6.56 Acres of Land, Owned by Sandra Townes Powell*,
  915 F.3d 197 (4th Cir. 2019) ................................................................. 25, 27, 29

*Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*,
  No. 25-CV-333, 2025 WL 573764 (D. Md. Feb. 21, 2025) ............................. 30

*Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*,
  No. CV 25-239, 2025 WL 597959 (D.D.C. Feb. 25, 2025) ............................. 30

*Nat'l Fed'n of Indep. Bus. v. Occupational Safety & Health Admin.*,
  595 U.S. 109 (2022) ......................................................................................... 20

*Nken v. Holder,*
  556 U.S. 418 (2009) .................................................................................................. 29

*Normandy Apartments, Ltd. v. U.S. Dep't of Hous. & Urb. Dev.,*
  554 F.3d 1290 (10th Cir. 2009) ............................................................................... 10

*North Star Alaska v. United States,*
  14 F.3d 36 (9th Cir. 1994) ....................................................................................... 10

*Ohio v. EPA,*
  603 U.S. 279 (2024).............................................................................................. 20, 21

*Open Communities All. v. Carson,*
  286 F. Supp. 3d 148 (D.D.C. 2017) ........................................................................ 29

*Pacito v. Trump,* No.
  2:25-cv-255, 2025 WL 655075 (W.D. Wash. Feb. 28, 2025) ................................. 26

*Pacito v. Trump,*
  No. 2:25-cv-255-JNW, 2025 WL 893530 (W.D. Wash. Mar. 24, 2025) ................. 18

*Par Pharms., Inc. v. TWI Pharms., Inc.,*
  No. 11–2466, 2014 WL 3956024 (D. Md. Aug. 12, 2014) ..................................... 26

*Pashby v. Delia,*
  709 F.3d 307 (4th Cir. 2013) ................................................................................... 30

*PFLAG v. Trump,*
  No. 25-337, 2025 WL 685124 (D. Md. Mar. 4, 2025) ........................................... 25

*Rochester Pure Waters Dist. v. EPA,*
  960 F.2d 180 (D.C. Cir. 1992) ................................................................................ 19

*Rodriguez v. Robbins,*
  715 F.3d 1127 (9th Cir. 2013) ................................................................................ 29

*Roe v. Dep't of Def.,*
  947 F.3d 207 (4th Cir. 2020) ............................................................................. 21, 30

*State of N.Y. v. Trump,*
  No. 25-cv-39, 2025 WL 1098966 (D.R.I. Apr. 14, 2025) ................................... 5, 14

*Strickland v. United States,*
  32 F.4th 311 (4th Cir. 2022) ................................................................................... 25

*Stuller, Inc. v. Steak N Shake Enters.,*
  695 F.3d 676 (7th Cir. 2012) ................................................................................... 27

*Sustainability Inst. v. Trump*,
No. 25-cv-02152 (D.S.C. April 9, 2024) ................................................................... 14

*Telemaque v. United States*,
82 Fed. Cl. 624 (2008) ............................................................................................... 14

*Train v. City of N.Y.*,
420 U.S. 35 (1975) ...................................................................................................... 16

*U.S. Dep't of Navy v. Fed. Lab. Rels. Auth.*,
665 F.3d 1339 (D.C. Cir. 2012) ................................................................................. 19

*United States v. J & E Salvage Co.*,
55 F.3d 985 (4th Cir. 1995) ........................................................................................ 11

*United States v. South Carolina*,
720 F.3d 518 (4th Cir. 2013) ........................................................................................ 9

*Widakuswara v. Lake*,
No. 25-cv-1015, 2025 WL 1166400 (D.D.C. Apr. 22, 2025) ..................................... 13

*Williams v. Roth*,
No. 21-cv-02135, 2022 WL 4134316 (D. Md. Sept. 12, 2022) ................................... 11

*Winter v. Nat. Res. Def. Council*,
555 U.S. 7 (2008 .......................................................................................................... 9

*Woonasquatucket River Watershed Council v. U.S. Dep't of Agric.*,
No. 25-cv-00097, 2025 WL 1116157 (D.R.I. Apr. 15, 2025) ......................... 11, 14, 15, 28, 29

*Youngstown Sheet & Tube Co. v. Sawyer*,
343 U.S. 579 (1952) .................................................................................................... 19

**Statutes**

2 U.S.C. §§ 683-684 ........................................................................................................ 19

28 U.S.C. § 1491 .............................................................................................................. 10

31 U.S.C. § 1301 .............................................................................................................. 19

5 U.S.C. § 702 .................................................................................................................. 10

5 U.S.C. § 704 .................................................................................................................. 15

5 U.S.C. § 705 .................................................................................................................... 9

5 U.S.C. § 706 .................................................................................................................. 20

6 U.S.C. § 111 .................................................................................................. 17

6 U.S.C. § 271 ............................................................................................. 2, 17

Consolidated Appropriations Act of 2023, Pub. L. No. 117-328, 136 Stat. 4459 (2022) .. 3, 16, 19

Further Consolidated Appropriations Act of 2024, Pub. L. No. 118-47, 138 Stat. 460 (2024)..... 3, 16, 19

**Regulations**

2 C.F.R. § 200.206 ........................................................................................ 29

2 C.F.R. § 200.305 ........................................................................................ 18

2 C.F.R. § 200.340 ........................................................................................ 18

2 C.F.R. §§ 200 *et seq.*, 3002.10 ................................................................. 17

200 C.F.R. § 200.305 .................................................................................... 18

**Constitutional Provisions**

U.S. Const., art. I, § 8 .................................................................................. 18

U.S. Const., art. I, § 9 .................................................................................. 18

U.S. Const., art. II, § 3 ................................................................................. 19

**Other Authorities**

Am. Bar Ass'n, *Practice Advisory: Ethical Duties in Immigration Cases After Funding Loss*, https://perma.cc/VHY8-FPZM (accessed Apr. 24, 2025). ....................................................... 27

*Fiscal Year 2024 Citizenship and Integration Grant Program*, U.S. Citizenship and Immigration Services, https://perma.cc/H8D4-HYRH (last visited Mar. 24, 2025) ....................................... 3

*FY 2023 Grant Recipients*, U.S. Citizenship and Immigration Services, https://perma.cc/2EBL-HQDK (last visited Mar. 16, 2025). ..................................................... 3

*Grant Program Impact,* U.S. Citizenship and Immigration Services, https://perma.cc/WZM4-EGLF (last visited Mar. 16, 2025) ........................................... 2, 3, 18

## INTRODUCTION

Under the Citizenship and Integration Grant Program (CIGP), nonprofits provide naturalization services to eligible Lawful Permanent Residents and, if they meet required benchmarks, the government funds that work. Plaintiffs are grant recipients who have built multi-year programs to carry out CIGP grants. Plaintiffs have satisfied the program's benchmarks. And, as a result, they reasonably expected receive CIGP funding for the remainder of their grant terms.

Defendants, however, decided to shutter the CIGP. At first, they framed it as an indefinite funding freeze, based on threadbare justifications (in a memo that was never even made public). When Plaintiffs challenged that freeze, Defendants dismantled the CIGP by terminating the grants of all CIGP grantee organizations in one fell swoop. Defendants sent a single email and nearly identical form letters to Plaintiffs and other grantees, offering only the unsupported explanation that the "scope of work" in every CIGP grant award "no longer effectuates the program goals and the Department's priorities." Defendants ordered the grantees to stop all work immediately and informed them that would be reimbursed only up to the date of the termination letter.

The harm to Plaintiffs was immediate and irreparable. In reliance on the continued CIGP, Plaintiffs had hired staff, developed programming, advertised their services, and entered into attorney-client relationships with lawful permanent residents to whom they owe ongoing ethical duties. Plaintiffs counted on CIGP to continue their programming and services through at least the end of their grant periods. But now they have had to lay off staff, end partnerships with other organizations, shrink or end their citizenship programming, and scramble to continue to provide services for vulnerable communities that have come to count on them.

No law allows Defendants to unilaterally dismantle an entire grant program, especially one for which Congress specifically appropriated funds. Quite the opposite: Defendants' wholesale

dismantling of the CIGP violates the Administrative Procedure Act, the Constitution, and is ultra vires. And this Court has jurisdiction to conclude as much. Plaintiffs seek to preliminarily enjoin Defendants from dismantling the CIGP or stay the dismantling under Section 705 of the APA.

## FACTUAL BACKGROUND

I.   **To fulfill its statutory mission, DHS creates the Citizenship and Integration Grant Program to promote citizenship education and naturalization.**

When DHS and its component agency USCIS were created in 2003, Congress tasked the agency with "promoting instruction and training on citizenship responsibilities for aliens interested in becoming naturalized citizens of the United States, including the development of educational materials." 6 U.S.C. § 271(f)(2). In 2009, USCIS's Office of Citizenship created the Citizenship and Integration Grant Program (CIGP) to "provide[] support to community-based, non-profit organizations and educational institutions actively working to remove barriers to naturalization."[1] Grant recipients provide "English language and civics instruction, legal assistance with naturalization applications, and …community space for immigrant [integration]" to qualified lawful permanent residents (LPRs).[2] The "goal of the [CIGP] is to expand the availability of high-quality citizenship preparation services for [LPRs] across the nation and to provide opportunities for immigrants to gain the knowledge and skills necessary to integrate into the fabric of American society." Exs. L, M, N, ECF 30-3, J.R. 045, 098, 161.

To effectuate this Program, since 2009, USCIS has awarded more than $155 million in funding through 644 competitive CIGP grants to organizations in 41 states and the District of

---

[1] *Grant Program Impact,* U.S. Citizenship and Immigr. Servs., https://perma.cc/WZM4-EGLF (last visited Mar. 16, 2025).

[2] *Id.* It appears that the Agency Defendants may have replaced "integration" and variations thereon with "assimilation" and its variations on Agency websites discussing the CIGP. This USCIS webpage does not indicate the date it was last updated, so it is unclear to Plaintiffs when this change in terminology was implemented.

Columbia. This funding has helped more than 350,000 LPRs prepare for citizenship.[3] CIGP funding includes Citizenship Instruction and Naturalization Application Services (CINAS) grants, which help public or nonprofit organizations offer citizenship instruction and assistance filing applications for naturalization,[4] as well as Community and Regional Integration Network (CARING) Grants, which are similar but focused on helping the most vulnerable immigrants, including refugees, asylees, and trafficking victims. Ex. M, ECF No. 30-3, J.R. 100.

For Fiscal Year 2023, Congress appropriated $25 million "for the Citizenship and Integration Grant Program, … to remain available until September 30, 2024." Consolidated Appropriations Act of 2023, Pub. L. No. 117-328, 136 Stat. 4459, 4745 (2022). For Fiscal Year 2024, Congress appropriated $10 million "for the Citizenship and Integration Grant Program, … to remain available until September 30, 2025." Further Consolidated Appropriations Act of 2024, Pub. L. No. 118-47, 138 Stat. 460, 612 (2024). Congress has not rescinded these appropriated funds or passed any additional legislation authorizing Defendants not to spend them.

## II. Defendants allocate CIGP funding to Plaintiffs to help noncitizens prepare for naturalization.

Plaintiffs are nonprofit organizations that serve low-income immigrant communities, collectively helping thousands of people reach the difficult, meaningful goal of U.S. citizenship.

Defendants issued Notices of Funding Opportunity for various types of funding they planned to allocate out of their FY23 and FY24 appropriated funds. Exs. L, M, N, ECF No. 30-3, J.R. 044-213. USCIS awarded more than $22 million in CIGP funding from FY23 appropriations to 65 organizations, with a performance period of October 1, 2023, through September 30, 2025.[5] A

---

[3] *Id.*

[4] *Fiscal Year 2024 Citizenship and Integration Grant Program*, U.S. Citizenship and Immigr. Servs., https://perma.cc/H8D4-HYRH (last visited Mar. 24, 2025).

[5] *FY 2023 Grant Recipients*, U.S. Citizenship and Immigr. Servs., https://perma.cc/2EBL-HQDK (last visited Mar. 16, 2025).

3

majority of this funding was allocated via CINAS grants, which were awarded to 51 organizations around the country, including Plaintiffs Coalition for Humane Immigrant Rights (CHIRLA), Michigan United, the Central American Resource Center (CARECEN), Community Center for Immigrants (CCI), the English Skills Learning Center (ESLC), Instituto del Progreso Latino (IDPL), and HIAS Pennsylvania (HIAS PA). Compl. ¶ 63, *see also* Exs. B, C, E-G, I, J.R. 527, 535, 550, 558, 566, 589. USCIS also awarded its only CARING grant to Plaintiff Solutions in Hometown Connections (SHC). Ex. A, J.R. 517 ¶ 9. USCIS awarded millions of dollars in funding in FY24, including to Plaintiffs Immigrant Law Center of Minnesota (ILCM) and Massachusetts Immigrant and Refugee Advocacy Coalition (MIRA). Ex. J, J.R. 597, ¶ 5; Ex. H, J.R. 578 ¶ 4. The 2024 grants have a performance period of November 22, 2024, through September 30, 2026. *Id.*

For many Plaintiffs, their FY23 or FY24 CIGP funding continued years-long programmatic relationships with USCIS. *See, e.g.*, Ex. E, J.R. 550 ¶ 7; Ex. J, J.R. 597 ¶ 4. Plaintiffs use their CIGP funding to provide comprehensive naturalization services to LPRs, including eligibility screening, legal representation in the naturalization process, and citizenship and English language classes. *See, e.g.*, Ex. B, J.R. 526–27 ¶¶ 3-5; Ex. F, J.R. 557 ¶ 3; Ex. E, J.R. 548 ¶ 3; Ex. I, J.R. 588 ¶ 3. They have hired dedicated staff and have built programs, developed educational materials, and contracted with third parties to provide high-quality citizenship and naturalization services. *See, e.g.*, Ex. A, J.R. 515-16 ¶¶ 3-5 (programs tailored to specific client population, services provided over course of years, former students hired as childcare providers for current students); Ex. H, J.R. 578 ¶ 4 (grant funds portion of 14 employees' work and subgrantee that provides citizenship classes). Plaintiffs serve a broad variety of communities, including several that are historically difficult to reach and where Plaintiffs have invested time and other organizational resources to establish their good reputations as service providers. *See, e.g.*, Ex. A, J.R. 515 ¶ 3

4

(years of work with Afghan and Iraqi wives of Special Immigrant Visa holders); Ex. C, J.R. 534–35 ¶ 4 (years of building trust with low-income, naturalization-eligible Latino immigrants); Ex. H, J.R. 577-8 ¶ 2 (29 years' investment in serving immigrants in Minnesota,).

### III.  Defendants illegally freeze support for the CIGP and then shut it down entirely.

On January 28, DHS Secretary Kristi Noem issued a Memorandum placing "on hold pending review" "all Department grant disbursements and assessments of grant applications that: (a) go to non-profit organizations or for which non-profit organizations are eligible, and (b) touch in any way on immigration, . . . except to the extent required by controlling legal authority." Ex. A, ECF No. 30-3, J.R. 001. Secretary Noem gave three reasons for "this freeze": "(1) concerns that these grants may be funding illegal activities, such as encouraging or inducing illegal immigration, 8 U.S.C. § 1324(a)(1)(A)(iv), or illegal harboring of illegal aliens, 8 U.S.C. § 1324(a)(1)(A)(ii)-(iii); (2) concerns that there may be racially discriminatory language in certain grants; and (3) concerns that these grants may not be an efficient use of government resources." *Id.* The Noem Memorandum made the funding freeze "[e]ffective immediately." *Id.* Any DHS component that sought to keep funding flowing "to the extent required by controlling legal authority" was required to "obtain the express written consent of the General Counsel" within seven days. *Id.*

Seven days later, USCIS sent Plaintiffs a letter stating that, "[p]ursuant to the Department of Homeland Security Secretary Kristi Noem's memorandum dated January 28, 2025, and effective immediately, your grant from U.S. Citizenship & Immigration Services is frozen." Ex. B, ECF No. 30-3, J.R. 002. The letter did not attach or link to the Noem Memorandum.[6] The Freeze Letter

---

[6] To Plaintiffs' knowledge, the Noem Memorandum has never been published on any Executive Branch website. Plaintiffs' Exhibit A is a copy of the memo submitted by the government as evidence in a different case. Hamilton Decl. Ex. 1, *State of New York, et al. v. Trump, et al.*, No. 25-cv-39 (D.R.I. Feb. 11, 2025), ECF No. 102-2

stated further that "payments are not available at this time," and that USCIS "recognize[d] this will have an impact on your organization" but was "unable to provide a timeline on this freeze." *Id.*

Two days after Plaintiffs filed a motion for preliminary relief, Dkt. 30, in a single email to all CIGP funding recipients, including Plaintiffs, Defendants terminated their funding and instructed them to stop CIGP-funded work immediately. Supp. Ex. A, ECF No. 31-1, J.R. 218. The mass termination email stated only that "Pursuant to 2 C.F.R. § 200.340(a)(2) and the terms and conditions of your award, DHS has determined that the scope of work performed under this award no longer effectuates the program goals and the Department's priorities." *Id.* Later that day, Defendants posted nearly identical letters to all Plaintiffs on Defendants' online grants portal. *See, e.g.*, Supp. Ex. B, ECF 31-2, J.R. 220. Those letters likewise cited "program goals and the Department's priorities," and instructed recipients to submit requests for reimbursement of allowable costs incurred through the termination date, and any allowable termination costs. *Id.*

### IV.  The dismantling of CIGP irreparably injures Plaintiffs.

From the initial funding freeze, Plaintiffs were unable to access reimbursements they were owed, which caused immediate cash-flow problems and forced various Plaintiffs to lay off staff members and cancel citizenship classes. Even if Plaintiffs are eventually reimbursed for their allowable costs through March 27, and for their allowable termination costs, those harms cannot be repaired. And in all events, Plaintiffs will continue to suffer irreparable harm that the CIGP dismantling has wrought on their naturalization programs, their ability to retain key staff, their reputations, and their future financial stability.

**A.** The dismantling of the CIGP harms Plaintiffs' naturalization programs. For some Plaintiffs, the CIGP grant provides the largest funding source for the naturalization program. Ex. A, J.R. 519 ¶ 21, Ex. C, J.R. 537 ¶ 14, Ex. D, J.R. 544-45 ¶ 16, Ex. E, J.R. 552 ¶ 17. Some of these organizations, such as ESLC, which funds 76% of its naturalization program from the grant, will

have to shut down their naturalization program entirely. Ex. E, J.R. 552 ¶¶ 17-18, Ex. D, J.R. 544-5 ¶ 16; *see also* Ex. G, J.R. 569 ¶ 14. Without continuing access to their grants, several Plaintiffs have already been forced to eliminate or restrict the services they provide under the grant, including by cutting citizenship classes, canceling future appointments for screening services, refusing new clients, and turning to fee-based models. *See, e.g.*, Ex. A, J.R. 522 ¶ 31; Ex. B, J.R. 529 ¶¶ 14-15; Ex. D, J.R. 544-45 ¶¶ 16-17; Ex. H, J.R. 583 ¶ 19; Ex. I, J.R. 590 ¶ 8. While some Plaintiffs have been able to use unrestricted funds to keep their naturalization programs afloat, these scarce funds must be taken from other priorities. Ex. H, J.R. 581-82 ¶ 14, Ex. G, J.R. 570-71 ¶ 19.

**B.** Plaintiffs have also been forced to make or plan for staffing cuts as a result of the CIGP dismantling. Some Plaintiffs already laid off employees and eliminated positions. Ex. B, J.R. 529 ¶ 15, Ex. D, J.R. 544-45 ¶ 17, Ex. F, J.R. 561-62 ¶ 17. Some Plaintiffs have seen staff leave due to funding uncertainty. Ex. D, J.R. 544–545 ¶ 17; Ex. E, J.R. 553 ¶ 18. Plaintiffs who have not yet laid off staff are anticipating doing so. Ex. I, J.R. 593 ¶ 18, Ex. G, J.R. 569 ¶¶ 14-15. Some Plaintiffs have moved staff to other programs to avoid layoffs, but that means the naturalization program loses these employees' critical skills. Ex. C, J.R. 537-38 ¶ 15**,**

**C.** The changes wrought by Defendants' sudden, unexplained dismantling of the CIGP damage the reputations that Plaintiffs have built over years in their communities, particularly with hard-to-reach client populations. *See* Ex. A, J.R. 523 ¶ 36 (organization spent years building trust with Afghan, Iraqi communities); Ex. B, J.R. 531 ¶¶ 24–25 (charging for classes, firing instructors, and scaling back program will tarnish reputation); Ex. C, J.R. 539 ¶ 21 (citizenship program builds trust and credibility with clients and serves as "credible pipeline"); Ex. D, J.R. 546-47 ¶ 25 (funding freeze hurting long-term ability to build relationships and trust); Ex. G, J.R. 575 ¶¶ 31-32 (students will lose trust if classes and services are canceled after they already paid USCIS fee).

7

Plaintiffs have invested years and sometimes decades establishing trust with these vulnerable, low-income immigrant communities by providing consistent, comprehensive naturalization services. *See, e.g.*, Ex. C, J.R. 534-35 ¶ 4; Ex. G, J.R. 571 ¶ 20.

Thanks to Plaintiffs' responses to the CIGP dismantling, clients have begun to view plaintiffs as unreliable providers of naturalization services, undoing their reputations. *See, e.g.*, Ex. B, J.R. 531-32 ¶¶ 24-25; Ex. J, J.R. 602-03 ¶ 24. Plaintiffs are cutting services at the exact time that demand for naturalization assistance has gone up, leaving them underprepared to meet it. Ex. A, J.R. 520 ¶ 25; Ex. D, J.R. 545 ¶ 17; Ex. G, J.R. 572 ¶ 25. In many cases, the communities that Plaintiffs serve will be effectively left without access to critical naturalization services, including legal representation and citizenship or English classes. Ex. F, J.R. 563 ¶ 22; Ex. G, J.R. 575 ¶ 32; Ex. H, J.R. 586 ¶ 27. Because Plaintiff SHC is the sole CARING grant recipient in the country, the vulnerable community they serve in Maryland—especially Afghan and Iraqi women—would be left with no other organization to turn to for access to services. Ex. A, J.R. 523 ¶ 35.

**D.** By straining Plaintiffs' existing operations and tarnishing their reputations, the CIGP dismantling hurts Plaintiffs' future financial stability. FY23 grantees have almost five months left on their grant and would ordinarily be able to ramp up their fundraising efforts soon. *See, e.g.*, Ex. D, J.R. 545 ¶ 18 (May); Ex. B, J.R. 530 ¶ 19 (July). This ordinarily allows Plaintiffs to balance providing services with fundraising. But after the sudden dismantling, Plaintiffs had to reallocate scarce resources and accelerate fundraising in ways for which they were unprepared. *See, e.g.*, Ex. B, J.R. 531 ¶ 22; Ex. G, J.R. 570-571 ¶ 19; Ex. E, J.R. 554 ¶¶ 22–24. And some Plaintiffs lack the capacity to raise more than minimal funds to make up for the loss. Ex. D, J.R. 545-46 ¶ 20.

Plaintiffs are already facing questions along these lines, with donors asking what they "did" to lose funding, with the explanation of not being "align[ed] with the agency's priorities" only

causing further confusion and damage to their reputation. *See, e.g.*, Ex. E, J.R. 555 ¶ 27. Donors and longstanding partners have expressed disappointment, Ex. G, J.R. 572 ¶ 24, given negative feedback, Ex. H, J.R. 585 ¶ 24, and have even already withheld grants for fear that plaintiffs' organizations are unsustainable Ex. G, J.R. 572-73, ¶ 24.

## ARGUMENT

In APA cases, courts may also "issue all necessary and appropriate process to . . . preserve status or rights pending conclusion of the review proceedings" when doing so is "necessary to prevent irreparable injury." 5 U.S.C. § 705. Likewise, a preliminary injunction can "protect the status quo," "prevent irreparable harm during the pendency of a lawsuit," and give the Court time to "render a meaningful judgment on the merits." *United States v. South Carolina*, 720 F.3d 518, 524 (4th Cir. 2013) (quoting *In re Microsoft Corp. Antitrust Litig.*, 333 F.3d 517, 525 (4th Cir. 2003)). A preliminary injunction is appropriate if Plaintiffs show that: (1) there is a likelihood of success on the merits; (2) there is a likelihood they will suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) the injunction is in the public interest. *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008). The standard for relief under Section 705 is the same as for a preliminary injunction. *Casa de Maryland, Inc. v. Wolf*, 486 F. Supp. 3d 928, 949–50 (D. Md. 2020). All four factors weigh in Plaintiffs' favor here.[7]

This Court has jurisdiction over Plaintiffs' claims, which arise from legal restrictions on Defendants' ability to eliminate entirely a Congressionally funded program and which seek prospective, injunctive relief. Plaintiffs are likely to succeed on their claims because the CIGP

---

[7] Plaintiffs all have standing because they are all recipients of CIGP grants, have been injured by Defendants' dismantling of the CIGP, and can have their injuries redressed by a favorable decision that enjoins dismantling the CIGP. *See, e.g., Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.,* 528 U.S. 167, 180–81 (2000).

dismantling—from the initial funding freeze to the ultimate mass termination of awarded funding—is unlawful, unconstitutional, and ultra vires. Plaintiffs have also established that Defendants' CIGP dismantling is already causing irreparable harm to their operations, reputations, and ability to fulfill their missions. Because enjoining the CIGP dismantling would merely require Defendants to respect statutory and constitutional law and maintain the pre-freeze status quo, the balance of equities and the public interest tilt in Plaintiffs' favor and demand injunctive relief.

### I. This Court has jurisdiction.

**A.** Plaintiffs bring constitutional, statutory, and regulatory claims to challenge Defendants' dismantling of the CIGP. Plaintiffs seek declaratory, injunctive, and administrative relief that determines Defendants' ongoing legal obligations, vacates and sets aside the dismantling of the CIGP, and enjoins Defendants from dismantling the CIGP for the remainder of Plaintiffs' grant terms. *See* Am. Compl. at 38-39. Because Plaintiffs are "seeking relief other than money damages," this Court has jurisdiction under the APA. 5 U.S.C. § 702.

**B.** The Tucker Act, on the other hand, vests the Court of Federal Claims with jurisdiction over "express or implied contract[s] with the United States." 28 U.S.C. § 1491(a)(1). The Tucker Act applies if the issue in a case is "at its essence" a contract claim. *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 967 (D.C. Cir. 1982). Whether a claim "at its essence" is contractual turns on (1) "the source of the rights" underlying the claims and (2) "the type of relief sought (or appropriate)."[8] *Id.* at 968. Both make clear that the Tucker Act does not apply here and that this Court has jurisdiction.

---

[8] Various courts apply the *Megapulse* test to Tucker Act claims. *See, e.g., Atterbury v. U.S. Marshals Serv.*, 805 F.3d 398, 406 (2d Cir. 2015); *Normandy Apartments, Ltd. v. U.S. Dep't of Hous. & Urb. Dev.*, 554 F.3d 1290, 1299–1300 (10th Cir. 2009); *North Star Alaska v. United States,* 14 F.3d 36, 37 (9th Cir. 1994). While the Fourth Circuit has not yet explicitly adopted *Megapulse*, it has adopted an analogous test in a non-contract Tucker Act case. *Coleman v. Kendall*, 74 F.4th 610, 615 (4th Cir. 2023). A judge in this district also recently applied a similar framework to a grant termination case, citing *Megapulse* as persuasive authority. *McMahon,* 2025 WL 863319, at *2–5.

**1.** Courts determine the "source of the rights" at issue by reading the complaint with "an eye toward 'the true nature of the action.'" *Am. Ass'n of Colls. for Tchr. Educ. v. McMahon*, No. 25-cv-00702, 2025 WL 863319, at *3 (D. Md. Mar. 19, 2025) (quoting *Williams v. Roth*, No. 21-cv-02135, 2022 WL 4134316, at *5 (D. Md. Sept. 12, 2022)). The sources of the rights in this case are the Constitution, the Administrative Procedure Act, two appropriations acts, the Homeland Security Act, and the Uniform Guidance regulations. The question is not whether a contract is the source of the *relationship* between the parties. *See, e.g.*, *United States v. J & E Salvage Co.*, 55 F.3d 985, 988 (4th Cir. 1995). The question is whether the legal claims require the court to analyze contract terms under contract law, *see id.*, or instead to "examin[e] the federal regulations and federal statute[s] governing Plaintiffs' grant awards." *Climate United Fund v. Citibank, N.A.*, No. 25-cv-698, 2025 WL 1131412, at *9 (D.D.C. Apr. 16, 2025).

Here, Plaintiffs challenge Defendants' dismantling of the CIGP as unconstitutional, contrary to law, and insufficiently explained and reasoned. Resolution of these claims will require this Court to "address clear regulatory and statutory questions" regarding Defendants' lack of constitutional or statutory authority to shutter an entire program for which Congress appropriated specific funds, and whether Defendants violated the APA in doing so. *Climate United Fund*, 2025 WL 1131412, at *9. Plaintiffs' "claims arise under a federal grant program and turn on the interpretation of statutes and regulations rather than on the interpretation of an agreement negotiated by the parties," so the Tucker Act does not apply. *Md. Dep't of Hum. Res. v. U.S. Dep't of Health & Hum. Servs.*, 763 F.2d 1441, 1449 (D.C. Cir. 1985); *see also Woonasquatucket River Watershed Council v. U.S. Dep't of Agric.*, No. 25-cv-00097, 2025 WL 1116157, at *13 (D.R.I. Apr. 15, 2025).

That regulations—here, the Uniform Guidance—are incorporated into the grants does not turn Plaintiffs' claims into contract claims. District courts cannot be divested of jurisdiction—and their

ability to grant equitable relief—under the constitution, APA, or any other statute whenever a grant incorporates that legal authority. If that were true, "the government might creatively contract their way out of judicial reviewability of its actions, shielding itself by virtue of its 'contractual relationship' with a party. That cannot be, and is not, what Congress envisioned for judicial review under the APA. Nor is it the law." *Climate United Fund*, 2025 WL 1131412, at *12.

**2.** The type of relief Plaintiffs seek—prospective, equitable relief—also makes plain that this is not a contract case. Plaintiffs seek, among other things, an order enjoining Defendants from dismantling the CIGP, which would allow Plaintiffs to continue to carry out their CIGP-funded programs and later seek reimbursement for completed work. Because any dispersal of funds would be contingent on satisfying the grant terms in the future, Plaintiffs seek a "complex ongoing relationship" involving "constantly shifting balancing sheets"—the type of relationship "that the Administrative Procedure Act 'is tailored' to." *Maine Cmty. Health Options v. United States*, 590 U.S. 296, 327 (2020) (quoting *Bowen v. Massachusetts*, 487 U.S. 879, 904-05, 904 n.39 (1988)). That Defendants might have to disburse to Plaintiffs uncertain amounts of money in the *future* does not turn Plaintiffs' claims from "an equitable action for specific relief" into an "action at law for damages." *Bowen*, 487 U.S. at 893. That is because Plaintiffs do not seek money damages—specific, calculated sums "designed to compensate for completed labors," which is "the Tucker Act's heartland." *Maine Cmty. Health Options*, 590 U.S. at 327. To categorize "strings-attached" grants, subject to "supervision and adjustment," as money damages "would strain the meaning of the term to its breaking point." *Lummi Tribe of the Lummi Rsrv. v. United States*, 870 F.3d 1313, 1318-19 (Fed. Cir. 2017).

The Court's order denying Plaintiff's original motion for preliminary relief concluded that Plaintiffs sought only backward-looking relief because the termination letters showed "that the

Plaintiffs will not incur new expenses under their Grants in the future," and thus the Tucker Act applied. Order at 19, ECF No. 46. Plaintiffs' amended complaint clarifies that Defendants' dismantling of the CIGP—the only reason Plaintiffs cannot incur expenses under their grants in the future—is precisely the illegal action that Plaintiffs ask this Court to enjoin.

**C.** The Supreme Court's four-paragraph, per curiam order in *Dep't of Educ. v. California*, 145 S. Ct. 966 (2025) does not change the analysis here.[9] "It was true before *California*, and it remains true now, that 'whether a claim is at its essence contractual for the Tucker Act depends both on the source of the rights upon which the plaintiff bases its claims, and upon the type of relief sought (or appropriate).'" *Widakuswara v. Lake*, No. 25-cv-1015, 2025 WL 1166400, at *9 (D.D.C. Apr. 22, 2025) (cleaned up). *California* stayed a TRO requiring the Department of Education to reinstate grants terminated for a subset of specific grantees. *See California v. Dep't of Ed.*, No. 25-1244, 2025 WL 878431, at *1 (1st Cir. Mar. 21, 2025). The challenge there turned on the terms of particular grants and the individual basis of the termination decisions themselves. *See, e.g.*, Complaint ¶¶ 166, 183, *California v. Dep't of Ed.*, No. 25-cv-10548, 2025 WL 725103 (D. Mass. Mar. 6, 2025), ECF No. 1. Here, Plaintiffs do not challenge individual terminations and do not seek grant-specific remedies or "to enforce a contractual obligation to pay money" that is owed. *California*, 145 S. Ct. at 968 (cleaned up).

The tide of post-*California* case law agrees that constitutional or statutory challenges to agency actions—including dismantling of grant programs—belong in federal district court, and not the Court of Federal Claims. *See Widakuswara*, 2025 WL 1166400, at *9–10; *Climate United Fund*, 2025 WL 1131412, at *9–12; *Woonasquatucket River Watershed Council*, 2025 WL

---

[9] Relying on *California*, the Fourth Circuit stayed a preliminary injunction but did not provide any analysis at all. Stay Order, *Am. Ass'n of Colls. for Tchr. Educ. v. McMahon*, No. 25-1281 (4th Cir. April 10, 2025), ECF No. 30.

1116157, at *12-15; *Chi. Women in Trades v. Trump*, No. 25-cv-2005, 2025 WL 1114466, at *8-10 (N.D. Ill. Apr. 14, 2025); *State of N.Y. v. Trump*, No. 25-cv-39, 2025 WL 1098966, at *1-3 (D.R.I. Apr. 14, 2025); *Maine v. U.S. Dep't of Agric.*, No. 25-cv-00131, 2025 WL 1088946, at *14-15 (D. Me. Apr. 11, 2025); Order, *Sustainability Inst. v. Trump*, No. 25-cv-02152 (D.S.C. April 9, 2024), ECF No. 52. So too should this Court.

**D.** Finally, this Court has jurisdiction for another reason—Plaintiffs challenge an agency action for which "there is no other adequate remedy in a court." 5 U.S.C. § 704. Plaintiffs request prospective relief—the ability to continue their CIGP work, then to seek whatever reimbursements accrue in the future. But the Court of Federal Claims cannot adjudicate the lawfulness of an agency's action that will affect a future, ongoing relationship between parties. *Katz v. Cisneros*, 16 F.3d 1204, 1209 (Fed. Cir. 1994). So the Court of Federal Claims has no power to grant Plaintiffs the only relief that their complaint requests.

What's more, Plaintiffs have brought constitutional and ultra vires claims, under which courts cannot order the government to pay money damages. *See, e.g.*, *Telemaque v. United States*, 82 Fed. Cl. 624, 626 (2008). The Tucker Act does not apply to such claims, which the government has correctly conceded. *See Aids Vaccine Advoc. Coal. v. U.S. Dep't of State*, No. 25-cv-400, 2025 WL 752378, at *7 n.6 (D.D.C. Mar. 10, 2025). Those claims must remain with this Court.

**II.  Plaintiffs are likely to succeed on the merits of their claims.**

Defendants' wholesale dismantling of the CIGP violates the Constitution, various laws, and the agency's own regulations, it exceeds the agency's lawful authority, and it is arbitrary and capricious, giving rise to constitutional, non-statutory, and APA claims.

**A.  The CIGP dismantling violates the Administrative Procedure Act.**

***Final Agency Action*:** As an initial matter, the steps Defendants took to entirely dismantle the CIGP—the Noem Memorandum, the funding freeze letters, and the termination email and letters

sent en masse to CIGP funding recipients—constitute final agency action. *See* 5 U.S.C. § 704. Final agency actions are those (1) that "mark the consummation of the agency's decisionmaking process," and (2) "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (quotation marks omitted).

Defendants did not contest that the CIGP dismantling was final agency action in earlier briefing. *See* ECF No. 32. And with good reason: The CIGP dismantling immediately and conclusively stopped the disbursement of Congressionally appropriated and previously awarded funding to Plaintiffs, throwing their operations into chaos. Shortly after the initial indefinite "freeze"—a de facto dismantling of the program—Defendants issued a mass termination email and letters to all CIGP funding recipients, directing them to stop their CIGP-funded work and instructing them to "closeout" their grants in Defendants' systems. J.R. 217-22. These actions are the "consummation" of Defendants' decision-making process. *Bennett*, 520 U.S. at 178.

The CIGP dismantling has also necessarily affected Plaintiffs' "rights or obligations" and created legal consequences—terminating their CIGP awards, requiring them to submit reimbursement requests on a new deadline and "closeout" their awards, and forcing them to lay off staff and cut programming. *Id.*; *see Woonasquatucket*, 2025 WL 1116157, at *15 ("'[L]egal consequences" surely flow, given that grant recipients cannot access previously awarded funds.").

***Contrary to Law***: Under the APA, the Court "shall . . . hold unlawful and set aside agency action" that is an "abuse of discretion, or otherwise not in accordance with law"; "contrary to constitutional right, power, privilege, or immunity"; or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A)-(C).

**1.** The CIGP dismantling contravenes numerous laws, including two appropriations acts, the Homeland Security Act, and regulations that Defendants adopted.

*Appropriations Acts*: The CIGP dismantling is "not in accordance with" the appropriations laws that Congress passed for fiscal years 2023 and 2024, which required Defendants to spend specific amounts of money for the CIGP: $25 million for FY23 and $10 million for FY24. 136 Stat. at 4745 (Consolidated Appropriations Act of 2023); 138 Stat. at 612 (Further Consolidated Appropriations Act of 2024). USCIS issued Notices of Funding Opportunity for both fiscal years, Plaintiffs and other nonprofits applied for and were awarded that funding, and until early February, that funding was being disbursed as the law required.

The CIGP dismantling shows, however, that much of this funding will now never be spent. The money Congress appropriated for FY23 was only "available" for awarding "until September 30, 2024." 136 Stat. at 4745. After reimbursing Plaintiffs and other FY23 grantees for their expenses through March 27 and their allowable termination costs, Defendants will have no further ability to allocate FY23 CIGP funds. Given that the CIGP dismantling cut off FY23 grants approximately three-quarters of the way through their performance period, about a quarter of FY23 CIGP funding will now go unspent. And while Defendants have an additional five months in which to award remaining FY24 CIGP funding, *see* 138 Stat. at 612, it is clear from the Noem Memorandum and the wholesale dismantling of the program that they have no intention of doing so. Recipients of FY24 CIGP funding were a mere four months into their performance period, which began in late November 2024. Defendants will ultimately spend almost none of the $10 million that Congress directed them to spend on the CIGP for FY24. This violates these appropriations acts. *See Train v. City of N.Y.*, 420 U.S. 35, 41 (1975) (spending less than full amount appropriated by Congress violates appropriations statute).

*Homeland Security Act*: When creating DHS, Congress forbade the department from "diminish[ing] or neglect[ing]" any of its "functions . . . not related directly to securing the

homeland" without being authorized in advance by "a specific explicit Act of Congress." 6 U.S.C. § 111(b)(1)(E). At the same time, Congress tasked USCIS with "promoting instruction and training on citizenship responsibilities for [noncitizens] interested in becoming naturalized citizens of the United States." *Id.* § 271(f)(2). The CIGP is the main way by which Defendants accomplish this statutory command. Defendants cite no "specific explicit Act of Congress" that allows them to "diminish[] or neglect[]" their citizenship and naturalization promotion duties—nor could they, as none exists. *See Al Otro Lado v. Mayorkas*, No. 17-cv-02366, 2021 WL 3931890, at *12 (S.D. Cal. Sept. 2, 2021) (finding that § 111(b)(1)(E) "belies [DHS's] entire argument" that it has discretion to neglect statutory duties in favor of other agency priorities).

In fact, Congress regularly appropriated funds for the CIGP starting in 2009, requiring DHS to carry out its citizenship-promotion duties in part through grant funding. Reading sections 111(b)(1)(E) and 271(f)(2) together, along with appropriations acts funding the CIGP, Congress plainly mandated that DHS carry out its citizenship promotion duties in part via this program. Congress has sometimes "diminished" those duties by appropriating less money for the CIGP: for example, Congress appropriated $25 million in FY23 and $10 million in FY24. But less money does not mean no money. By zeroing out the CIGP despite current appropriations for the program and its statutory citizenship-promotion obligations, DHS has violated its own enabling statute.

*Uniform Guidance regulations*: Violating regulations violates Section 706(2) of the APA. *Deese v. Esper*, 483 F. Supp. 3d 290, 314 (D. Md. 2020). The CIGP dismantling also contradicts the Uniform Guidance regulations adopted by DHS. 2 C.F.R. §§ 200 *et seq.* The Guidance limits Defendants' authority to terminate grants to specific circumstances, none of which exist here.[10]

---

[10] The Uniform Guidance also specifically prohibits what Defendants did to Plaintiffs during the freeze period. The regulations state that "[p]ayments for allowable costs must not be withheld at

Defendants can terminate grants "to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities." 2 C.F.R. § 200.340(a)(4). But this provision does not permit Defendants' action. First, this provision does not allow termination not "authorized by law," and a wholesale refusal to spend appropriated funds is not. *See Pacito v. Trump*, No. 2:25-cv-255-JNW, 2025 WL 893530, at *9 (W.D. Wash. Mar. 24, 2025) ("[T]his regulation cannot authorize actions that contravene statutory requirements, nor does it relieve [an agency] of its duty to follow the law."). Further, while the termination email and letters invoked the program goals and Department priorities language (citing to the wrong version of the Guidance), they provided no evidence of any change in CIGP goals or DHS priorities. *See, e.g.*, Supp. Ex. B, ECF No. 31-2, J.R. 220. Nor did any other contemporaneous agency statements reveal any such change in goals and priorities. Indeed, on the date Defendants sent out the mass termination email and letters, USCIS had an active website describing the exact same goal for the CIGP as indicated in the original Notices of Funding Opportunity.[11]

**2.** The CIGP dismantling also violates the Constitution's bedrock principle of separation of powers, and thus the APA. *See* 5 U.S.C. § 706(2)(B). The Constitution vests exclusive power over federal spending with Congress. U.S. Const., art. I, § 8, cl. 1; *see also id.* art. I, § 9, cl. 7 ("No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law").

---

any time during the period of performance" of a grant "unless required by Federal statute, [or] regulations," or if the grantee has failed to comply with the terms or is delinquent on a debt to the federal government. 2 C.F.R. § 200.305(b)(6). As to disbursements, the Uniform Guidance is clear: agencies must reimburse award recipients for covered expenses "within 30 calendar days after receipt of the payment request unless the [agency] . . . reasonably believes the request to be improper." *Id.* § 200.305(b)(3). During the freeze, Defendants never challenged any Plaintiff's compliance or the propriety of any specific payment request; rather, they unilaterally withheld funding in direct contravention of their own regulations.

[11] Compare Ex. L, ECF No. 30-3, J.R. 045; Ex. M, ECF No. 30-3, J.R. 098; Ex. N, ECF No. 30-3, J.R.161 with *Grant Program Impact*, U.S. Citizenship and Immigr. Servs., https://perma.cc/NVA5-26MJ (last visited Mar. 16, 2025).

The President's constitutional role is to spend the money Congress appropriates for the purposes Congress identifies—to "take Care that the Laws be faithfully executed." *Id.* art. II, § 3; *Clinton v. City of New York*, 524 U.S. 417, 438 (1998) ("There is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes.").

Given that Congress already exercised its exclusive appropriations power to fund the CIGP and Defendants are "tak[ing] measures incompatible with the expressed or implied will of Congress," the executive branch's power "is at its lowest ebb." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring). To defend this dismantling of an entire program for which Congress appropriated funding, Defendants can rely only on the President's "own constitutional powers minus any constitutional powers of Congress over the matter." *Id.* With appropriations, Congress has "exclusive power over the federal purse." *U.S. Dep't of Navy v. Fed. Lab. Rels. Auth.*, 665 F.3d 1339, 1346 (D.C. Cir. 2012) (Kavanaugh, J.) (quoting *Rochester Pure Waters Dist. v. EPA*, 960 F.2d 180, 185 (D.C. Cir. 1992)). And Congress afforded Defendants no discretion in their appropriations. 136 Stat. at 4745; 138 Stat. at 612. While the executive branch may have "policy reasons . . . for wanting to spend less than the full amount appropriated by Congress for a particular project or program[,]" it "does not have unilateral authority to refuse to spend the funds."[12] *In re Aiken County*, 725 F.3d 255, 261 n.1 (D.C. Cir. 2013); *see also City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1235 (9th Cir. 2018) (same).

---

[12] While this limitation is established by the Constitution alone, Congress has confirmed via the Impoundment Control and Anti-Deficiency Acts that the executive branch may not withhold appropriated funds for policy reasons. *See* 2 U.S.C. §§ 683–684 (appropriated funds "shall be made available for obligation" unless the President transmits a special message to Congress and Congress rescinds the appropriation, and may be deferred only via similar process); 31 U.S.C. § 1301(a) ("Appropriations shall be applied only to the objects for which the appropriations were made except as otherwise provided by law."). The existence of these statutes reinforces that withholding appropriated funds places the executive branch's power at its lowest ebb.

**3.** The CIGP dismantling is also "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(C). Agencies "are creatures of statute" and are therefore subject to the limits prescribed by Congress. *Nat'l Fed'n of Indep. Bus. v. Occupational Safety & Health Admin.*, 595 U.S. 109, 117 (2022) (per curiam). Agencies "'literally ha[ve] no power to act' except to the extent Congress [has] authorized." *Marin Audubon Soc'y v. Fed. Aviation Admin.*, 121 F.4th 902, 912 (D.C. Cir. 2024) (first alteration in original) (quoting *Fed. Election Comm'n v. Ted Cruz for Senate*, 596 U.S. 289, 301 (2022)). When an agency exceeds its statutory authorization, and steps outside the boundaries set for it by Congress, the court must vacate and set aside that agency action. Nothing authorizes Defendants to entirely dismantle a program for which Congress appropriated funding and which is central to Defendants' statutory mandate of citizenship and naturalization promotion. *See Climate United Fund*, 2025 WL 1131412, at *16 ("EPA lacks the authority to effectively unilaterally dismantle a program that Congress established[.]"). In the absence of statutory authorization for their actions, Defendants' dismantling of the CIGP is unlawful.

**Arbitrary and Capricious:** Plaintiffs are also likely to succeed on their claim that the CIGP dismantling is arbitrary and capricious. *See* 5 U.S.C. § 706(2)(A). An agency action is arbitrary or capricious if it is not "reasonable and reasonably explained." *Ohio v. EPA*, 603 U.S. 279, 292 (2024) (internal quotation marks and citation omitted). The APA requires an agency to "examine the relevant data and articulate a satisfactory explanation for its action including 'a rational connection between the facts found and the choice made.'" *Mayor of Balt. v. Azar*, 973 F.3d 258, 275 (4th Cir. 2020) (quoting *State Farm*, 463 U.S. at 43). That "satisfactory explanation" cannot rely "on factors which Congress has not intended it to consider, entirely fail[] to consider an important aspect of the problem, offer[] an explanation for its decision that runs counter to the evidence before the agency, or [be] so implausible that it could not be ascribed to a difference in

view or the product of agency expertise." *Id.* (quoting *State Farm*, 463 U.S. at 43). Agency action can be upheld "only upon the grounds on which the agency acted," not based on post hoc rationalizations. *Michigan v. EPA*, 576 U.S. 743, 760 (2015).

**1.** No element of Defendants' CIGP dismantling passes arbitrary and capricious review. Crucially, the dismantling—from the initial Noem Memorandum to the mass termination email and letters—was not "reasonably explained." *Ohio*, 603 U.S. at 292. The Noem Memorandum neither cites nor examines *any* data. It justifies the funding freeze based on three speculative and unsubstantiated concerns: (1) "these grants *may* be funding illegal activities, such as encouraging or inducing illegal immigration"; (2) "there *may* be racially discriminatory language in certain grants"; and (3) "these grants *may* not be an efficient use of government resources." Ex. A, ECF 30-3, J.R. 001 (emphasis added). Providing a list of ways something might be objectionable "is so broad and vague as to be limitless; devoid of import, even." *See Am. Ass'n of Colleges for Tchr. Educ. v. McMahon*, No. 1:25-CV-00702-JRR, 2025 WL 833917, at *21 (D. Md. Mar. 17, 2025), *reconsideration denied*, 2025 WL 863319 (D. Md. Mar. 19, 2025), *appeal filed*, Case No. 25-1281 (4th Cir. Mar. 24, 2025). And a "categorial [sic] predictive assessment" is not "a satisfactory explanation" for a decision that eliminates the possibility of individualized determinations based on an assessment of relevant facts. *Roe v. U.S. Dep't of Def.*, 947 F.3d 207, 224 (4th Cir. 2020), *as amended* (Jan. 14, 2020) (internal quotation marks omitted).

The mass termination email and letters fare no better. They state summarily, without analysis or individualized assessment, that DHS determined that the "scope of work" for all CIGP funding awards "no longer effectuates the program goals and the Department's priorities." Supp. Ex. A, ECF No. 31-1, J.R. 218; Supp. Ex. B, ECF No. 31-2, J.R. 220. No other rationale or explanation is provided. And Defendants do not explain at all the decision to dismantle this entire program in

one fell swoop. It is per se arbitrary and capricious for an agency to provide "no explanation at all for a change in policy." *Morales-Izquierdo v. Gonzales*, 486 F.3d 484, 493 (9th Cir. 2007) (en banc); see also *Bedford Cnty. Mem. Hosp. v. Health & Human Servs.*, 769 F.2d 1017, 1022 (4th Cir. 1985) (finding agency policy arbitrary and capricious where agency provided "no explanation" for why it selected the policy at issue). As the Supreme Court has made clear, "[w]hen an administrative agency sets policy, it must provide a reasoned explanation for its action. That is not a high bar, but it is an unwavering one." *Judulang v. Holder*, 565 U.S. 42, 45 (2011). Here, Defendants merely announce "the choice made" to dismantle the CIGP without discussing any underlying "facts found" or articulating a "rational connection" between the two. *State Farm*, 463 U.S. at 43. That is insufficient under the APA.

The failure to provide a reasoned explanation or any factual support for the wholesale dismantling of the CIGP is especially dubious because this is not "a new policy created on a blank slate." *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). It is, instead, the sudden abandonment of a 16-year commitment to a program that DHS itself conceived and promoted.

**2.** The CIGP dismantling is also substantively unreasonable. See *Multicultural Media, Telecom & Internet Council v. FCC*, 873 F.3d 932, 936 (D.C. Cir. 2017) (Kavanaugh, J.) (distinguishing substantive-unreasonableness claims from lack-of-reasoned-explanation claims). Agencies cannot adopt policies outside the "zone of reasonableness." *Fed. Comms. Comm'n v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). At bottom, "agency action must be based on non-arbitrary, 'relevant factors.'" *Judulang*, 565 U.S. at 55 (quoting *State Farm*, 463 U.S. at 43). Defendants' wholesale dismantling of the CIGP fails to meet that test.

Defendants claim—"counter to the evidence before the agency," *Mayor of Balt.*, 973 F.3d at 275—that Plaintiffs' CIGP-funded work somehow "no longer effectuates the program goals and

the Department's priorities." Supp. Ex. B, ECF 31-2, J.R. 220. But the CIGP's goals did not change. Defendants' stated agency priorities did not change. And the work Plaintiffs were doing with CIGP funding did not change. Yet somehow Defendants found a mismatch between them that did not exist when the funding was awarded. This rationale for the CIGP dismantling is "so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Mayor of Balt.*, 973 F.3d at 275 (quoting *State Farm*, 463 U.S. at 43).

Similarly, there is no "rational connection" between the speculative concerns in the Noem Memorandum and CIGP funding. *Mayor of Balt.*, 973 F.3d at 275. CIGP grants—which provide services to eligible lawful permanent residents working towards citizenship—do not "encourag[e] or induc[e] illegal immigration," a term the Memorandum does not define and that has no definition in immigration law. Ex. A, ECF No. 30-3, J.R. 001. Defendants do not even attempt to make a connection between providing citizenship-education classes and assistance filing naturalization applications, and illegal immigration. CIGP funding awards also do not contain "racially discriminatory language". Nor does the Memorandum explain why DHS's fear of racially discriminatory language "in certain grants" justified freezing *all* funding. Finally, the Noem Memorandum's claimed concern for government efficiency is facially unreasonable as a basis to dismantle the CIGP: "The desire to review programs for efficiency or consistency . . . does not have a rational connection to the directives to proceed with a sudden, blanket suspension of congressionally appropriated" funds. *Aids Vaccine Advoc. Coal.*, 2025 WL 752378, at *10. Reliance on these unfounded "concerns" is "so implausible that it does not represent reasonable administration of the" CIGP. *Bedford Cnty. Mem. Hosp.*, 769 F.2d at 1022. Speculative concerns are not "factors which Congress . . . intended [Defendants] to consider" when spending

appropriated CIGP funding, and any reliance on these claimed concerns to dismantle the CIGP "runs counter to the evidence before the agency." *Mayor of Balt.*, 973 F.3d at 275.

**3.** Further, "[w]hen an agency changes course, as DHS did here," it must "consider the serious reliance interests" of stakeholders. *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020) (internal quotation marks and citations omitted). "It would be arbitrary and capricious to ignore such matters." *Id.* Plaintiffs structured their organizations, offered services, and entered subcontractor relationships reasonably relying on receipt of the funds they were guaranteed. Planning multiple years ahead, they hired staff and took on new clients. *See, e.g.*, Ex. H, J.R. 578 ¶ 4. Defendants' mass termination of CIGP funding has pulled the rug out from under them. They have been forced to cancel the English and citizenship classes they were offering and have laid off or soon will lay off staff due to lack of funding. Ex. A, J.R. 522 ¶ 31; Ex. B, J.R. 529 ¶ 15; Ex. D, J.R. 544-45 ¶ 17; Ex. F, J.R. 561-62 ¶ 17; Ex. I, J.R. 590 ¶ 8. All are contemplating drastic cuts to their citizenship and naturalization programs or are redirecting staff time and resources away from programmatic work towards finding new funding to fill in for the funding that Defendants initially froze and have now terminated. *See, e.g.*, Ex. H, J.R. 582-3 ¶ 17.

Defendants' throwaway mention of "impact" in their freeze letters, *see* Ex. B, ECF 30-3, J.R. 002, and failure to discuss reliance interests at all in the mass termination letters, *see* Supp. Ex. B, ECF 31-2, J.R. 220-22, highlights that they "entirely failed to consider an important aspect of the problem" as they dismantled the CIGP. *State Farm*, 463 U.S. at 43. *See also infra* Section III (describing irreparable harm caused by Defendants' actions).

**B.  The CIGP dismantling violates the separation of powers and is ultra vires.**

For the same reasons that Defendants' dismantling of the CIGP is contrary to law under the APA, it independently violates the Constitution's bedrock separation of powers principle and is ultra vires. *See, e.g.*, *PFLAG v. Trump*, No. 25-337, 2025 WL 685124, *18-21 (D. Md. Mar. 4,

2025) (finding likelihood of success on separation of powers claims in funding case), *appeal filed*, Case No. 25-1279 (4th Cir.). Where an agency has "disregarded a specific and unambiguous statutory directive" or "'violated some specific command' of a statute," its actions are *ultra vires* and reviewable by courts. *Griffith v. Fed. Lab. Relations Auth.*, 842 F.2d 487, 493 (D.C. Cir. 1988); *see also Strickland v. United States*, 32 F.4th 311, 363 (4th Cir. 2022). In addition to ignoring Congress's specific appropriations for the CIGP, Defendants' actions are *ultra vires* because they are "incompatible with the will of Congress" that USCIS provide citizenship instruction and resources. *See PFLAG*, 2025 WL 510050, at *20.

### III. Plaintiffs are suffering irreparable harm.

Irreparable harm occurs "when the threatened injury impairs the court's ability to grant an effective remedy," *Int'l Refugee Assistance Project v. Trump*, 883 F.3d 233, 270 (4th Cir. 2018), *vacated on other grounds*, 585 U.S. 1028 (2018), especially when actual and imminent harm cannot be "fully rectified by the final judgment after trial." *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land, Owned by Sandra Townes Powell*, 915 F.3d 197, 216-18 (4th Cir. 2019).

Agency action causes irreparable harm when an organization is forced "to significantly cut down on staff or otherwise reduce core operations." *AIDS Vaccine Advoc. Coal.*, 2025 WL 752378, *18. So too when "blanket suspension of funds [has] undermined [plaintiffs'] core missions and jeopardized vital services to vulnerable populations." *Id.* at *19; *Nat'l Council of Nonprofits*, 2025 WL 368852, at *12. And an "almost inevitable loss of good will and harm to reputation" adds to that harm. *HIAS, Inc. v. Trump*, 415 F. Supp. 3d 669, 685 (D. Md. 2020), *aff'd*, 985 F.3d 309 (4th Cir. 2021). Plaintiffs are suffering each of these injuries. And the combination of the injuries makes plain that Plaintiffs cannot be made whole absent preliminary relief.

**1.** The dismantling of CIGP has already forced—or will imminently force—Plaintiffs to shut down their naturalization programs and cut staff.

Irreparable harm results even where a Plaintiff is forced to close a "division" that is only a "small portion" of their "overall business." *Par Pharms., Inc. v. TWI Pharms., Inc.*, No. 11–2466, 2014 WL 3956024 at *3 (D. Md. Aug. 12, 2014). Because CIGP funds make up significant portions of several Plaintiffs' budgets for naturalization programs, *see, e.g.*, Ex. B, J.R. 529 ¶ 14, Ex. E, J.R. 552 ¶ 17, some Plaintiffs will have to prematurely terminate their naturalization programs, *see, e.g.*, Ex. E, J.R. 552–523 ¶¶ 17-18 (the CINAS grant funds 76% of ESLC's naturalization program, which will now be terminated entirely by June 2025); Ex. G, J.R. 569, ¶ 14. This "wholesale destruction of" their program "infrastructure [is] not [a] theoretical injur[y] that can be remedied by a check from the Treasury." *See Pacito v. Trump,* No. 2:25-cv-255, 2025 WL 655075, at *23 (W.D. Wash. Feb. 28, 2025).

Moreover, the dismantling of the CIGP and abrupt termination of funding has forced Plaintiffs to lay off, reassign, or lose staff. *See, e.g.*, Ex. B, J.R. 529 ¶ 15 (laid off all part-time citizenship instructors and one additional part-time employee); Ex. D, J.R. 545 ¶ 17 (part-time instructor left due to funding uncertainty); Ex. E, J.R. 553 ¶ 18 (moved citizenship staff to short-term funding stream and unrelated program that does not use their skills, and one staff member left due to funding uncertainty); Ex. G, J.R. 569 ¶ 14 (announced 17 layoffs to take place at the end of June). Even if Defendants are eventually enjoined from dismantling CIGP, Plaintiffs may not be able to rehire or reassign these staffers. And a number of staff who work on CIGP-funded activities possess talents or experience that make them uniquely valuable and irreplaceable to the organization. For example, ESLC will be forced to move to a volunteer-led program and lose an award-winning instructor with over 40 years of experience, who helped brainstorm the organization's innovative curriculum. Ex. E, J.R. 553 ¶ 18. The deprivation of such "valuable institutional knowledge" "can be irreparable," *Beacon Assocs v. Apprio, Inc.*, 308 F. Supp. 3d 277,

289 (D.D.C 2018), because it can "not be remedied by money damages." *Air Evac EMS, Inc. v. McVey*, 37 F.4th 89, 103 (4th Cir. 2022).

**2.** Plaintiffs also continue to suffer harms that cannot be "fully rectified" after trial because they are incurring costs that they will never be able to recover. *Mountain Valley Pipeline*, 915 F.3d at 216 (quoting *Stuller, Inc. v. Steak N Shake Enters.*, 695 F.3d 676, 680 (7th Cir. 2012)). Several Plaintiffs have tapped into limited unrestricted funds to continue providing the services formerly funded by the CIGP. *See, e.g.*, Ex. G, J.R. 569 ¶ 14. Restoration of the CIGP after a final judgment will not recover these expenditures because CIGP funds may be used only for specific purposes.

Among other expenses, Plaintiffs' limited other funds are now going to maintain existing attorney-client relationships that cannot be terminated simply because Defendants issued a stop-work order. Attorneys providing legal representation formerly funded by the CIGP cannot automatically withdraw because "a lawyer's primary ethical duty is owed to existing clients."[13] So for example, MIRA must find funds to cover 174 open naturalization cases, Ex. J, J.R. 600 ¶ 16, and CARECEN likewise must find a way to pay for its 140 open cases, Ex. B, J.R. 530 ¶ 16.

Compounding those harms, Plaintiffs have to divert already-scarce resources to plug the holes Defendants have created. Normally, when a grant's performance period is coming to an end, Plaintiffs begin seeking other sources of funding far in advance so they know whether and to what extent they will be able to carry on providing these services. *See e.g.*, Ex. A, J.R. 519 ¶ 22, Ex. G, J.R. 570 ¶ 16. The loss of CIGP funding, which Plaintiffs expected to continue for either six or eighteen more months, has forced Plaintiffs to divert staff and resources to emergency fundraising activities. *See, e.g.*, Ex. A, J.R. 520 ¶ 24, Ex. H, J.R. 583 ¶18, Ex. J, J.R. 601 ¶ 19. Those staff are

---

[13] Am. Bar Ass'n, *Practice Advisory: Ethical Duties in Immigration Cases After Funding Loss*, https://perma.cc/VHY8-FPZM (accessed Apr. 24, 2025).

pulled away from their regular job duties, and those resources cannot be recovered. *See, e.g.* Ex. E, J.R. 554 ¶ 24; Ex. C, J.R. 538 ¶ 18. Given their obligations to continue client services, Plaintiffs forced to choose between services and fundraising have been unable to engage in their ordinary fundraising activities. *See, e.g.*, Ex. D, J.R. 545 ¶ 20; Ex. G, J.R. 571 ¶ 19.

**3.** Plaintiffs' reputation with subgrantee organizations, the immigrant communities they serve, and prospective funders will suffer irreparable harm as a result of the CIGP dismantling. *See Handsome Brook Farm, LLC v. Humane Farm Animal Care, Inc.*, 700 Fed. App'x 251, 263 (4th Cir. 2017) ("The possibility of . . . the loss of goodwill may give rise to irreparable harm.") (cleaned up); *see also Edge-Works Mfg. Co. v. HSG, LLC*, 285 F. Supp. 3d 883 (E.D.N.C. 2018).

Some Plaintiffs have been forced to terminate relationships with subgrantee organizations. *See, e.g.,* Ex. G, J.R. 574, ¶ 29, Ex. H, J.R. 584, ¶¶ 22-24. Even if the CIGP is restored at the end of this case, these organizations may not be willing or able to resume their partnerships with Plaintiffs as a result of the uncertainty and the concomitant damage to their own reputations from the CIGP dismantling. *See id*. Likewise, Plaintiffs' have invested years in building a trustworthy reputation amongst hard-to-reach immigrant communities, and their clients will lose trust in Plaintiffs' efficacy and reliability when their citizenship or language classes are suddenly cancelled, or they are no longer able to receive help with their naturalization applications. *See, e.g.* Ex. C, J.R. 539 ¶ 21; Ex. H, J.R. 584 ¶ 21; Ex. G, JR 572 ¶ 25 (clients expressed concern, dire need for services); Ex. J, J.R. 602-603, ¶ 24 (failure to meet client needs despite increased demand). *Woonasquatucket*, 2025 WL 1116157, *23 (finding irreparable reputational harm where funding freeze would result in loss of trust with hard-to-reach Native American tribes).

In addition, the Termination Letter itself causes irreparable harm: it will be a permanent part of Plaintiffs' federal award record and a factor in the risk assessment federal agencies undertake

when awarding funding. *See* 2 C.F.R. § 200.206(b); s*ee Climate United Fund*, 2025 WL 1131412, at * 19 ("EPA's termination of the grants will impact Plaintiffs' ability to apply for and receive federal and/or state grant funds, and damage their reputations.") (cleaned up).

**4.** Any of these harms standing alone are enough to grant the motion. When combined, there can be no question that without preliminary relief, it will be impossible for Plaintiffs' harms to be "fully rectified by the final judgment after trial." *Mountain Valley Pipeline, LLC*, 915 F.3d at 216-18. Plaintiffs do not have the resources to continue the naturalization services required by the grants. So a final judgment will merely give them the futile right to seek reimbursement for work they cannot perform. And because Plaintiffs are already shuttering programs, losing staff, and damaging valuable relationships, final relief that technically allows them to revive their hollowed-out programs months down the road will be no relief at all.

## IV.  The balance of equities and public interest favor Plaintiffs.

The final two factors—the balance of equities and the public interest—"merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). The Government "cannot suffer harm from an injunction that merely ends an unlawful practice." *Open Communities All. v. Carson*, 286 F. Supp. 3d 148, 179 (D.D.C. 2017) (quoting *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013)); *see also Woonasquatucket River Watershed Council*, 2025 WL 1116157, at *23. There is also "a substantial public interest in having governmental agencies abide by federal laws that govern their existence and operations." *HIAS, Inc.*, 415 F. Supp. 3d at 686. Plaintiffs, on the other hand, have established harm "ranging from shutting down programs, to furloughing and laying off employees, to shuttering altogether" their naturalization programs, as well as "existential consequence[s] to their missions." *See AIDS Vaccine Advoc. Coal. v. Dep't of State*, No. 25-00400, 2025 WL 485324, at *6 (D.D.C. Feb. 13, 2025).

## V. Relief

A district court has "broad discretion to craft remedies based on the circumstances of a case," and should "meet the exigencies of the particular case" while ensuring that relief is "is no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *HIAS, Inc. v. Trump*, 985 F.3d 309, 326-27 (4th Cir. 2021) (internal quotation marks omitted) (quoting *Roe*, 947 F.3d at 232). Both a temporary stay of the CIGP dismantling under Section 705 of the APA and a broad equitable injunction are appropriate here. First, a Section 705 stay simply "postpone[s] the effective date of an agency action." 5 U.S.C. § 705. The stay runs against the agency action itself and not the specific defendants in a case, *see Casa de Maryland, Inc*, 486 F. Supp. 3d at 970-71, here, the wholesale dismantling of the CIGP. Second, nationwide injunctions are "appropriate when the government relies on a 'categorical policy,' and when the facts would not require different relief for others similarly situated to the plaintiffs." *HIAS, Inc.*, 985 F.3d at 326. Defendants have dismantled the entire CIGP via a memorandum applicable to all nonprofit grants that "touch in any way on immigration," a boilerplate letter addressed to "grant recipient," and a mass email and second boilerplate letter terminating every CIGP award. Defendants' categorical policy calls for a categorical remedy.[14]

### CONCLUSION

For these reasons, the Court should grant the motion and preliminarily enjoin Defendants from dismantling the CIGP or postpone the effective date of this dismantling under Section 705 of the APA until the Court can further consider the merits.

---

[14] The Court should exercise its discretion to waive or set at $0 the security requirement of Fed. R. Civ. P. 65(c). *See Pashby v. Delia*, 709 F.3d 307, 332 (4th Cir. 2013). In similar cases, courts in this jurisdiction and others have determined bond unnecessary. *See, e.g., Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*, No. 25-CV-333, 2025 WL 573764, at *29 (D. Md. Feb. 21, 2025) (setting a bond of zero dollars); *Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, No. CV 25-239, 2025 WL 597959, at *19 (D.D.C. Feb. 25, 2025) (declining to set a bond).

April 25, 2025

Respectfully submitted,

 /s/ Bradley Girard
Bradley Girard (Bar No. 31437)
Sarah M. Rich*
Adnan Perwez*
Robin F. Thurston⁺
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, DC 20043
Phone: (202) 448-9090
Fax: (202) 796-4426
bgirard@democracyforward.org
srich@democracyforward.org
aperwez@democracyforward.org
rthurston@democracyforward.org

*Counsel for Plaintiffs*

Niyati Shah (Bar No. 31526)
Shalaka Phadnis***
ASIAN AMERICANS ADVANCING
JUSTICE—AAJC
1620 L St. NW, Suite 1050
Washington, DC 20036
Phone: (202) 296-2318
nshah@advancingjustice-aajc.org
sphadnis@advancingjustice-aajc.org

Jose Perez**
LATINOJUSTICE PRLDEF,
475 Riverside Dr., Suite 1901
New York, NY 10115
Phone: (212) 219-3360
Fax: (212) 431-4276
jperez@latinojustice.org

Nickole Durbin-Felix**
LATINOJUSTICE PRLDEF
4700 Millenia Blvd., Suite 500
Orlando, FL 32839
Phone: (321) 247-6657
ndurbin-felix@latinojustice.org

⁺*Application for full admission pending*
**Admitted* pro hac vice
*** *Motion to appear* pro hac vice *forthcoming*
*** *Motion to appear* pro hac vice *pending*

31