**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

―――――――

**No. 25-1640**

―――――――

SOLUTIONS IN HOMETOWN CONNECTIONS; CENTRAL AMERICAN
RESOURCE CENTER; COALITION FOR HUMANE IMMIGRANT RIGHTS;
COMMUNITY CENTER FOR IMMIGRANTS, INC.; ENGLISH SKILLS
LEARNING CENTER; MICHIGAN ORGANIZING PROJECT, d/b/a Michigan
United; HEBREW IMMIGRANT AID SOCIETY AND COUNCIL MIGRATION
SERVICE OF PHILADELPHIA, d/b/a HIAS Pennsylvania; IMMIGRANT LAW
CENTER OF MINNESOTA; INSTITUTO DEL PROGRESO LATINO;
MASSACHUSETTS IMMIGRANT AND REFUGEE ADVOCACY
COALITION,

Plaintiffs - Appellants,

v.

KRISTI NOEM, in her official capacity as Secretary of the Department of
Homeland; UNITED STATES DEPARTMENT OF HOMELAND SECURITY;
JOSEPH B. EDLOW, in his official capacity as Director of the United States
Citizenship and Immigration Services; UNITED STATES CITIZENSHIP AND
IMMIGRATION SERVICES,

Defendants - Appellees.

------------------------------------------

RMC RESEARCH; CHILD TRENDS, INCORPORATED,

Amici Supporting Appellants.

―――――――

Appeal from the United States District Court for the District of Maryland, at Greenbelt.
Lydia Kay Griggsby, District Judge.  (8:25-cv-00885-LKG)

―――――――

Argued:  October 23, 2025                    Decided:  January 23, 2026

————————————

Before NIEMEYER, RUSHING, and HEYTENS, Circuit Judges.

————————————

Affirmed by published opinion.  Judge Niemeyer wrote the opinion, in which Judge Rushing joined.  Judge Heytens wrote a dissenting opinion.

————————————

**ARGUED:**   Bradley Scott Girard, DEMOCRACY FORWARD FOUNDATION, Washington, D.C., for Appellants.  Jessica Frances Woods Dillon, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellees.  **ON BRIEF:** Niyati Shah, Shalaka Phadnis, ASIAN AMERICANS ADVANCING JUSTICE—AAJC, Washington, D.C.; Jose Perez, Rex Chen, New York, New York, Nickole Durbin-Felix, LATINOJUSTICE PRLDEF, Orlando, Florida; Sarah M. Rich, Adnan Perwez, Robin F. Thurston, DEMOCRACY FORWARD FOUNDATION, Washington, D.C., for Appellants.  Kelly O. Hayes, United States Attorney, Rebecca A. Koch, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellees.  Daniel F. Jacobson, Kyla M. Snow, JACOBSON LAWYERS GROUP PLLC, Washington, D.C., for Amici RMC Research and Child Trends, Incorporated.

2

NIEMEYER, Circuit Judge:

In response to the Department of Homeland Security's (DHS) freezing and then terminating grants issued by its component agency, the U.S. Citizenship and Immigration Services (USCIS), through its "Citizenship and Integration Grant Program" (Grant Program), ten grantees commenced this action against the Department, its Secretary, USCIS, and its Director. The plaintiffs contended that freezing and terminating the grants was arbitrary and capricious, unconstitutional, and otherwise unlawful. They filed a motion for a preliminary injunction, requesting that the district court prohibit the "dismantling" of the Grant Program, which they describe as "terminating grant awards . . . or [] pausing, freezing, impeding, or blocking the disbursement of grant funds." They also requested that the court stay the defendants' actions pursuant to the Administrative Procedure Act (APA), 5 U.S.C. § 705.

The district court denied the plaintiffs' motion, concluding that the plaintiffs were not likely to succeed on the merits "because they ha[d] not established that the Court possesse[d] subject matter-jurisdiction to consider [their] claims." The court explained that, for the most part, "the essence" of the plaintiffs' lawsuit was "a breach of contract claim that seeks to recover monetary damages from the government" and therefore that "the United States Court of Federal Claims ha[d] exclusive jurisdiction" over such claims. (Citing *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 967 (D.C. Cir. 1982)). With respect to the plaintiffs' claims that the defendants' actions were ultra vires and violated the Constitution's separation of powers, the court also noted that the plaintiffs had failed to provide adequate legal authority in support of those claims. And to the extent that the

plaintiffs might still have had a claim under the APA with respect to the alleged agency's "dismantling" of the Grant Program, the court concluded, as an alternative ruling, that the plaintiffs had not identified "a discrete agency action upon which to base [their] claims," as required by the APA, 5 U.S.C. §§ 702, 704.  From the district court's order dated May 20, 2025, denying their motion, the plaintiffs filed this interlocutory appeal.  *See* 28 U.S.C. § 1292(a)(1).

After carefully reviewing the record, the district court's opinion, and the arguments of the parties, we conclude that the district court did not abuse its discretion and therefore affirm.

I

Upon taking office in January 2025, the President issued an executive order directing the Secretary of DHS to review all grants providing funding to organizations providing services "to removable or illegal aliens, to ensure" that they "conform to applicable law and are free of waste, fraud, and abuse, and that they do not promote or facilitate violations of our immigration laws."  Exec. Order No. 14159, *Protecting the American People Against Invasion*, 90 Fed. Reg. 8443, 8447 § 19(a) (Jan. 20, 2025).  The President directed the Secretary further to "[p]ause distribution of all further funds" awarded under those grants during the review process and then to "[t]erminate" all such grants that are determined to have violated the law or to have been "sources of waste, fraud, or abuse."  *Id*. § 19(b)–(c).

In response to the President's direction, DHS Secretary Kristi Noem issued an agency memorandum on January 28, 2025, to "[put] on hold pending review" all grants and grant applications "touch[ing] in any way on immigration . . . except to the extent required by controlling legal authority."  The memorandum expressed "concerns" that some grants might be "funding illegal activities," might have contained "racially discriminatory language," or might have constituted inefficient use of government resources.  As a component agency of DHS, USCIS, in turn, sent a letter dated February 4, 2025, to recipients of grants under the Grant Program to inform them of Secretary Noem's instructions.

USCIS created the Grant Program in 2009 to provide "English language and civics instruction, legal assistance with naturalization applications, and community space for immigrant integration."  And Congress appropriated funds for the Program in the Consolidated Appropriations Act of 2023, as follows:

> For necessary expenses of U.S. Citizenship and Immigration Services for Federal assistance for the Citizenship and Integration Grant Program, $25,000,000, to remain available until September 30, 2024.

Pub. L. No. 117-328, 136 Stat. 4459, 4745 (2022).  And it also did so in the Further Consolidated Appropriations Act of 2024, as follows:

> For necessary expenses of U.S. Citizenship and Immigration Services for Federal assistance for the Citizenship and Integration Grant Program, $10,000,000, to remain available until September 30, 2025.

Pub. L. No. 118-47, 138 Stat. 460, 612 (2024).  Congress provided no further instruction or limitation on the funds, which then became available for grants awarded by USCIS.

In its February 4 letter to grant recipients, USCIS stated:

> Pursuant to the Department of Homeland Security Secretary Kristi Noem's memorandum dated January 28, 2025, and effective immediately, your grant from U.S. Citizenship & Immigration Services is frozen.
>
> In accordance with the pause in activities, payments are not available at this time.
>
> We recognize this will have an impact on your organization. We are unable to provide a timeline on this freeze.

Almost two months later, on March 27, 2025, the DHS Office of Procurement Operations then sent recipients an email and simultaneously a letter terminating their grants. The letter stated:

> Effective immediately, the U.S. Department of Homeland Security (DHS) hereby terminates the Award Number . . . to end all work.
>
> Pursuant to 2 C.F.R. § 200.340(a)(2) and the terms and conditions of your award, DHS has determined that the scope of work performed under this award no longer effectuates the program goals and the Department's priorities. [Grantee] must cease all federally funded work under this Award and any costs incurred for such work on or after the date of this letter will be unallowable. . . .
>
> Costs resulting from financial obligations which were properly incurred by [Grantee] before the date of this termination notice, and that were not incurred in anticipation of termination, remain allowable if they would have otherwise been allowable had the award not been terminated. If you wish to object to the termination of this award, you may challenge the termination in writing and provide any information or documentation relevant to your challenge. You must submit any written objections no later than [30 days]. There will be no other opportunity to appeal this action to DHS.

Ten grantees commenced this action after receiving notice that their grants were being frozen.[*] In their amended complaint, the plaintiffs alleged that the "dismantling" of

---

[*] The plaintiff grantees are Solutions in Hometown Connections, Central American Resource Center, Coalition for Humane Immigration Rights, Community Center for (Continued)

the Grants Program, as reflected by the freezing and termination of the grants, was (1) "arbitrary and capricious," in violation of the APA, 5 U.S.C. § 706(2)(A); (2) "contrary to law," in violation of the APA, § 706(2)(A)–(C); (3) in violation of the separation of powers with respect to the expenditure of federal funds, as mandated by the U.S. Constitution under Art. I, § 8, cl. 1; Art. I, § 9, cl. 7; and Art. II, § 3; (4) in violation of the Due Process Clause of the Fifth Amendment; (5) "ultra vires"; and (6) retaliation in violation of the First Amendment on the ground that some of the agency's actions were taken after the plaintiffs had filed their initial complaint.

The plaintiffs claimed that they were injured and will continue to be injured by the termination of their grants and the Grant Program. They alleged that they had accepted the grants "with the expectation that they would build and carry out multi-year programs to provide services to [lawful permanent residents] seeking to naturalize"; that they had incurred expenses and built out their programs "with the expectation that they would be reimbursed through an iterative process for the entire length of their grant performance periods, as they completed grant-funded work"; that the defendants' actions "removed [their] ability to be compensated in the future for their ongoing work implementing the programs that [they] planned to carry out (and be funded) over the entire term of the [Program] grants"; and that they "have sought or will soon seek reimbursement for grant work completed" and that they still have "outstanding grant funds obligated to them for

---

Immigrants Incorporated, English Skills Learning Center, Michigan Organizing Project, Hebrew Immigrant Aid Society and Council Migration Service of Philadelphia, Immigrant Law Center of Minnesota, Instituto del Progreso Latino, and Massachusetts Immigrant and Refugee Advocacy Coalition.

future grant work." They also alleged various aspects of injury to their reputation and credibility for having to end their work prematurely. The plaintiffs sought various forms of declaratory and injunctive relief, including mandatory injunctive relief.

In their operative motion for a preliminary injunction, which is all that is before us in this interlocutory appeal, the plaintiffs argued that injunctive relief was necessary "*to restore*" the Grant Program for the following reasons (emphasis added):

> Since the dismantling began in early February, Plaintiffs have scrambled to continue providing to their clients the citizenship and naturalization services their funding supported. Some have already had to shrink their services and lay off staff, and others are quickly approaching the point where they will be unable to continue paying their bills without reducing services or staffing. Immediate relief is necessary so that Plaintiffs preserve the ability to run their naturalization programs, have funding for the ongoing legal representation obligations they took on in reliance on Defendants' funding, and maintain the goodwill and reputations they have built over years as trusted service providers for lawful permanent residents looking to become U.S. citizens.

And in their memorandum in support of the motion, the plaintiffs explained further:

> From the initial funding freeze, Plaintiffs were unable to access reimbursements they were owed, which cause immediate cash-flow problems and forced various Plaintiffs to lay off staff members and cancel citizenship classes. . . . Plaintiffs will continue to suffer irreparable harm that the [Grant Program] dismantling has wrought on their naturalization programs, their ability to retain key staff, their reputations, and their future financial stability.

The district court conducted a hearing and then issued an order dated May 20, 2025, denying the plaintiffs' motion, followed by a memorandum opinion a few days later explaining its decision. First, the court concluded that the plaintiffs' claims were in essence contract claims against the United States for which the United States Court of Federal Claims has exclusive jurisdiction. To reach that conclusion, it applied the two-part test set

8

forth in *Megapulse*, 672 F.2d at 968 — which we adopted in *United States v. J&E Salvage Co.*, 55 F.3d 985, 988–89 (4th Cir. 1995) — to determine whether a claim was essentially contractual such that the Tucker Act, 28 U.S.C. §§ 1346(a) and 1491, would abrogate district court jurisdiction. Applying the first prong, the court concluded that the source of the plaintiffs' claims was each plaintiff's individual grant. The court noted that the plaintiffs had acknowledged that they had received grants; that they had claimed irreparable harm from the loss of those grants; and that they "challenged the Defendants' decision to terminate their respective grants." Moreover, the court observed that the plaintiffs had pointed to no statute or regulation that gave them the right to funding under their respective grants, emphasizing that their rights to the funds, if any, arose from their grant agreements.

And applying the second prong — which considers the type of relief sought — the court concluded that "[t]he amended complaint . . . makes clear that the relief sought by the Plaintiffs with regards to their APA, separation of powers and ultra vires claims is identical, monetary in nature and backward-looking," thus further indicating a lack of district court jurisdiction. While the court acknowledged that the plaintiffs sought only declaratory and injunctive relief, it concluded nonetheless that the relief sought would "require that the Defendants unfreeze the Grant funds and honor the Plaintiffs' requests for reimbursement of expenses incurred under the [Grant Program]." In short, the relief would constitute the disbursement of funding by the government pursuant to the parties' contractual agreements and "allow [the Plaintiffs] to continue to receive Grant funds from the Government."

Finally, to the extent that its Tucker Act analysis may not have encompassed the plaintiffs' "dismantling" claim, the district court concluded alternatively that the plaintiffs had not alleged reviewable agency action, as required by the APA. *See Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 64 (2004); 5 U.S.C. §§ 702, 704.

Because the district court concluded that the plaintiffs were not likely to succeed on the merits, it explained that it did not need to address the remaining factors that the plaintiffs were required to show for a preliminary injunction. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) (noting that to be afforded the extraordinary remedy of a preliminary injunction, the plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest").

This appeal followed, and we review the district court's order denying the preliminary injunction for abuse of discretion.

II

A preliminary injunction is extraordinary relief because it grants relief *before* trial, albeit on a temporary basis. *See Real Truth About Obama, Inc. v. Fed. Election Comm'n*, 575 F.3d 342, 345 (4th Cir. 2009), *vacated on other grounds*, 559 U.S. 1089 (2010), *remanded to*, 607 F.3d 355, 355 (4th Cir. 2010) (reinstating relevant part). Because a preliminary injunction is issued on a process that amounts to a substantial truncation of the trial process, "the party seeking [a] preliminary injunction must demonstrate by a *clear showing* that, among other things, it is likely to succeed on the merits at trial." *Id.*

10

(emphasis added) (cleaned up); *Winter*, 555 U.S. at 20, 22.  The plaintiffs contend that they have made such a showing.

They assert that, with respect to the freezing and termination of grants, the district court erred in concluding that it likely had no jurisdiction because the relief the plaintiffs sought was not money damages, but rather equitable relief to allow them "to carry out their grant programs going forward."  And they contend with respect to their dismantling claims that "DHS's discrete acts to eliminate [the Grant Program] are all 'agency actions,'" and therefore "are reviewable under the APA," contrary to what the district court concluded. *See* 5 U.S.C. §§ 702, 704.

The government contends that the plaintiffs' arguments must fail as they are based simply on the plaintiffs' "framing [the claims] as nonstatutory separation of powers and ultra vires claims" and by "reframing their [individual grant] claims as challenging the 'dismantling' of the [Grant Program]."  It argues that the district court properly read through the plaintiffs' reframing of the issues to conclude that it likely had no jurisdiction over the grant claims and that there was no agency action on the alleged "dismantling" claim.

To begin, we emphasize that we have before us only the denial of a motion for a preliminary injunction, not the claims that might more broadly be alleged in the complaint. Therefore, we must focus only on the relief sought in the motion for a preliminary injunction that the district court denied.

In their motion for a preliminary injunction, the plaintiffs stated, "Plaintiffs request that this Court grant preliminary relief to restore the [Grant Program] that Defendants

arbitrarily, capriciously, and unlawfully dismantled." And they explained that preliminary injunctive relief was "necessary so that Plaintiffs preserve the ability to run their naturalization programs, have funding for the ongoing legal representation obligations that they took on in reliance on Defendants' funding, and maintain the goodwill and reputations they have built over the years as trusted service providers for lawful permanent residents looking to become U.S. citizens." And in their proposed injunction order, they requested that the district court order that "Defendants shall not dismantle the [Grant Program] including by terminating grant awards . . . or by pausing, freezing, impeding, or blocking the disbursement of grant funds."

Thus, we address whether the plaintiffs' proposed preliminary injunction would provide relief that they were likely to obtain on the merits or, more precisely, whether the district court abused its discretion in concluding that the plaintiffs were not likely to succeed because of a lack of subject-matter jurisdiction.

The district court focused on two federal statutes that waive the sovereign immunity of the United States from suit. The APA provides that a "person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action . . . is entitled to judicial review thereof" in the district court if he seeks "relief other than money damages," 5 U.S.C. § 702, and has "no other adequate remedy in a court," *id.* § 704. The Tucker Act, on the other hand, provides exclusive jurisdiction in the Court of Federal Claims for "any claim against the United States founded . . . upon any express or implied contract with the United States" and that seeks money damages greater than $10,000. 28 U.S.C. § 1491(a)(1); *see also id.* § 1346(a)(2). The district court concluded that regardless

12

of how the plaintiffs characterized their claims, the claims — including their ultra vires and separation-of-powers claims — were essentially contractual claims seeking money damages based on previously issued grants and thus must go to the Court of Federal Claims. It also provided an alternative reason that even if there were APA claims, the plaintiffs had failed to identify a "final agency action" to dismantle the grant program. 5 U.S.C. § 704.

This case is materially similar to the Supreme Court's recent decisions in *Department of Education v. California*, 604 U.S. 650 (2025), and *National Institutes of Health v. Public Health Association*, 145 S. Ct. 2658 (2025), and therefore it is, we conclude, governed by those cases.

In *California*, the plaintiffs — grant recipients under various federal grant programs — sought and received preliminary relief in the district court enjoining the U.S. Department of Education from terminating their education-related grants. The district court there issued an injunction ordering the government to "pay out past-due grant obligations" and "continue paying obligations as they accrue," and it further enjoined the Department from initiating any future funding freeze. *California*, 609 U.S. at 650. After the court of appeals affirmed, the Supreme Court stayed the enforcement of the injunction, concluding that the government was "likely to succeed in showing [that] the District Court lacked jurisdiction to order the payment of money under the APA." *Id*. at 651. As the Court explained, the APA's "limited waiver" of sovereign immunity does not extend to claims seeking money damages or "orders 'to enforce a contractual obligation to pay

money' along the lines of what the District Court ordered here." *Id.* (quoting *Great-West Life & Annuity Ins. v. Knudson*, 534 U.S. 204, 212 (2002)).

The plaintiffs argue here that *California* is distinguishable. In their view, *Bowen v. Massachusetts*, 487 U.S. 879, 893–94 (1988), is more apt, and it articulated "[t]he controlling question under the Tucker Act [to be] whether a plaintiff seeks (or could receive) money damages" for past harms, as distinct from relief directing the future payment of money. In relying on *Bowen*, however, the plaintiffs overlook that the Supreme Court in *California* addressed its applicability and rejected it. As the *California* Court explained:

> [A] district court's jurisdiction "is not barred by the possibility" that an order setting aside an agency's action may result in the disbursement of funds. *Bowen v. Massachusetts*, 487 U.S. 879, 910 (1988). But, as we have recognized, the APA's limited waiver of immunity does not extend to orders "to enforce a contractual obligation to pay money" *along the lines of what the District Court ordered here.* *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204 (2002). Instead, the Tucker Act grants the Court of Federal Claims jurisdiction over suits based on "any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1).

604 U.S. at 651 (emphasis added). And the district court's order in *California* enjoined the government from terminating grants, required it to pay out past-due grant obligations, *and* required it to continue paying obligations as they accrue. That order is hardly different from the order sought by the plaintiffs in this case.

Here, the plaintiffs sought an injunction "to restore" the Grant Program to provide "funding" so as to "preserve the ability to run their naturalization programs" and to "have funding for ongoing legal representation obligations." The plaintiffs explained that they "were unable to access reimbursements they were owed," with a consequence of causing

14

them injury. And the specific injunction that they proposed to the district court would prohibit defendants from "dismantl[ing]" the Grant Program "including by terminating grant awards . . . or by pausing, freezing, impeding, or blocking the disbursement of grant funds." As observed in *California*, these claims for relief are grounded only on alleged contractual obligations to fund their grants and therefore are committed to the Court of Federal Claims to resolve. Without that contractual basis, the plaintiffs could claim no relief.

Moreover, were there any question over whether *California* controls here, such doubt would be put to bed by the Supreme Court's similar decision handed down just five months later in *NIH*.

As in *California* — and indeed in this case — the plaintiffs in *NIH* were grantees whose grants were terminated. The district court enjoined the government's termination of various research-related grants, 145 S. Ct. at 2659, and in its order, the district court "'vacated' the grant terminations and ordered the government to pay plaintiffs sums due under the agreements 'forthwith.'" *Id*. at 2661 (Barrett, J., concurring). The district court also declared internal agency "guidance" documents unlawful, treating the termination of grants and the declaration of guidance documents "as distinct agency actions." *Id*. The Supreme Court stayed enforcement of the injunction vacating the grant terminations. Relying on *California*, it held:

> The application [for a stay] is granted as to the District Court's judgments vacating the Government's termination of various research-related grants. The Administrative Procedure Act's "limited waiver of [sovereign] immunity" does not provide the District Court with jurisdiction to adjudicate

15

> *claims "based on" the research-related grants or to order relief designed to enforce any "'obligation to pay money'" pursuant to those grants.*

145 S. Ct. at 2659 (emphasis added) (quoting *California*, 604 U.S. at 651); *id*. at 2661 (Barrett, J., concurring); *see also id*. at 2663 (Gorsuch, J., concurring in part and dissenting in part) (explaining that in *California*, "this Court granted a stay because it found the government likely to prevail in showing that the district court lacked jurisdiction to order the government to pay grant obligations").

The government conduct at issue in both *California* and *NIH* is substantially the same as the conduct complained about in this case. As the district court pointed out, only the verbiage and characterizations differed. Because *California* and *NIH* "inform how a court should exercise its equitable discretion in like cases," *Trump v. Boyle*, 145 S. Ct. 2653, 2654 (2025), we conclude in this factually analogous case that the district court did not abuse its discretion in denying materially similar relief. *The plaintiffs' motion for preliminary injunction sought at its core an order "to restore" the Grant Program so that the plaintiffs could have "funding" for their work.* And the injunction order that they proposed would prohibit the defendants from "dismantl[ing]" the Program and "pausing, freezing, impeding, or blocking the disbursement of grant funds." These requests are hardly distinct from those made in *California* and *NIH*, on which the Supreme Court concluded that the plaintiffs were unlikely to succeed with respect to jurisdiction.

To the extent that plaintiffs' ultra vires and separations-of-powers claims may not be divested by the Tucker Act, the district court's analysis nonetheless shows that the

plaintiffs were not likely to succeed on them, as the plaintiffs had pointed to no statute or other law that would support the claims. The district court explained:

> While the Plaintiffs do allege in the amended complaint that the Defendants violated separation of powers by "dismantling" the [Grant Program], because the Defendants have refused to spend money appropriated by Congress for that program, they point to no language in the relevant appropriations legislation to support this claim. The Plaintiffs also argue that the "dismantling" of the [Grant Program] is ultra vires, because no statute, constitutional provision or source of law authorizes the Defendants to withhold the funds appropriated for the [Grant Program]. But again, they point to no language in the relevant appropriations legislation, or any other law, to support this claim. Given this, the Plaintiffs have also not shown that their separation of powers and ultra vires claims provide an independent basis for the Court to exercise jurisdiction in this case.

(Record citations omitted). We conclude that this analysis provided an additional sound basis for rejecting the plaintiffs' assertion that they were likely to succeed on their ultra vires and separation-of-powers claims.

Accordingly, for the reasons given, we affirm the district court's order dated May 20, 2025, denying the plaintiffs' motion for a preliminary injunction.

AFFIRMED

TOBY HEYTENS, Circuit Judge, dissenting:

I would vacate the district court's order and remand for further proceedings. I agree that the Supreme Court's intervening order in *National Institutes of Health v. American Public Health Association*, 145 S. Ct. 2658 (2025), precludes much of what plaintiffs asked the district court to do. But I also think that some of what plaintiffs sought in their preliminary injunction motion is at least arguably permissible under *NIH*, and I would have the district court take the first cut at the required analysis.

The district court concluded that plaintiffs' requests to "[v]acate and set aside" "the January 28, 2025 Noem Memorandum" and "the February 4 Freeze Letter" were "identical" to their request to restore their grants and funding access because both "would require that the Defendants unfreeze the Grant funds and honor the Plaintiffs' requests for reimbursement of expenses incurred under the" grant program.[*] JA 746. But "the[se] claims are legally distinct." *NIH*, 145 S. Ct. at 2661 (Barrett, J., concurring). And in the time since the district court issued its decision, the controlling *NIH* opinion has clarified that district courts *do* have jurisdiction to consider requests for "vacatur of internal guidance"—even when that "guidance discusses internal policies related to grants." *Id.*

I also think the district court committed legal error in concluding that plaintiffs were unlikely to win their separation of powers and ultra vires claims. Unlike the district court,

---

[*] This aspect of the district court's decision is what differentiates this case from our recent decision in *The Sustainability Institute v. Trump*, No. 25-1575, 2026 WL 157120 (4th Cir. Jan. 21, 2026). In that case, the district court did not address—and this Court "express[ed] no opinion on"—whether it could exercise jurisdiction over "Executive Orders and various [agency] directives." *Id.* at *8 n.8.

18

I do not think plaintiffs "point to *no* language in the relevant appropriations legislation, or any other law, to support th[ese] claim[s]." JA 746 (emphasis added). Rather, as plaintiffs note, Congress directed that funding "for the Citizenship and Integration Grant Program" would "*remain available*" during the relevant periods. Pub. L. No. 118-47, 138 Stat. 460, 612 (2024) (emphasis added); Pub. L. No. 117-328, 136 Stat. 4459, 4745 (2022) (same). Non-profit organizations were eligible to receive grants under that program. See JA 63, 178. And yet, the Noem memorandum told the Department of Homeland Security to "freeze" "*all* Department grant disbursements" that "touch[ed] in any way on immigration" and "for which non-profit organizations [were] eligible." JA 229 (emphasis added). The U.S. Citizenship and Immigration Services then implemented the Noem memorandum's directive by telling grant recipients that their promised "payments [were] not available at this time." JA 230. In my view, plaintiffs have a colorable argument that these discrete agency directives contradicted a statutory and constitutional mandate to make the appropriated funds available to *someone*.

Finally, the district court failed to analyze whether the Noem memorandum, the USCIS freeze letter, or the grant termination letters were *individually* reviewable agency actions, focusing instead on plaintiffs' challenge to "the wholesale shuttering of the" grant program. JA 748 (quotation marks removed). As with the guidance challenged in *NIH*, it is perhaps "not obvious" these specific acts are reviewable under the APA. *NIH*, 145 S. Ct. at 2662. But plaintiffs' challenge to discrete agency directives (their "dismantling" claim) is far from an impermissibly "broad programmatic" challenge. JA 748 (quotation marks removed); see JA 747 ("Plaintiffs have also not shown a likelihood of success on their APA

19

claims based upon the 'dismantling' of the [grant program], *because they do not identify a discrete agency action upon which to base these claims*." (emphasis added)). I would thus instruct the district court to analyze in the first instance whether the Noem memorandum, the USCIS freeze letter, and the grant termination letters constitute one or more "final determination[s]" that the Department had no "obligation[]" to spend the funds Congress appropriated to the grant program. *National Veterans Legal Servs. Prog. v. United States Dep't of Def.*, 990 F.3d 834, 839 (4th Cir. 2021) (alterations and quotation marks removed).